1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   CHERYL ADAMS, State Bar #164194
    Chief Trial Deputy
3   BLAKE P. LOEBS, State Bar #145790
    Chief of Civil Rights Litigation
4   PETER J. KEITH, State Bar #206482
    Deputy City Attorney
5   1390 Market Street, 6th Floor
    San Francisco, California 94102-5408
6   Telephone:     (415) 554-3868 – Loebs
    Telephone:     (415) 554-3908 - Keith
7   Facsimile:     (415) 554-3837
    E-Mail:        blake.loebs@sfgov.org
8   E-Mail:        peter.keith@sfgov.org

9
    Attorneys for Defendant
10  CITY AND COUNTY OF SAN FRANCISCO
    HEATHER FONG, in her official capacity,
11  JOHN KEESOR, MICHELLE ALVIS and
    PAUL MORGADO
12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15  KATHLEEN ESPINOSA, as a personal          Case No. C06-04686 JSW
    representative of the Estate of decedent ASA
16  SULLIVAN; A.S., by and through his         **DEFENDANTS' MOTION IN LIMINE NO. 2 –
    Guardian ad Litem, NICOLE GUERRA,          TO EXCLUDE CERTAIN OPINIONS OF
17                                             PLAINTIFFS' POLICE PROCEDURES
        Plaintiffs,                            EXPERT LOU REITER AND RELATED
18                                             EVIDENCE;  DECLARATION OF BLAKE P.
        vs.                                    LOEBS IN SUPPORT, WITH EXHIBITS**
19
    CITY AND COUNTY OF SAN                     Hearing Date:      April 1, 2013
20  FRANCISCO, HEATHER FONG, in her           Time:              2:00 p.m.
    capacity as Chief of Police; JOHN KESSOR, Place:             Courtroom 11, 19th Floor
21  MICHELLE ALVIS and PAUL MORGADO,
    et al.,                                    Trial Date:        December 2, 2013
22
        Defendants.
23

24

25

26

27

28

I.    **MR. REITER SHOULD BE PROHIBITED FROM QUOTING, DESCRIBING OR SUMMARIZING ANY HEARSAY STATEMENTS FROM WITNESSES OR COMMENTING ON THEIR CREDIBILITY.**

In preparing his opinions in this case, Plaintiffs' police practices expert, Lou Reiter, reviewed the depositions of 15 witnesses, 22 interviews by San Francisco Police Department Homicide Inspectors ("Homicide interviews"), 16 interviews by the San Francisco Office of Citizen Complaints ("OCC interviews") and 11 interviews by members of San Francisco Police Departments Management Control Division ("MCD interviews"). (Loebs Decl. ¶2, Exhibit A, Reiter Report pp. 3-4.) Plaintiffs have informed Defendants that Plaintiffs intend to use Mr. Reiter as their vehicle to introduce to the jury isolated statements from the thousands of pages in interviews and deposition that Mr. Reiter believes to be important, similar to the way in which statements are presented in Mr. Reiter's report. (Loebs Decl. ¶3; Reiter Report.) Plaintiffs further informed Defendants that they intend to have Mr. Reiter not only repeat information that he gathered from various interviews and depositions, but to comment as to whether he thinks various witnesses' statements are consistent with others'.

1.    **Mr. Reiter Should Be Prohibited From Quoting Or Summarizing Any Witness Statements Or Deposition Testimony That Has Not Been Or Will Not Be Admitted As Evidence.**

Plaintiffs' proposed use of Mr. Reiter as a vehicle to present hearsay statements to the jury should be prohibited. Although an expert may rely on inadmissible hearsay in formulating their opinion, the party offering the opinion may not ask the expert about the inadmissible facts or data relied upon, without leave of court. FRE 703. Leave of court should only be granted if the probative value "substantially outweighs their prejudicial effect." FRE 703 (emphasis added.)

Here, any probative value of allowing Mr. Reiter to be used as a tool to admit any hearsay statement Plaintiffs wish is far outweighed by the prejudicial effect. Asking Mr. Reiter to repeat various statements from interviews or deposition testimony, without substantial good cause, violates the very reason for the exclusion of hearsay, because it denies the Defendants the ability to cross-examine those witnesses about those statements or allow those witnesses to explain the context of their remarks. Also, if Mr. Reiter is allowed to testify in this manner, then he would be subject to similar cross examination in which Defendants would simply use Mr. Reiter as their vehicle to read all of those statements in the vast files of this case that are helpful to Defendants, which would be repeated

1    with Defendants' police procedures expert does the same, wasting considerable time and confusing the

2    jury.  If this were an appropriate way to use an expert then that expert would be the only witness either

3    side would need − because all other testimony could come in through them.

4         Defendants request that to address this issue, both parties should be required to examine expert

5    witnesses by the use of hypothetical questions, rather than by inviting the expert to guess what

6    evidence has or will be admitted into the case when responding to a question about the basis for his or

7    her opinions.

8         **2.    Mr. Reiter Should Be Prohibited From Commenting On The Credibility Of
             Any Witnesses Or Offering His Opinion As To Whether Various
9            Witnesses' Testimony Is Consistent.**

10        Expert opinion regarding credibility should be excluded because it usurps the role of the jury.

11   *See First United Financial Corp. v. U.S. Fidelity & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996).  In

12   addition, as a police practices expert with no "specialized knowledge" in divining inconsistencies in

13   testimony, Mr. Reiter's opinion about credibility of witnesses or inconsistency in testimony is beyond

14   the scope of his expertise.  FRE 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S.

15   579, 591 (1993).  It is the jury's job to detect and resolve inconsistencies in witnesses' testimony, not

16   an expert's.

17        **3.    Mr. Reiter Should Be Prohibited From Discussing The Contents Of The
             Homicide Interviews With The Two Parkmerced Security Guards.**

18        Officer Morgado has testified that one of the security guards for Parkmerced informed him that

19   2 Garces was supposed to be vacant, *before* Officer Morgado entered the apartment.  Unless prohibited

20   from doing so by this Court, Plaintiffs intend to try to impeach Officer Morgado's testimony by having

21   Mr. Reiter repeat and/or summarize his understanding of the Homicide interviews of the two

22   Parkmerced security guards (Roberto Castillo and Manuel Chavez), neither of whom was deposed or

23   will be testifying at trial.  (Loebs Decl. ¶4.)  Plaintiffs' attempt to use these statements for

24   impeachment is particularly troubling because the security guards were never asked whether they told

25   Officer Morgado that the unit was vacant – but it is nevertheless Mr. Reiter's opinion that their failure

26   to volunteer that they told Officer Morgado that they believed that the unit was vacant impeaches

27

28

1  Officer Morgado's testimony.  (Reiter Report ¶31.)  Because Plaintiffs are offering the out-of-court

2  statements of the security guards for their truth, they are inadmissible hearsay.  FRE 801, 802.

3      Plaintiffs should be prohibited from getting in through Mr. Reiter what they cannot otherwise

4  have admitted.  Because these statements would be used to impeach Officer Morgado on a critical fact

5  without allowing Defendants an opportunity to cross-examine the security guards, the unfair prejudice

6  to Defendants would be enormous if Mr. Reiter were allowed to repeat this inadmissible hearsay.  The

7  prejudice is further compounded by the fact that this hearsay concerns a question that the guards were

8  not asked.  Thus, Plaintiffs cannot demonstrate that the probative value would "substantially outweigh

9  their prejudicial effect," as they required to do under FRE 703 before Mr. Reiter could repeat these

10  hearsay statements.

11

12  **II.    MR. REITER SHOULD BE PROHIBITED FROM OFFERING HIS OPINION AS TO
         WHETHER THE ENTRY AND/OR SEARCH WAS LEGAL.**

13      Mr. Reiter states in his report that, in his opinion, Officer Morgado's entry into the residence

14  was illegal.  (Reiter Report ¶¶22-35.)  Mr. Reiter should be prohibited from giving this opinion, or any

15  other opinion regarding the legality of any of the officers' actions.  Legal conclusions on an ultimate

16  issue of law by experts are inadmissible because they invade the exclusive domain of the judge and the

17  jury. *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997)  ("the judge's expert

18  knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial"); *Specht

19  v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc) (reversible error to allow expert in section

20  1983 case to testify about whether a search was lawful). *See also Burkhart v. Washington Metro. Area

21  Transit Auth.,* 112 F.3d 1207, 1212-14 (D.C. Cir. 1997) (reversible error to allow an expert in police

22  practices to opine on whether police officers' efforts in communicating with a deaf Plaintiffs were

23  enough to satisfy federal disability statutes).

24

25

26

27

28

**III.    MR. REITER AND PLAINTIFFS SHOULD BE PRECLUDED FROM PRESENTING ANY EVIDENCE OR ARGUMENT THAT THE SFPD OR OFFICER MORGADO FAILED TO PROPERLY INVESTIGATE THE DRUG RELATED BEHAVIOR AT 2 GARCES.**

Plaintiffs intend to offer the opinion of Mr. Reiter that, because the SFPD had sufficient information that there was drug-related behavior at 2 Garces, the SFPD should have engaged in a sophisticated drug bust operation, consisting of sustained surveillance and a buy-bust operation rather than sending Office Morgado to the premise for a well-being check.  (Reiter Report ¶¶10-21.)

Such testimony and /or argument should be excluded because it is irrelevant to the issues in the case and confusing to the jury.  This Court granted Defendants' summary judgment motion as to Plaintiffs' claims that the City (or SFPD) in any way contributed to Plaintiffs damages.[1] Therefore, any evidence that the SFPD – or some non-defendant officers – failed to engage in the type of anti-crime operation that Mr. Reiter thought was appropriate is irrelevant to any of the issues before the jury and should be excluded pursuant to FRE 401, 402 and 403.

To the extent Plaintiffs are arguing that Mr. Reiter can opine that Officer Morgado's individual response (as opposed to the SFPD's corporate response) was inappropriate because he had information that this call was drug-related, Mr. Reiter's opinion should also be excluded because that claim was eliminated on summary judgment.  Defendants moved for summary judgment regarding Plaintiff's claim for any "negligent tactical decision proceeding the use of force." (Loebs Decl. ¶5, Exh. B; Dkt. No. 175, Order on Summary Judgment "SJ Order" p. 13.)  In granting Defendants' motion, the Court stated, "Plaintiff's concur, but clarify that they can bring a negligence claim based on their use of deadly force." (SJ Order p. 13.)  On that basis, the Court granted Defendants' motion "to the extent Plaintiffs' claim is premised on the Defendant Officers' pre-shooting tactics." (SJ Order p. 13.)  In any case, Mr. Reiter never opined in his report concerning Officer Morgado's individual response in this regard, just SFPD's corporate response.  The 10 paragraphs that Mr. Reiter devotes to his opinion on this topic speaks to response by the SFPD as a whole, with frequent reference to information unavailable to Officer Morgado.  (Reiter Report ¶¶11-21.)

---

[1] Following the Court's orders on summary judgment dismissing Plaintiffs' *Monell* claims and negligence claims against the City, the only remaining claim against the City is for vicarious liability for the Defendant Officers' actions.  (SJ Order at 10-11, 15.)

IV.   **MR. REITER SHOULD BE PRECLUDED FROM OFFERING ANY OPINIONS REGARDING ANY ALLEGED TACTICAL PRE-SHOOTING ERRORS SUCH AS WHETHER THE OFFICER RESPONDED APPROPRIATELY TO A PERSON OF DIMINISHED CAPACITY AND/OR WHETHER THEY SHOULD HAVE RETREATED.**

In his report, Mr. Reiter offers numerous opinions about the officers' inappropriate "tactical response to a person of diminished capacity" and failure to use "diffusing tactics" such as retreating from the attic. (Reiter Report ¶¶36-53.)

As a matter of law, however, bad tactics cannot amount to a constitutional violation. *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002) (holding that Plaintiffs cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided").   Moreover, an expert's opinion that "an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless" does not create a triable issue of fact as to whether the force used was reasonable. *Id.* at 1189.  In addition, under state law Defendants are immune from liability for their tactical decisions preceding a use of force. *Munoz v. City of Union City,* 120 Cal. App. 4th, 1077, 1079 (2004).  And, Plaintiffs' claim for pre-shooting negligence has been dismissed. (SJ Order at 13.

Moreover, Mr. Reiter's suggestion that the officers had a duty to retreat is also contrary to the law.  *Porter v. City of Muncie*, No. IP 98–1491–C H/G., 2000 WL 682660, at *10 (S.D. Ind. Feb. 16, 2000) ("The Fourth Amendment does not require a police officer to retreat when a subject threatens the officer or others with violence." (citing *Plankas v. Drinksi,* 19 F.3d 1143, 1148 n.5 (7th Cir. 1994), which was citing *Reed v. Hoy*, 909 F.2d 324, 330-31 (9th Cir. 1989)); *Roy v. City of Lewiston*, 42 F.3d 691, 694-96 (1st Cir. 1994) (affirming summary judgment in police shooting case even though plaintiff's expert testified that police could easily have retreated).  Police officers are not required to use other less intrusive alternatives before using deadly force, particularly where officers are reacting to exigencies of the moment. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see also* Cal. Penal Code § 835a (providing that a police officer need not retreat in the face of an uncooperative suspect). Particularly during a standoff, officers must be able to "quickly and effectively adjust tactics based on the evolving events on the scene." *Fisher v. City of San Jose*, 558 F.3d 1069, 1079 (9th Cir. 2009).

1   Because bad tactics and failure to retreat cannot amount to excessive force, and Plaintiffs'

2   claim for all pre-shooting negligence has been dismissed (SJ Order at 13), Mr. Reiter should not be

3   allowed to offer these opinions because they are irrelevant, unfairly prejudicial, confusing to the jury

4   and would waste time.  FRE 401, 402 and 403.

5

6   **V.     MR. REITER SHOULD BE PRECLUDED FROM OFFERING ANY OPINIONS
           REGARDING SFPD'S POST-SHOOTING INVESTIGATION AND/OR
7           PROCEDURES AND ALL RELATED EVIDENCE SHOULD BE EXCLUDED AS
           WELL.**

8           In his report, Mr. Reiter opines that the SFPD failed to conduct a proper investigation into the

9   subject shooting, namely because the sergeant in charge of the scene allowed Officer Alvis and Officer

10  Keesor to drive to the station together and that the SFPD did not administer a drug test following the

11  shooting.  (Reiter Report ¶¶54-59.)

12          Mr. Reiter's allegations were the basis for Plaintiff's *Monell* claim against the City, which was

13  dismissed.  (SJ Order p. 11.)  The Court also dismissed all other claims against the City, except for

14  respondeat superior liability under state law.  (SJ Order p. 13.)  Therefore, all evidence or opinions

15  relating to the SFPD post-shooting investigation should be excluded as irrelevant, confusing to the

16  jury, unfairly prejudicial and unduly consumptive of time.  FRE 401, 402 and 403.

17

18  Dated:  March 4, 2013

19                                        DENNIS J. HERRERA
                                          City Attorney
20                                        CHERYL ADAMS
                                          Chief Trial Deputy
21                                        BLAKE P. LOEBS
                                          Chief of Civil Rights Litigation
22                                        PETER J. KEITH
                                          Deputy City Attorney
23

24                                        By:/s/ Blake P. Loebs
                                             BLAKE P. LOEBS
25
                                          Attorneys for Defendants
26                                        CITY AND COUNTY OF SAN FRANCISCO
                                          HEATHER FONG, in her official capacity,
27                                        JOHN KEESOR, MICHELLE ALVIS and
                                          PAUL MORGADO
28

## DECLARATION OF BLAKE P. LOEBS IN SUPPORT OF MOTION IN LIMINE NO. 2

I, Blake P. Loebs, declare as follows:

1. I am a Deputy City Attorney with the City and County of San Francisco. I have personal knowledge of the contents of this declaration, and, if called upon to testify, I could and would testify competently to the contents of this declaration.

2. Attached hereto as Exhibit A is a true and correct copy of Lou Reiter's Rule 26 report for this case.

3. While meeting and conferring, Plaintiffs have informed Defendants that Plaintiffs intend to use Mr. Reiter as their vehicle to introduce to the jury isolated statements from the thousands of pages in interviews and deposition that Mr. Reiter believes to be important, similar to the way in which statements are presented in Mr. Reiter's report. Plaintiffs further informed Defendants that they intend to have Mr. Reiter not only repeat information that he gathered from various interviews and depositions, but to comment as to whether he thinks various witnesses' statements are consistent with others.

4. Officer Morgado has testified that one of the security guards for Parkmerced informed him that 2 Garces was supposed to be vacant, *before* Officer Morgado entered the apartment. Unless prohibited from doing so by this Court, Defendants believe that Plaintiffs intend to try to impeach Officer Morgado's testimony by having Mr. Reiter repeat and/or summarize his understanding of the Homicide interviews of the two Parkmerced security guards (Roberto Castillo and Manuel Chavez), neither of whom was deposed or will be testifying at trial.

5. Attached hereto as Exhibit B, for the Court's convenience, is a true and correct copy of the Court's order on summary judgment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

Executed, March 4, 2013, at San Francisco, California.

*/s/ Blake P. Loebs*
BLAKE P. LOEBS

**Motion in Limine 2**
**EXHIBIT A**



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

**KATHLEEN ESPINOSA, et al.,**

    **Plaintiff,**

v.                                                                  **Case No. C 06 04686 JSW**

**CITY AND COUNTY OF SAN FRANCISCO, et al.,**

    **Defendants.**

_____/

## PRELIMINARY EXPERT REPORT OF LOU REITER

1.      My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2.      Since 1983 I have been providing law enforcement consultation in police training and management. I provide law enforcement training in the following areas:

- Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures
- Personnel practices.
- Supervisory techniques
- Crowd control procedures.

1

- Liability management.
- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization.  My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3.      Since 1983, I have been retained in over 1000 police related cases.  This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes  case analysis and development and expert witness testimony.  I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico,  to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

2

4.      I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the <u>Police Task Force Report</u> of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide <u>Law Enforcement Administrative Investigations</u>; the Second Edition in 1998, and the current Third Edition in 2006.

5.      My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6.      I have reviewed the following materials to date regarding this case:

- First Amended Complaint
- Court documents and litigation management information
- Interrogatories and responses
- Requests for Production and Admissions
- Defendants Response to Disclosures
- Letters between Plaintiff and Defense attorneys
- Depositions
  - Officer Michelle Alvis (2)
  - Officer Paulo Morgado
  - Nicole Guerra
  - Kathleen Espinosa
  - Jason Ramon Martin (2)

3

- •  Officer John Keesor
- •  Officer Eric Leung
- •  Gina Vignati
- •  Inspector Ronan Shouldice
- •  Collen Vignati
- •  Lisa Carella
- •  Margarita Wynn
- •  Sgt. Darren Choy
- •  Sgt. J. Morgan
- •  David Russell
- Homicide transcribed interviews
  - •  Officer Joe Chang
  - •  Officer Molly O'Leary
  - •  Sengh Sullivan
  - •  Officer Eric Leung
  - •  Officer John Keesor
  - •  Sgt. Darren Choy
  - •  Sgt. Fitz Wong
  - •  David Russell
  - •  Lisa Carella
  - •  Roberto Castillo
  - •  Manuel Chanez
  - •  Officer Alan Lamb
  - •  Collen Vignati
  - •  Officer Yukio Oshita
  - •  John Sarmiento
  - •  Officer Patrice Scanlan
  - •  Jarrett Schank
  - •  Margarita Wynn
  - •  Gina Vignati
  - •  Kristin Marcos
  - •  Jason Martin
  - •  Karina Mathisen
  - •  Officer Paulo Morgado
  - •  Officer Michelle Alvis
- MCD taped interviews (CD)
  - •  Joe Chang
  - •  J. Morgan
  - •  P. Morgado
  - •  D. Choy
  - •  T. McCray
  - •  J. Keesor (2)

4

- M. Alvis (2)
- Y. Oshita
- Sgt. F. Wong
- E. Leung
- Sengh Sullivan
- OCC taped interviews (CD)
  - Nissa Blackstone
  - Dehnyra Sullivan
  - Brian Hichlin
  - Officer P. Scanlan
  - Officer M. O'Leary
  - Officer A. Lamb
  - Jason Martin
  - Sgt. D. Choy
  - Officer M. Alvis
  - Officer P. Morgado
  - Officer Y. Oshita
  - Inspector R. Shouldice
  - Officer J. Keesor
  - Sgt. F. Wong
  - Collen Vignati
  - Officer E. Leung
- OCC investigations
  - 869-03 Blackstone
  - 39-05   Freeman
- Sullivan Officer Involved Shooting investigation
  - Police incident reports
  - Investigators' handwritten notes
  - Copies of crime scene photographs
  - Videotape of crime scene
  - Copies of autopsy photographs
  - CD of ballistics report and projectiles
  - Crime scene diagrams
  - Lab examinations of Visine Bottle and glass pipe
  - Lab examinations of latent prints
  - Medical Examiner's Register and reports
  - Apartment lease documents
  - Miscellaneous newspaper articles and internet search results
- Ancillary police documents
  - SFPD Incident Report regarding the arrest of David Russell at 2 Garces, 12/14/05, by Officer Joe Chang

- SFFD Incident Report regarding fire/explosion at Bryant Gudor house
- Asa Sullivan medical documents
- Prior police contacts of Asa Sullivan from SFPD, SF Sheriff's Department, San Mateo County Sheriff's Department and Daly City Police Department
- San Francisco Police Department policies, bulletins and training materials
  - General Order 2.02 (94) "Alcohol Use by Members"
  - General Order 2.03 (94) "Drug Use by Members"
  - MOU with SFPOA 2007-2011 regarding substance testing and specifics regarding samples in on-duty traffic accidents
  - General Order 8.01 "Critical Incident Evaluation and Notification"
  - General Order 8.02 "Hostage and Barricaded Suspect Incidents"
  - General Order 8.04 "Critical Incident Response Team"
  - General Order 5.01 "Use of Force"
  - General Order 5.02 "Use of Firearms"
  - SFPD Bulletin "Ramey Entering a Home to Make an Arrest," 11/01/06
  - California POST training domains
    - Chapter 4 "Mental Illness"
    - LD 20 "Use of Force"
    - Chapter 3 "Warrantless Searches and Seizures"

7.     These opinions are based upon the totality of my specialized knowledge in the field of police practices. This experience is derived from my personal police experience, knowledge and training.   This expertise has been developed during my 46 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant. This experience has provided me with extensive personal and specialized training, experience and knowledge of police operations and generally accepted police practices. The body of knowledge that I have reviewed over the years coupled with my personal and

professional experiences, my continued auditing of police agencies, my constant

training of police supervisors, managers and executives, my continuous interaction with

other police professionals, organizations and training personnel, all form the foundation

for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and

standards which modern, reasonably managed and administered police agencies

across the U.S. should follow and apply to its operations.  These generally accepted

practices have developed over time to encourage and assist police agencies to deliver

police services to communities serviced which are professional, reasonable, effective

and legal.  Many of these generally accepted practices have been developed from law

enforcement critical analysis of field incidents and examinations of incidents reported to

cause police liability, deficiencies and employee misconduct.  These generally accepted

practices have been a response to reported cases of police misconduct and liability and

a desire by law enforcement to create a system to ensure that police conduct remains

within acceptable legal and constitutional bounds.  I am familiar with this body of

knowledge and through my continuous training and audits assist law enforcement with

this requirement for reasonable and legal police response to field incidents and for

constant improvement.

My examination of the factors involved in this police practices incident embodies

the basic fundamentals which I employ in my professional examination of police

agencies during my audits and when working as a consultant with the U.S. Department

of Justice.  My opinions are provided with a reasonable degree of certainty within the

7

fields of law enforcement, police activity and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

8.      It is my understanding from my review of these materials that the following events culminated in this litigation: Prior to June 6, 2006, residents of the Park Merced apartment complex had made complaints to the complex management and the local station (Taraval) of the San Francisco Police Department regarding what they regarded as suspicious activities at the apartment at 2 Garces; they believed drug activity was taking place. On June 6, 2006, the Police Department was called by a resident of the apartment complex regarding an open door at 2 Garces. Officer Morgado responded. He requested the assistance of other officers. Plainclothes Officers Alvis and Keesor were the first to respond followed by numerous other officers and supervisors. Following their entry into the apartment, the officers encountered resident Jason Martin and secured him. They were alerted to another person, Asa Sullivan, who had crawled into the attic and secreted himself in a far corner. Three officers (Alvis, Keesor and

8

Morgado) went into the attic. After what the officers estimate was approximately 15 minutes of verbal contact, Officer Alvis and Keesor discharged their service weapons resulting in the death of Asa Sullivan.

9.      This preliminary expert report will address four (4) issues of police practices involved in this fatal shooting: (1) Reasonable police response to citizen call of suspicious activities, (2) entrance into the private residence, (3) tactical response to a person of diminished capacity, and (4) reasonable investigative procedures for officers involved in a fatal shooting.

**Reasonable response to citizen information regarding suspicious activity**

**10.      The San Francisco Police Department failed to use reasonable and generally acceptable police practices when they were informed of potential drug activity at 2 Garces. The information that the local police station received was sufficient to instigate pro-active investigative techniques and should have put the Police Department and local police station on notice. This notice would more likely than not have curtailed the subsequent response by field officers resulting in the fatal shooting of Asa Sullivan.**

11.      Citizen information regarding possible criminal activity is an essential element for local police enforcement efforts. This type of information can be a significant element in the local police department's ability to focus its efforts to corroborate the information and devise a reasonable and legal enforcement effort to the identified crime problem.

12.     An example of the generally accepted practices can be found in a leading text for law enforcement.[1]  "Once information is received and its source is evaluated, the verification phase begins.  Independent verification of information must be conducted separately from the source itself in order to ensure its accuracy.  Three investigative methods are usually considered for this task..."  This text identifies these investigative methods as surveillance, use of informants and other sources of vital information.

13.     When a local police department gets information from a citizen informant regarding possible drug activity at a location, the reasonable police practices would include various corroborative and investigative techniques.  Some of those techniques are: (1) conducting a data search to determine whether any 911 calls or police reports have been filed with that address; (2) consulting with the management agency for the apartment complex to determine whether they had any complaints and to identify the names on the lease; (3) conduct data searches on the known occupants from this information; (4) conduct drive-by surveillance to validate the information of groups coming and going; (5) if warranted, operate a controlled buy at the location; and (6) do a "knock and talk" operation where an officer simply walks up to the location, knocks, and conducts an informal exchange with the person answering the door.

14.     In this case none of these were used by the San Francisco Police Department, yet there were numerous information sources available.

---

[1] Practical Drug Enforcement, Michael Lyman, Elsevier, 1989, page 5

10

15.     On December 14, 2005, Officer Joe Chang (an officer who was also at the location when Asa Sullivan was fatally shot) made an arrest of David Russell at 2 Garces for an outstanding warrant.  His report indicated that he had learned of information that Russell was at the location.  He simply knocked at the door, Russell answered, and he was arrested without incident.

16.     Gina Vignati in her deposition testified that she was aware of the occupants of 2 Garces and knew that Jason Martin was in the apartment.  She also was aware of Asa Sullivan.  She testified that she was aware that drugs were involved in that apartment, but this drug activity did not involve either Jason or Asa.  On the day before the fatal shooting, Gina reported that Jason Martin verbally harassed her (21).  She reported this to the local station to an Officer L. Briggs who filed it as a "suspicious occurrence."  She was told by "Dixon" to call the police if she saw Martin and the police could enter the apartment if the door was open (47).  In her deposition, she said that Officer Briggs, "She told me that the next time the door was opened to call them right away because they could enter on a well check but that they couldn't enter if the door was shut.  If the door was shut, they would not be able to enter forcefully.  You know, they'd have to wait for someone to enter the door.  So if the door is opened, call us right away.  We'll be right out there and we'll see what's going on." (57)   She said the door was open 90 percent of the time, but she was never concerned that someone inside needed help (58).  She acknowledged that the reason she called was so the police would come out to figure what was going on with the drug activity (59).

17.     Lisa Carella, in her homicide statement, stated that she frequently

11

complained about 2 Garces being a "drug house." She reported this to the apartment complex during January and February. They didn't call her back so she set up an appointment with the manager, Ms. Wynn (14). She made a specific complaint to her in February, but Ms. Wynn never called her back (15). She also called regarding the apartment door being open (5).

18.     Collen Vignati stated that the problems at 2 Garces continued to "persist." (6-8)  Ms. Vignati stated that the police responded to the incident with Gina, but the door was closed and no one answered. Gina was told to go to the station to file a report. Officer Briggs told Gina that the next time she observed the door open to call the police so they could enter (9). On the night of the fatal shooting she called, said the door was open and there may be squatters inside (10). She acknowledged that she saw the door "closed but not latched." (13)   She said that she talked to Officer Morgado when he arrived and he said he knew it was a "drug house." (13)

19.     Margarita Wynn, the apartment complex manager, stated that she received calls in February regarding "suspicious activity" at 2 Garces (9).

20.     Kristin Marcos stated that she observed men coming and going with duffle bags and suitcases (6). One time she confronted an older man at the apartment and she said she smelled "crystal meth" smoke (8). When she called the local police station to inquire about what they were doing regarding Gina's complaint, she was told that an officer came out and the door was closed so there was nothing he could do (9). She approached Officer Morgado when he first arrived and told him that the location was a drug house; he said he was aware of that (10).

12

21.    "What if the police manufacture an exigency?  If they do so by unlawful conduct the fruits doctrine would seem to control.  If the subjective intent of the officers is relevant to this Fourth Amendment analysis, then the same result would be mandated even if the conduct was legal.  Because exigency is a warrant exception based on the inability to obtain a warrant, it would seem that intentionally creating a situation in which it is impossible to obtain one should not be allowed."[2]

### Entrance into the private residence

22.    **The San Francisco Police officers, in my opinion, did not have probable cause nor any form of exigency to enter 2 Garces on June 6, 2006.  Any reasonable officer would have known that the initial entry of the private apartment was Unconstitutional and not consistent with generally accepted police practices.  It was Officer Morgado's initial illegal entry into 2 Garces apartment that set into motion the subsequent series of events culminating in the unreasonable fatal shooting of Asa Sullivan.**

23.    Law enforcement officers from their first days in the basic police academies are taught the provisions of the Fourth Amendment, specifically the absolutes regarding entering a private dwelling.  This provision is documented in numerous police references, including those of the San Francisco Police Department.

24.    The San Francisco Police Department training compotes with the

---

[2] <u>Warrantless Search Law Deskbook</u>, 2003 Edition, Paul Joseph, Thomson/West, 342-343

Learning Domains of the California Commission on Peace Officer Standards and Training (POST). Chapter 3 covers warrantless searches and seizures. "Although warrantless searches and seizures are presumptively illegal, when certain conditions are met, officers may lawfully search and seize evidence without a search warrant. For evidence to be admissible at trial, officer must have a clear understanding of the legal requirements for those conditions." [3]  Under the section on Exigent Circumstances it lists "Under exigent circumstances, the primary purpose of the officer's entry is to attend to the emergency situation."

    25.    Chief of Police Fong issued a Department Bulletin on November 1, 2006, regarding provisions for entering a private residence.[4]  "California courts and the United States Supreme Court have consistently held that officer <u>may not</u> enter a home to make a warrantless arrest of an occupant simply because they have probable cause to arrest. Officers must also have a legal right to enter an area when there is a reasonable expectation of privacy; e.g. an arrest warrant, consent or exigent circumstances... *Ramey* is focused on the physical intrusion into the home, where there is the greatest expectation of privacy, and one of the highest levels of judicial scrutiny."

    26.    **"Search of the premises** Except under conditions when you pursue someone into a house or apartment or other private place, or when contraband or other evidence is in plain sight while you are lawfully inside the place, or when you can show

---

[3] "LD 16: Chapter 3 – Warrantless Searches and Seizures," POST

[4] "Ramey-Entering a Home to Make an Arrest"

14

that you did not have time to get a warrant prior to the search because the delay would

result in destruction of the evidence, your best option is to seek permission for the

search from a person who has a legal right to give consent to search the place or

person you wish to search."[5]

27.     The original CAD entry starting this police operation lists "RP:

LISA...FRONT DOOR TO APT IS SWINGING OPEN. RP SAYS THAT SHE WAS

TOLD TO CALL POLICE WHEN DOOR IS OPEN. THIS IS A POSS DRUG HOUSE.

NOTHING ELSE IS SEEN. NFI"

28.     The actual transcript of the initial call is more descriptive of the intent of

the caller. "I live in Park Merced and was coming out, and the door is kind of swinging

open in Park Merced at 2 Garces...And I know like a neighbor was in there in Taraval

Station yesterday, filing a complaint with 2 Garces. And they said whenever the door is

open to let you guys know. So the neighbor called to tell me, you know, whenever you

see — because sometimes the door is just like open, you know? It's a drug, it's a, it's,

um, it's a drug house...And Taraval Station said whenever you see like the door open or

if it's opening to call us. Because you can't enter the apartment without, um, unless the

door is open. Because they were out there yesterday."

29.     As outlined in paragraphs 18 and 20, both Kristin Marcos and Collen

Vignati indicated that they contacted Officer Morgado shortly after he arrived and told

him that 2 Garces was a drug house. Both persons indicated that he acknowledged

---

[5] Police Field Operations, Second Edition, Thomas Adams, Prentice Hall, 1990,
348-349

that he was aware of that.

30.     Officer Morgado, in his homicide statement, acknowledged that he read the CAD description of the call and that the address was suspected of being a drug house.  He stated that he pushed at the door and "it felt like something was holding against the door." (6)   He pushed on the door more. (7)

During his deposition Officer Morgado testified that he was aware that the person reporting the incident at 2 Garces had said that the door was open and that it was a "known drug house." (43)   He said he looked inside the windows and saw "several items, unknown items" inside (55).  He did not see the bloody shirt (55).  He was approached by a female who said she had called (58).  "She told me that it was a known drug house; and that the door was opening and closing.  And she also told me that she was instructed to, by another police officer, to call if there was any activity." (59)   The door to 2 Garces when he arrived "appeared closed." (60)   He does not recall making any attempt to get other information from this female (61-63).  He heard no sounds from the apartment and he testified that he "checked the door," "I pushed up against it...it opened slightly...It opened and then it closed." (67-68)   "It opened enough to see slightly through the crack and then it closed." (69)   He did not see anything through the crack (69).  Officer Morgado testified, "I felt something was pushed up against the back side of the door holding the door secure or trying to secure the door." (69)   Officer Morgado testified that the apartment security officer checked with his dispatch who told him that "there was nobody on the lease; and that the prior person had moved out." (76)   With the security guard by him he pushed on the door more and

16

"The object that was behind it fell down and the door swung opened." (81)

31.     The ParkMerced apartment security guards who responded to Officer Morgado's call were Roberto Castillo and Manuel Chanez.  Neither one stated during their homicide interviews that Officer Morgado asked them regarding the status of 2 Garces.  They both indicated that the only request was whether they had keys for the location.

32.     The lease documentation and the statements of the apartment manager, Margarita Wynn, support that the apartment had been on a long term lease that had reverted to a month to month with a 3 day notice for vacating due on the Monday following this fatal shooting.  David Russell, who was arrested at the location 6 months prior stated that he had left 15 minutes before the arrival of the police on the night of the fatal shooting (12).  Jarrett Schank, who was one of the leasees, stated that he let Jason Martin stay at the apartment to do some painting (5).  Schank also allowed Russell to stay there (10).  Schank stated that he was supposed to be out of the apartment on Monday (8).

33.     The first officers to arrive in response to Officer Morgado's call for additional units were plainclothes Officers Keesor and Alvis.  Both officers were aware that Officer Morgado had reported that he had seen a "bloody T shirt" inside the apartment.  Officer Keesor was asked by Morgado to clear the house (6).  When he entered "it appeared like it was being renovated..." (7)  Officer Alvis testified during her first deposition that she was not told how the door was opened by Officer Morgado (123).  She testified that Officer Morgado was involved with another male at the site and

17

told her "that the house hadn't been checked out yet.  Whether he said I need you to

check it out or, not is not something I recall." (125)

34.     It is obvious from the version of events of the officers that the door was

not open when they arrived.  Officer Morgado made little effort to determine what was

occurring other that ask the apartment security whether they had keys for the

residence.  Officer Morgado's version that he was told there were no legitimate tenants

is refuted by the security guards, the apartment manager, and the lease documentation.

Officer Morgado's own version of events indicates that the door was closed and in

some manner secured.  He made no attempt to announce his presence and contact the

persons inside.  He heard nothing from inside.  Even after he opened the door and

observed the T shirt, he exhibited no haste to determine whether there was anyone in

harm's way.  He allowed himself to become engaged with a male who appeared on the

scene rather than focus on any immediate needs within the apartment.  He knew of no

criminal activity at the location.  He was given no information that would have indicated

that there was contraband at the location.

35.     Any reasonable officer would know based upon the version of events that

evening that entry into 2 Garces was illegal and not consistent with generally accepted

police practices and the specific training received by San Francisco police officers.


**Tactical response to a person of diminished capacity and use of deadly force**

36.     The San Francisco officers participating in the confrontation with

18

**Asa Sullivan, who by the officers' own versions exhibited symptoms of a person of diminished capacity, made conscious choices and omissions known to exacerbate these types of common police encounters. Their egregious departures were unwarranted from these known diffusing tactics, in my opinion, and escalated this incident resulting the objectively unreasonable fatal shooting of Asa Sullivan.**

37.     Every police agency, particularly those in urban areas, can expect that its officers will encounter emotionally disturbed persons.  This is a term used by law enforcement to identify persons who are exhibiting unusual, strange, bizarre or erratic behaviors.  Some of these types of individuals have ingested drugs or large quantities of alcohol, have mental illness, or are suicidal.  The number of these types of persons has increased during the past 40 some years with their presence in urban areas now being considered commonplace.  This trend has increased with the elimination of governmental facilities for these types of persons since the administration of President Kennedy.  These persons of diminished capacity present law enforcement officers with special needs.  Field officers are presented with multiple choice options.  Making the wrong choice frequently results in unreasonable uses of force and exacerbates the situation resulting in unnecessary harm to the person with this diminished capacity.

38.     I use in training on the subject of dealing with persons who may be emotionally disturbed and/or suicidal an acronym - CCCT.  This is a graphic model which embodies the leading law enforcement materials on this subject.  Some of these

19

sources are both books by Gerald Murphy published in 1986 <u>Special Care: Improving the Police Response to the Mentally Disabled</u> and in 1989 <u>Managing Persons with Mental Disabilities</u>, the International Association of Chiefs of Police Training Keys 273 <u>Suicide Intervention</u> and 274 <u>Mentally Ill</u>, and the initial authoritative police manuals by Rowland and Matthews published between 1954 and 1975 <u>Police Manual: How to Recognize and Handle Abnormal People</u>. These concepts have been more recently codified in the 1997 Model Policy and Concept Paper "Dealing with the Mentally Ill," by the International Association of Chiefs of Police. These tactical police concepts are also outlined in the authoritative texts by Calibre Press including <u>Street Survival: Tactics for Armed Encounters</u>, 1981, and <u>The Tactical Edge</u>, 1986.

**Coordination.** The concept of devising a plan. Allocating available resources and ensuring that sufficient units and equipment are brought to the scene. Determining who will be doing what aspects of the operation. Developing a perimeter to ensure that outside persons don't become involved. Determining who will be the lead person. Ensuring that the officers at the scene conduct themselves in manner not to unnecessarily agitate or excite the subject.

**Containment.** Devising a plan which will contain the subject. This includes the ability to convince the subject that they do not need to move or continue flight. This oftentimes requires officers to ensure that they respect the comfort zone of the subject and not agitate or compress this comfort zone.

**Communication.** One person should be designated as the command voice. Verbal communication should be non-threatening. Open ended questions should be used which will facilitate the subject's participation. Various methods of communication should be used particularly if the subject does not respond. Sharp, authoritative commands should be avoided. Officers must constantly analyze what affect, if any, their efforts are having on the subject.

**Time.** History has shown that the longer the encounter is allowed to occur, the better the chance of a successful and safe resolution. This allows the subject to reflect on his or her predicament. It also allows for the deployment of additional police resources. It encourages the ability to communicate and create a relationship between the lead officer and the subject.

39. These same concepts are embodied in the training materials from the

San Francisco Police Department based upon the provisions of the California POST.[6]

| "Request backup | Situation can be unpredictable and escalate quickly |
|---|---|
| Calm the situation | Move slowly |
| | When possible, eliminate emergency lights and sirens |
| | Reduce environmental distractions such as radio or television noise |
| | Assume a quiet nonthreatening manner when approaching and conversing with the individual |
| | If possible, avoid physical contact if no violence or destructive acts have taken place |
| | If possible, explain intended actions before taking action |
| | Take time to assess the situation |
| | Provide reassurance that officers are there to help |
| | Give the person time to calm down |
| Communicate | Keep sentences short |
| | Determine if the person is taking medication |
| | Talk with the individual in an attempt to determine what is bothering that person |
| | Acknowledge the person's feelings |
| | Ask if the person if he or she is hearing voices and, if so, what they are saying |
| | Avoid topics that may agitate the person |
| | Guide the conversation toward subjects that will bring the individual back to reality |
| | Allow time for the person to consider questions and be prepared to repeat them |
| | Do not mock the person or belittle his or her behavior |

---

[6] "LD37: Chapter 4 – Mental Illness" 4-11and12

| | |
|---|---|
| Do not make threats | Do not threaten the individual with arrest... Threats may create additional fright, stress or potential aggression |
| Be truthful | If the individual becomes aware of deception, that person may: Withdraw from any contact in distrust Become hypersensitive, or Retaliate in anger." |

40.     Reasonable police officers are trained in the legal and operational aspects of use of force. Use of force training all must conform to the Supreme Court decisions and state law. This training has become national in scope. Model policies on use of force are promulgated by several national guidance bodies such as the International Association of Chiefs of Police. Police officers are provided with laws, models and subject control tactics to use. These are designed to be within the parameters of legal uses of force. They are also designed to protect not only the officer involved, but the subject upon whom force is used. Officers are restricted in the use of force to use only that force which is reasonable and necessary to overcome resistance, comply cooperation and effect an arrest (*Graham v. Conner*). The police training stemming from this case and generally accepted by police practitioners is that the force used by officers must be evaluated on the seriousness of the crime, the level of resistence of the subject, the continuing threat to officers and others, and whether the subject is capable of resisting arrest and fleeing.

41.     This use of force training is usually complemented by the use of some form of use of force/control/subject resistance matrix, continuum or graphic. These are

22

very similar in the basic content.  They identify levels of subject resistance and types of

officer reaction/response to this resistance.  The graphics are designed to demonstrate

visually to police officers, trainees and others viewing the document the reasonable

relationship between what a subject being arrested/restrained does and the officer's

response.  Common to these graphics are subject levels of resistance such as verbal,

passive, active, assaultive, aggressive and aggravated.  Common descriptors used for

officer response are presence, verbal, soft hand control, chemical agents, hard hand

control, transporters, intermediate, incapacitating and deadly force.

  42.  These concepts are similar to those embodied in the San Francisco

Police Departments training and written policies.  The training is from POST in "LD 20:

Use of Force."  The policies controlling use of force in the Department are General

Orders 5.01 "Use of Force" and 5.02 "Use of Firearms."

  43.  In the encounter involving Asa Sullivan there *are* very little differences in

the officers' versions of events, other than the final moment when Officers Alvis and

Keesor used deadly force resulting in his death.

  44.  This police encounter was not a split second incident or a rapidly evolving

police encounter.  From the CAD printout the timing can be determined.  The entire call

from the initial citizen call to the "shots fired" consumed 47:19 minutes.  Officer

Morgado first transmission requesting apartment security (although he more likely than

not was on the scene for a slightly longer period) to the "shots fired" consumed 35:03

minutes.  The time from the record "running on the roof" to "shots fired" consumed

23:24 minutes.  The time from the record "has guy now" to "shots fired" consumed

23

12:12 minutes.  Sergeants Wong and Choy were on the scene 7:03 minutes prior to the notation "shots fired."

45.   By the time Office Alvis had located Asa Sullivan in the attic crawl space the officers had dispelled any consideration that someone was bleeding severely and in need of immediate medical attention.  The officers had cleared the entire apartment. The best anyone could have considered any crime involved, even with the minimal preliminary investigation of the circumstances of the property, was trespassing.  This is a minor crime and any preliminary investigation would have even eliminated this possible crime.

46.   The statements and testimony of the officers indicated that Asa Sullivan would have fit the description of someone who in police terminology would be considered an emotionally disturbed, suicidal, person of diminished capacity.  Officer Alvis in her second deposition testified that Asa Sullivan appeared to be under the influence "of an amphetamine substance or a cocaine-based substance." (13)   "He was profusely sweating.  He was very agitated.  He was behaving illogically." (13)   Officer Keesor testified that he believed that Asa Sullivan was contemplating suicide by the terminology Mr. Sullivan was using (138-139).  Officer Keesor in his homicide statement indicated, "...he is acting really, real kinky.  So I'm trying to talk to him, um, just basically to calm him down." (14)   Officer Morgado stated in his Responses to Plaintiff's Special Interrogatories, Set One, "In addition to his comments, Mr. Sullivan's demeanor, behavior, movements and appearance all caused me to believe that Mr. Sullivan was hostile, aggressive, irrational, perhaps in a mentally altered state and that he was intent

24

on forcing us to use lethal force against him."

47.     The statements of officers, testimony during depositions, dispatch transcription, and CAD printout all indicate that the officers failed to follow the reasonable and generally accepted principles outlined in paragraphs 38 and 39 of this report. None of the sergeants who were on the scene took command of the encounter. No one attempted to diffuse the situation. Officer Leung stated, "We were talking. I mean, there's, there's a lot of talking. Everyone's talking, you know, to the suspect. The detainee (Jason Martin) is talking to the suspect." (39)   Officer O'Leary stated that he sounded disparate, "I'm not going back." Someone said he's going to "801 (suicide) by cop." (9)   Officer Oshita stated that Sullivan said "You're gonna have to kill me. You're gonna have to shoot me to get me out of here." (9)   Officer Oshita stated that he did a lot of talking with Sullivan (10) and he heard the commands "show hands" at least "20 or 25" times (14).

48.     There was no logical reason that the officers did not pull back from the attic. The location was a tactical disadvantage for the officers with limited headroom and secure footing. They knew that Asa Sullivan was contained.  They knew that other resources were available including the beanbag shotgun and a police dog.  Most officers had no idea what, if any, crime had been committed. The testimony of the officers certainly indicated that Sullivan was acting irrationally.  All three officers in the attic had their guns drawn and were presenting Asa Sullivan with authoritative commands repeatedly.  Their continued conduct exacerbated the confrontation, rather than any effort to diffuse the agitation.  Their presence in the manner they chose to

25

deploy it simply invaded the zone of safety for Sullivan. This is known to further agitate the subject in these types of police encounters. No one coordinated the efforts to enable the dispatch of negotiators which would have been consistent with San Francisco Police Department General Order 8.02 "Hostage and Barricaded Suspect Incidents."

49. Both Officers Alvis and Keesor fired shots at Asa Sullivan. Both emptied their service weapons' magazines. Asa Sullivan had 16 gunshot wounds when examined by the Medical Examiner. He had no weapon. The only object found was a dark eyeglass case under his arm.

50. Police officers are trained that the decision to use deadly force against a subject must be based on objective reasonable beliefs, not subjective ones. Would a reasonable officer in the same set of circumstances believe at the moment the trigger is pulled that there are objectively reasonable conditions warranting this extreme level of force. In this case considering the totality of the circumstances known to the officers, the decision to resort to the use of deadly force against a person of diminished capacity who was not involved in any serious crime was objectively unreasonable and contrary to generally accepted police practices, in my opinion.

51. From the preponderance of the officers' statements and testimony, Officer Alvis was the first officer to use deadly force in the attic. Officer Alvis in her homicide statement recounted, "There's a lot of wood in between us and I got the best view of his hands, but it's not a very good view because there's a bunch of stuffing." (16) "And he's moving his hands around under the insulation. You can't see what he's doing. He

26

moves it behind his back a little bit.  Still moving; still moving.  And he's right here.  I'm right here.  I hear a pop.  I know he's shooting.  I don't see the gun but I hear the pop and that's when I, I start shooting at him." (17)   "But I know when I was shooting at him, I see this flashing, flashing from where he is.  So I figure that must be the muzzle of his gun flashing if he shoots at me.  I don't, I don't know, you know, what exactly but I see the flashing." (17)   "I don't know for a fact but I think it (the popping) comes from him because it sounded like it came from him, you know?  Who else would be shooting at us?" (30)   "I couldn't see the gun itself but I did see the gun firing.  From where, where he was, I could see his gun firing.  I could see the flashes of his gun firing." (30)   "I was thinking he might have a gun or he might be trying to fake us out so we'd shoot him." (36)

Officer Alvis testified during her second deposition that there was an obstruction between her and Asa Sullivan, "There was a large metal pipe and there was a lot of rafters.  I wasn't in a great visual position." (37)   She could never see his right hand (41).  When she shot she did not see his hands (45).  "I observed him move his right arm suddenly and quickly behind his back and then forward and up...I didn't observe his hands or him pointing his hands at me." (47)   "When I saw Mr. Sullivan make that sudden movement with his right arm, that is when I decided to shoot and move away from him.  I did hear a gunshot but I cannot say if that was prior to shooting.  It was not the reason I decided to shoot." (55)   She did not know whether the gunshot she heard was from her own weapon (56).

52.     Officer Keesor's account is different.  In his homicide statement he said,

27

"...he goes forward and he's got something black in his hand...And somebody said, He's got something in his hand...This was something black. It was long. I'd swear to God it was a gun. And all of a sudden I hear a boom, a loud boom. And Michelle is gone. I can't see her. And I, I knew for a fact he shot her; she was down. And I shot." (17) "I saw white (unintelligible) his arms come up. And there was a black oblong thing right, right, right above his hands." (24)  He did not recall seeing any muzzle flash (26).

During his deposition, Officer Keesor testified that Sullivan could have had he black object in both hands (163). He heard a "pop" that he believed was a gunshot (163).

53.     Officer Morgado during his deposition testified, "When I saw, saw sudden movement of Mr. Sullivan and then gunshots rang out...I saw his shoulder move in a forward direction over his waist to the left, to his left...I only saw his left arm...I never saw his right arm." (182)   He acknowledged that he never saw his right arm outstretched in any direction (184).

### Post shooting investigative procedures

54.     **The San Francisco Police Department failed to ensure that the officers who fatally shot Asa Sullivan were dealt with in a manner to produce an impartial investigation of this death. The two most significant failures are the failure to conduct any chemical analysis for substances in the shooting officers and allowing both involved officers to remain together without supervision.**

55.     The public safety doctrine would allow a police agency to test employees

28

who are involved in a fatal incident to be tested for any substance abuse.  This has

become even more significant with the more frequent use of prescribed medication by

law enforcement personnel.  This authority would stem from cases such as *Von Raab*

and *Skinner*.[7]

56.     The San Francisco Police Department has two provisions for this area of

personnel management.  General Order 2.02 "Alcohol Use by Members" states that "If

ordered, a member shall submit to either blood, breath or urine analysis to determine

the presence of alcohol in his/her blood."  The current Memorandum of Understanding

between the City and its police officers requires that such a sample and analysis be

conducted anytime a member is involved while on-duty in a traffic accident resulting in a

fatality or injury sufficient to be taken to the hospital.  Certainly a fatal shooting of a

citizen would fall within these provisions and any interpretation of the public safety

policy provision.  This is common with other police agencies in fatal officer-involved

shootings.

57.     Neither Officer Alvis or Keesor had any such testing and analysis

conducted.  Neither were asked to participate in such testing.

58.     Following the fatal shooting of Asa Sullivan, Officers Alvis and Keesor

were not separated.   Officer Keesor acknowledged this in both his homicide interview

and his deposition. They were allowed to drive together back to the station before any

---

[7] *National Treasury Employees Union v. Von Raab*, 109 S. Ct. 1384 (1989), 103 L.Ed.2d 685 and *Skinner v. Railway Labor Executive Association*, 109 S. Ct. 1402 (1989), 489 U.S. 602, 103 L.Ed.2d 639

29

homicide investigators met with them.

59.     This not only violated reasonable and generally accepted police practices, but the provisions of the Police Department, as well.  In the dispatch transcription following this fatal shooting 3X300 communicates to I200, "Jeremiah, make sure we follow that new GO on getting the officers out of there and separated, kept at the station, so that we can start the whole process..."  I200 copied with "10-4" meaning understood.  Sgt. Morgan's first name is Jeremiah.

60.     It is my understanding that additional materials may be in process of being produced or may be requested later.  I would request that this report be considered a preliminary report.  Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

61.     At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

62.     My fees for this professional service is a flat Case Development Fee of $7500 and a fee of $2000 for a deposition in Rhode Island or $2500 per day plus expenses for services away from Rhode Island including depositions and trial appearances.

This report is signed under penalty of perjury on this 1st day of May, 2008, in Greenville, RI.

_____

Lou Reiter

**Motion in Limine 2**
**EXHIBIT B**

United States District Court
For the Northern District of California

1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7
8                FOR THE NORTHERN DISTRICT OF CALIFORNIA
9   KATHLEEN ESPINOSA, et al.,
10                Plaintiffs,                      No. C 06-04686 JSW
11      v.
12  CITY AND COUNTY OF SAN FRANCISCO,    **ORDER RE PARTIES' CROSS-**
    et al.,                             **MOTIONS FOR SUMMARY**
13                                       **JUDGMENT**
                 Defendants.
14  _____/
15
16
17          Now before the Court are the cross-motions for summary judgment filed by plaintiffs
18  Kathleen Espinosa and A.S. (collectively, "Plaintiffs") and defendants City and County of San
19  Fancisco ("the City"), Heather Fong in her official capacity, Officer John Kessor, Officer
20  Michelle Avis, and Officer Paul Morgado (collectively, "Defendants"). Having considered the
21  parties' pleadings and the relevant legal authority, the Court hereby denies Plaintiffs' motion for
22  summary judgment and denies in part and grants in part Defendants' cross-motions for
23  summary judgment.[1]
24                              **BACKGROUND**
25          On June 6, 2006, Officers Kessor, Avis and Morgado ("Defendant Officers") entered 2
26  Garces Drive without a warrant and shot and killed Asa Sullivan. Preceding the incident at
27  issue, Sullivan spent between one to four nights a week for a couple of weeks at 2 Garces Drive.
28
    _____
            [1] The Court need not rule on Defendants' evidentiary objections because the Court
    did not need to consider such evidence in order to resolve the parties' cross-motions for
    summary judgment.

1   (Declaration of Benjamin Nisenbaum ("Nisenbaum Decl."), Ex. C (Deposition of Jason Martin)

2   at 53:17-54:3.)  Sullivan stayed at 2 Garces Drive, a unit in the Park Merced Villas in San

3   Francisco, with the permission of Jason Martin, as well as the permission of Bryant Gudor.  (*Id.*

4   at 54:14-17.)

5       Bryant Gudor and Jarret Schank were the lease holders of 2 Garces Drive.  (Nisenbaum

6   Decl., Ex. G (Deposition of Margarita Wynn) at 15:13-18.)  Starting on September 30, 2003,

7   Gudor and Schank were on a month-to-month tenancy at 2 Garces Drive.  (*Id.* at 16:19-24.)

8   Gudor and Schank gave thirty-days notice and were scheduled to move out by the end of March

9   of 2006.  However, according to Park Merced's documents, Gudor and Schank did not turn in

10  the keys.  According to Park Merced, the unit is considered occupied until the occupants return

11  the keys.  Because Park Merced had not received the keys from Gudor and Schank, their move-

12  out date was pushed back to May 1, 2006.  (*Id.* at 30:6-33:23.)  Park Merced considered the unit

13  occupied by Gudor and Schank between March 31 and May 26, 2006.  (*Id.*)  On June 1, 2006,

14  Park Merced charged the account for rent for 2 Garces Drive for the month of June.  Park

15  Merced's notes indicated that there was a move out date of June 2, 2006, but Park Merced did

16  not have any confirmation that Gudor and Schank had actually vacated as of June 6, 2006.  (*Id.*

17  at 75:3-77:5.)  However, according to Russell, both Gudor and Schank had moved out months

18  before the end of 2005.  (Declaration of Peter J. Keith, Ex. B (Deposition of David Russell (at

19  16:13-17:8, 21:14-23.)

20      On June 6, 2006, Officer Morgado went to 2 Garces Drive in response to a dispatch call

21  stating that the door was opening and closing with the wind and that this location was a known

22  drug house.  (Nisenbaum Decl., Ex. A (Deposition of Officer Morgado) at 42:2-15, 43:1-3.)

23  Officer Morgado was dressed in his police uniform.  (*Id.* at 56:18-21.)  When Officer Morgado

24  arrived, the door at 2 Garces Drive was closed and he did not see any bloody t-shirt through the

25  windows.  (*Id.* at 55:14-56:12, 60:4-9.)  The woman who had called the police approached

26  Officer Morgado and told him that she called because 2 Garces Drive was a known drug house,

27  that the door had been opening and closing, and that she had been instructed by another police

28

United States District Court

For the Northern District of California

1    officer to call if there had been any activity there or when the door was opening and closing.

2    (*Id.* at 57:25-60:3.)

3         Officer Morgado advised the woman to go back to her residence and then he pushed up

4    against the front door at 2 Garces Drive. (*Id.* at 66:19-23, 67:20-68:16.) The door opened

5    slightly, about an inch, and then closed again. (*Id.* at 68:17-69:1.) Officer Morgado felt that

6    something was pushed up against the back side of the door, trying to hold the door secure. (*Id.*

7    at 69:9-11.) Officer Morgado called Park Merced security to find out why the door on the lock

8    was different than the other door locks, why the door appeared to be held up by something

9    against the back side trying to secure it, and who, if anybody, lived or was on the lease at the

10   residence. (*Id.* at 69:13-70:14, 72:4-6, 74:2-6.) It was Officer Morgado's understanding that

11   Park Merced security was the management company in charge of 2 Garces Drive and that Park

12   Merced security keeps records on whether or not the units are rented. (*Id.* at 63:16-64:22.)

13        The Park Merced security officer told Officer Morgado that the lock on the door did not

14   belong to Park Merced security. The Park Merced security officer also informed Officer

15   Morgado that there was no one on the lease at 2 Garces Drive and that "the prior person had

16   moved out." (*Id.* at 76:11-20.) In his Declaration, Officer Morgado states that he asked the

17   Park Merced security officer "to back away from the building and observe the windows, and to

18   yell to me if he saw anyone trying to jump out a window of the unit." (Declaration of Officer

19   Paul M. Morgado ("Morgado Decl."), ¶ 4.) According to Officer Morgado, the Park Merced

20   security officer said that was okay. (*Id.*) While the Park Merced security officer was standing

21   next to Officer Morgado, Officer Morgado pushed up on the front door a little bit. The object

22   that had been behind the door fell down and the door swung open. ((Nisenbaum Decl., Ex. A at

23   80:19-81:3.) Officer Morgado did not have a search warrant for 2 Garces Drive. (*Id.* at 82:25-

24   83:6.)

25        When Officer Morgado pushed the door open, he saw a bloody t-shirt hanging over an

26   interior door. (*Id.* at 83:7-12.) The blood on the shirt appeared to be fresh to Officer Morgado.

27   (*Id.* at 83:13-21.) Once he saw the bloody t-shirt, Officer Morgado called for back up. (*Id.* at

28   84:2-4.)

United States District Court
For the Northern District of California

3

1   Officers Kessor and Alvis arrived at 2 Garces Drive in response to a request for another

2   unit. (Nisenbaum Decl., Ex. I (Deposition of Officer John Kessor) at 56:17-23.) Both Officers

3   Kessor and Alvis were dressed in plain clothes. (*Id.* at 45:15-19.) When Officers Kessor and

4   Alvis arrived, the door was open and the bloody t-shirt was visible. (*Id.* at 67:19-68:3.) Officer

5   Leung also came to the scene and was dressed in his police uniform. Officers Kessor, Alvis and

6   Leung walked through the house, calling out "San Francisco Police Department." (*Id.* at 71:17-

7   72:3.) Officer Kessor entered 2 Garces Drive based on his observation of the bloody t-shirt and

8   the information he received from Officer Morgado that he had not cleared the house yet. (*Id.* at

9   67:19-68:3.) Officer Kessor initially testified that he could not tell whether the blood on the

10   shirt was fresh or dried, but then later clarified that he remembered seeing fresh blood on the

11   shirt. (*Compare id.* at 70:21-23 with *id.* at 78:23-79:2.)

12   Officers Kessor, Alvis and Leung walked through the first floor of 2 Garces Drive,

13   loudly announcing their presence as they went. (*Id.* at 71:17-72:3.) As Officer Kessor walked

14   through the downstairs, he did not hear anything other than the sound of the officers' own

15   activity. (*Id.* at 72:4-12.) The officers did not find anyone in the house on the first floor. (*Id.* at

16   73:8-10.) Other than the bloody t-shirt, there was nothing on the first floor of the house to

17   indicate that there was an emergency at 2 Garces Drive. (*Id.* at 75:1-9.) The officers then went

18   upstairs. (*Id.* at 73:11-74:6.) Upstairs, none of the doors appeared to Officer Kessor to have

19   been kicked in and Officer Kessor did not observe any indications that the house had been

20   burglarized. (*Id.* at 80:19-81:3.) Officer Kessor did not remember observing any blood. (*Id.* at

21   83:24-84:11.)

22   The Court shall address additional facts as necessary to its analysis in the remainder of

23   this Order.

24   **ANALYSIS**

25   **A.   Legal Standard.**

26   Summary judgment is proper when the "pleadings, depositions, answers to

27   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

28   genuine issue as to any material fact and that the moving party is entitled to judgment as a

4

United States District Court

For the Northern District of California

1    matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is sufficient evidence

2    for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

3    477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome of the case.

4    *Id.* at 248.  "In considering a motion for summary judgment, the court may not weigh the

5    evidence or make credibility determinations, and is required to draw all inferences in a light

6    most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.

7    1997).  A principal purpose of the summary judgment procedure is to identify and dispose of

8    factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).

9           The party moving for summary judgment bears the initial burden of identifying those

10   portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

11   issue of material fact. *Id.* at 323.  Once the moving party meets this initial burden, the

12   non-moving party must go beyond the pleadings and by its own evidence "set forth specific

13   facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving

14   party must "identify with reasonable particularity the evidence that precludes summary

15   judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v.*

16   *Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

17   **B.      Officer Morgado's Initial Entry.**

18          Both parties move for summary judgment regarding whether Officer Morgado's initial

19   entry was lawful.  The Fourth Amendment proscribes "unreasonable searches and seizures."

20   U.S. Const. amend IV.; *see also Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995);

21   *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994).  The ultimate test of reasonableness

22   requires the court to balance the governmental interest that justifies the intrusion and the level

23   of intrusion into the privacy of the individual. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92

24   F.3d 1486, 1496 (9th Cir. 1996).

25          In order to claim the protection of the Fourth Amendment, Sullivan must "demonstrate

26   that he personally ha[d] an expectation of privacy in the place searched, and that his expectation

27   [was] reasonable ....'" *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citation omitted).  If

28   Sullivan was not lawfully residing at 2 Garces Drive, but was merely a squatter, any expectation

1    of privacy he had there would not have been reasonable.  *See Zimmerman v. Bishop Estate*, 25

2    F.3d 784, 787 (9th Cir. 1994) (finding that squatters, with no legal right to occupy the property,

3    had no reasonable expectation of privacy).

4         Here, the Court finds that there are questions of fact precluding summary adjudication of

5    this issue in favor of either party.  Plaintiffs submit evidence indicating that Sullivan was

6    staying at 2 Garces Drive with the permission of Gudor.  However, there is conflicting evidence

7    regarding whether Gudor and Schank, the lease holders of 2 Garces Drive were still lawful

8    tenants as of June 6, 2006, and thus able to give Sullivan permission to stay there.  Gudor and

9    Schank gave notice that they were terminating the lease and vacating by the end of March 2006.

10   While there is evidence indicating that Park Merced, the owner of 2 Garces Drive, did not

11   consider the unit vacated until the tenants turned in the keys, Defendants have submitted

12   evidence showing that neither Gudor nor Schank had lived at 2 Garces Drive since almost a

13   year before June 6, 2006.  On the record before it, the Court finds that it cannot find as a matter

14   of law that Sullivan did or did not have a reasonable expectation of privacy in 2 Garces Drive.

15        Moreover, even if the Court found that Sullivan had a reasonable expectation of privacy

16   in 2 Garces Drive, Defendants have submitted evidence which, if credited, is sufficient to

17   demonstrate a question of fact as to whether a person with apparent authority consented to

18   Officer Morgado's entry.  If Gudor and Schank had vacated and abandoned the unit by June 6,

19   2006, authority to search would have reverted from the former tenants to the landlord, Park

20   Merced.  *United States v. Sledge*, 650 F.2d 1075, 1078 (9th Cir. 1981) ("The law of California

21   recognizes that a tenant can abandon the premises to the landlord. ...").  The Park Merced

22   security officer told Officer Morgado that the unit was vacant.  (Nisenbaum Decl., Ex. A at

23   76:11-20.)  Thus, based on the evidence in the record, the Court cannot say as a matter of law

24   that it was unreasonable for Officer Morgado to believe that the Park Merced security officer

25   had authority to consent to a search of 2 Garces Drive.  *See Zimmerman*, 25 F.3d at 788 (finding

26   warrantless arrest valid where officers, at the time of entry, reasonably believed the property

27   owners had authority over the premises); *see also Sledge*, 650 F.2d at 1079 (upholding search

28   where the landlord told the officer that the tenant had abandoned the unit and the officer's own

**United States District Court**
For the Northern District of California

6

1  observations were consistent with the landlord's story). Although Officer Morgado did not

2  explicitly ask the Park Merced security officer for permission to search 2 Garces Drive, the

3  evidence could be read to support an inference that the Park Merced security officer impliedly

4  consented to the search through his participation in guarding the premise while Officer

5  Morgado entered and searched the home. *See United States v. Impink*, 728 F.2d 1228, 1233 n.3

6  (9th Cir. 1984) (consent may be inferred through some action that implies consent, such as

7  gestures to enter or assistance in the search of others). However, if the evidence is read in the

8  light most favorable to Plaintiffs, the evidence supports an inference that the Park Merced

9  security officer was never asked and never consented to the search of 2 Garces Drive. *See*

10  *United States v. Shaibu*, 920 F.3d 1423, 1426-27 (9th Cir. 1990) (declining to imply consent

11  where officers never requested entry and defendant did not take any affirmative acts to imply

12  consent because "[t]he existence of consent to a search is not lightly to be inferred") (internal

13  quotes and citation omitted). Therefore, the Court cannot grant either party's motion for

14  summary judgment on this issue.

15  **C.      Whether Officers Alvis and Kessor Used Unreasonable Force**.

16        Defendants move for summary judgment on the issue of whether Officers Alvis and

17  Kessor used excessive force. According to Defendants, the officers' decisions to shoot Sullivan

18  were objectively reasonable in light of the information available to them, and therefore, were

19  lawful under the Fourth Amendment.

20        Under a Fourth Amendment analysis, Plaintiffs must show that the Defendant Officers'

21  use of force was unreasonable. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The

22  reasonableness of the particular use of force must be judged from the perspective of a

23  reasonable officer on the scene. *Graham*, 490 U.S. at 396. The reasonableness inquiry is

24  objective, however, asking "whether the officers' actions are 'objectively reasonable' in light of

25  the facts and circumstances confronting them, without regard to their underlying intent or

26  motivation." *Id.* at 397. The Court must consider whether the "'totality of the circumstances'

27  justifies the force used, examining particularly severity of the crime at issue, whether the

28  suspect poses an immediate threat to the safety of the officers or others, and whether he is

1     actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, quoting *Tennessee v.*

2     *Garner*, 471 U.S. 1, 8-9 (1985).  The reasonableness of the particular use of force must be

3     judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

4     vision of hindsight.  *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. at 20-22).  When

5     determining whether the amount of force used was reasonable, the Court must balance "the

6     nature and quality of the intrusion on the individual's Fourth Amendment interests against the

7     countervailing governmental interests at stake." *Johnson v. County of Los Angeles*, 340 F.3d

8     787, 792 (9th Cir. 2003) (citing *Graham*, 490 U.S. at 396).

9          Police officers "may enter a dwelling without a warrant to render emergency aid and

10     assistance to a person whom they reasonably believe to be in distress and in need of that

11     assistance." *People v. Ray*, 21 Cal. 4th 464, 470 (1999) (citing *Root v. Gauper*, 438 F. 2d 361,

12     364-65 (8th Cir. 1971)).  Such exception to the warrant requirement, known as the community

13     caretaker exception, may be invoked only "when the police are not engaged in crime-solving

14     activities." *Id.* at 471.  If officers enter a home under this exception, the occupants are viewed

15     as potential victims, not as potential suspects. *Id.*  The caretaker exception "requires specific,

16     articulable facts indicating the need for swift action to prevent imminent danger to life or

17     damage to property." *Id.* at 472 (internal quotes and citation omitted); *see also United States v.*

18     *Snipe*, 515 F.3d 947, 952 (9th Cir. 2008) (warrantless search is constitutional if, based on the

19     totality of the circumstances, officers had "an objectively reasonable basis for concluding that

20     there was an *immediate* need to protect others or themselves from serious harm") (emphasis

21     added).

22          Defendants rely on the following circumstances to justify their search of the premises

23     and subsequent use of force: (1) seeing the bloody t-shirt; (2) finding Martin in a bedroom on

24     the second floor with a knife in his pocket; and (3) Sullivan's behavior in the Attic.

25     (Defendants' Mot. at 12-13.)  According to Defendants, the bloody t-shirt was evidence that a

26     violent crime may have been committed, and thus was a factor demonstrating that the use of

27     force was reasonable.  However, viewing the evidence in the light most favorable to Plaintiffs,

28     the officers could not tell if the blood on the shirt was fresh or dried.  If the blood on the shirt

*United States District Court*
For the Northern District of California

8

1   was not fresh, the Court cannot find as a matter of law that there are "specific, articulable facts

2   indicating the need for swift action to prevent *imminent* danger to life or damage to property."

3   *See Ray*, 21 Cal. 4th at 472. Moreover, there is evidence creating a question of fact regarding

4   whether the officers were engaged in crime-solving activities, as opposed to entering and

5   searching merely to "render emergency aid and assistance to a person whom they reasonably

6   believe to be in distress and in need of that assistance." *Id.* at 470-71.

7        The Court's determination that it cannot find as a matter of law that Officers Alvis and

8   Keesor's warrantless entry and search did not violate the Fourth Amendment also precludes

9   granting summary adjudication as to whether the officers' use of deadly force was reasonable.

10  "[W]here an officer intentionally or recklessly provokes a violent confrontation, if the

11  provocation is an independent Fourth Amendment violation, he may be held liable for his

12  otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir.

13  2002). In addition to the questions of fact regarding whether Officers Keesor and Alvis' entry

14  and search was an independent violation of Sullivan's Fourth Amendment rights, the Court

15  finds there are questions of fact as to whether the officers' entry and search provoked the

16  officers' use of deadly force.[2]

17  **D.      Whether Officer Morgado Used Excessive Force.**

18       Defendants also move for summary judgment on Plaintiffs' claim that Officer Morgado

19  used excessive force by pointing a gun at Sullivan. Defendants argue that based on comparable

20  circumstances, courts have routinely granted summary judgment on claims that gun pointing

21  constitute excessive force. However, as noted above, the Court has found that there are

22  questions of fact regarding whether the officers' entry and search of 2 Garces Drive violated

23  Sullivan's rights under the Fourth Amendment. The Court finds that the same questions of fact

24  preclude the Court from determining as a matter of law that Officer Morgado's pointing a gun

25  at Sullivan was reasonable under the circumstances and did not constitute excessive force.

26

27

28  [2] The same questions of fact which preclude this Court from granting Defendants'
    motion for summary judgment on the merits of Plaintiffs' claims also preclude summary
    judgment based on qualified immunity.

United States District Court
For the Northern District of California

9

**E.   Plaintiffs' Claim for Loss of Familial Relationship.**

Plaintiffs' claim for loss of familial relationship with Sullivan arises under the Fourteenth Amendment. *See Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 371 (9th Cir. 1998). Parents and children of a person killed by law enforcement officers may bring this substantive due process claim. *Id.* To prevail on such a claim, Plaintiffs must demonstrate that the officers' use of force "can properly be characterized as arbitrary, or conscious shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1988). To meet this standard, Plaintiffs must show that the officers were motivated by a *purpose to cause harm* that was unrelated to the legitimate object of their use of force. *Id.* at 372 (emphasis added); *see also Rosales v. City of Bakersfield*, 2007 WL 1847628, *21 (E.D. Cal. June 27, 2007) (applying *Moreland* to case in which deadly force was used against a suspect); *Hos v. Pooler*, 2006 WL 196291, *3-4 (W.D. Wash. Jan. 23, 2006) (same). Moreover, because Plaintiffs need to demonstrate the officers had a particular mental state, *i.e.* that they were motivated by a purpose to cause harm unrelated to the legitimate object of their use of force, to survive summary judgment, Plaintiff must proffer evidence of "specific, nonconclusory factual allegations that establish improper motive." *Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)).

Plaintiffs failed to oppose Defendants' motion as to this claim. Therefore, they have not even argued that Officers Alvis and Kessor were motivated by a purpose to cause harm unrelated to the legitimate object of their use of force for self-defense, let alone submitted evidence demonstrating specific, nonconclusory facts to establish such improper motive. Accordingly, the Court grants Defendants' motion as to Plaintiffs' substantive due process claim for loss of familial relationships.

**F.   Plaintiffs' Monell Claim.**

With respect to the City and Chief Fong in her official capcity, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). Thus, to establish that the City and Chief Fong are liable, Plaintiffs must show

United States District Court
For the Northern District of California

1   that: (1) they had a constitutional right of which they were deprived; (2) the City had a custom

2   created by those who may be fairly said to determine official policy, which amounted to, at a

3   minimum, deliberate indifference to Plaintiffs' constitutional rights; and (3) the custom was the

4   moving force behind the constitutional violation.  *See Blair v. City of Pomona*, 223 F.3d 1074,

5   1079 (9th Cir. 2000); *see also Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

6         To establish the requisite policy regarding unconstitutional seizures, Plaintiffs rely on

7   the their allegations relating to the warrantless entry into 2 Garces Drive and the post-shooting

8   investigative procedures used by the City in this case.  (Plaintiffs' Opp. at 24.)  The only facts

9   Plaintiffs cite to in support of this claim is that neither Officer Alvis nor Officer Keesor were

10  tested for drugs or alcohol following the incident in violation of San Francisco Police

11  Department's provisions and that Officers Alvis and Kessor were allowed to drive back to the

12  police station unsupervised in the same vehicle.  (*Id.*)  Such post-incident occurrences relating

13  to this single incident are insufficient to demonstrate the existence of an official policy that was

14  the moving force behind the alleged constitutional violations.  *See City of Oklahoma v. Tuttle*,

15  471 U.S. 808, 823-24 (1985) (holding that "[p]roof of a single incident of unconstitutional

16  activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes

17  proof that it was caused by an existing, unconstitutional municipal policy, which policy can be

18  attributed to a municipal policy maker.").  Here, Plaintiffs have not adduced evidence of an

19  *existing*, unconstitutional municipal policy, let alone an unconstitutional municipal policy that

20  was the moving force behind the alleged constitutional violations.  Therefore, the Court grants

21  Defendants' motion for summary judgment as to the *Monell* claim against the City and Chief

22  Fong.

23  **G.**    **Plaintiffs' State Law Claims.**

24      **1.**    **California Penal Code Privileges.**

25        Defendants argue that the Defendants Officers are privileged under state law to use

26  reasonable force pursuant to California Penal Code §§ 196 and 835a.  The California Penal

27  Code privileges set the same standard as the federal Fourth Amendment for the use of force by

28  peace officers.  *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274 (1998); *see also*

11

1    *Johnson v. County of Los Angeles*, 340 F.3d 787, 794 (9th Cir. 2003).  Because the Court has

2    found that there are questions of fact precluding summary judgment on Plaintiffs' Fourth

3    Amendment unreasonable force claim, the Court cannot grant Defendants' motion for summary

4    judgment on this ground either.

5        **2.     California Government Code § 821.6 Immunity.**

6        Next Defendants argue that California Government Code § 821.6 bars Plaintiffs' sixth

7    and seventh claims under state law, as well as A.S.'s wrongful death claim premised on

8    negligence.  California Government Code § 821.6 provides: "A public employee is not liable

9    for injury caused by his instituting or prosecuting any judicial or administrative proceeding

10   within the scope of his employment, even if he acts maliciously and without probable cause."

11   Defendants contend that the Defendants Officers's conduct at issue occurred during their

12   investigation of possible crimes at 2 Garces Drive, and thus, they are immune pursuant to

13   Section 821.6.  First, Defendants' contention contradicts their assertion that the Defendants

14   Officers entered 2 Garces Drive pursuant to the community caretaker exception or emergency

15   aid exception to the warrant requirement.  Second, the type of conduct the Defendants Officers

16   are accused of "is not the sort of conduct to which Section 821.6 immunity has been held to

17   apply."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007) (holding Section

18   821.6 was inapplicable to alleged tortious conduct occurring during an arrest).  The principal

19   function of Section 821.6 immunity is to provide relief from malicious prosecution."  *Id.*  Police

20   conduct may be subject to 821.6 immunity only if it is taken in the course or as a consequence

21   of an investigation, such as an investigation into someone's guilt, not taken during the course of

22   an arrest or seizure.  *Id.*; *see also Phillips v. City of Fairfield*, 406 F. Supp. 2d 1101, 1118 (E.D.

23   Cal. 2005) (holding Section 821.6 was inapplicable to conduct during a "buy/bust operation"

24   because the officers were not conducting an investigation in preparation for judicial

25   proceedings).  Accordingly, the Court finds that Section 821.6 is inapplicable to Plaintiffs'

26   claims against the Defendants Officers and thus, denies Defendants' motion on this ground.

27

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

### 3.   Negligence Claim Against Defendant Officers.

Defendants also argue that, pursuant to *Munoz v. City of Union City*, 120 Cal. App. 4th 1077 (2004), the Defendants Officers cannot be liable for any negligent tactical decisions preceding the use of force. Plaintiffs concur, but clarify that while they cannot pursue a negligence claim based on the Defendants Officers' pre-shooting tactics, they can bring a negligence claim based on their use of deadly force. (Plaintiffs' Opp. at 28.) Plaintiffs are correct. *See Munez*, 120 Cal. App. 4th at 1099 (noting that while police officers may not be held liable for negligently failing to prevent harm, "police officers have a duty to use reasonable care in employing deadly force"). Therefore, the Court grants Defendants' motion with respect to Plaintiffs' fifth claim, but only to the extent Plaintiffs' claim is premised on the Defendants Officers' pre-shooting tactics.

### 4.   California Civil Code § 51.7.

California Civil Code § 51.7 protects against the use of "violence, or intimidation by threat of violence, committed against their persons or property ... on account of" a protected characteristic. Cal. Civ. Code § 51.7(a). Defendants argue that while Plaintiffs alleged that the Defendant Officers' conduct was motivated by racial prejudice, there is no evidence to support this claim. Plaintiffs do not oppose the dismissal of this claim. (Plaintiffs' Opp. at 28.) Therefore, the Court grants Defendants' motion as to Plaintiffs' claim under California Civil Code § 51.7.

### 5.   California Civil Code § 52.1.

California Civil Code § 52.1 provides:

(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California.... (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate

13

**United States District Court**
For the Northern District of California

1   equitable relief to protect the peaceable exercise or enjoyment of the right or
2   rights secured.

3   Cal. Civ.Code § 52.1. Article I, § 13 of the California Constitution provides:

4   "The right of the people to be secure in their persons, houses, papers, and effects
    against unreasonable seizures and searches may not be violated; and a warrant
    may not issue except on probable cause, supported by oath or affirmation,
5   particularly describing the place to be searched and the persons and things to be
    seized."
6

7   In reliance on *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998), Defendants argue that

8   Plaintiffs need to, but have failed to, establish the use of force and an attempted interference

9   with a constitutional right. Defendants reliance on *Jones* is misplaced. In *Jones*, the court

10  found that the plaintiffs failed to prove a section 52.1 claim because there was no state action,

11  and thus, there was no attempted or completed interference with a constitutional right. *Id.* at

12  333-34.

13  To establish a claim under section 52.1, a plaintiff needs to establish that the defendants

14  "interfered with the plaintiffs' constitutional rights by the requisite threats, intimidation, or

15  coercion." *Austin v. Escondido Union Schl. Dist.*, 149 Cal. App. 4th 869, 882 (2007). The

16  word "interferes" under this statute means "violates." *Id.* at 883. "The essence of [this] claim is

17  that the defendant, by the specified improper means (*i.e.*, 'threats, intimidation or coercion'),

18  tried to or did prevent the plaintiff from doing something that he or she had the right to do under

19  the law or force the plaintiff to do something that he or she was not required to do under the

20  law." *Id.* Use of law enforcement authority to effectuate a seizure and a search can constitute

21  interference by "threats, interference, or coercion" if the police officer lacked a justification to

22  seize and search a person. *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387,

23  F. Supp. 2d 1084, 1102-1103 (N.D. Cal. 2005). The Court finds that Plaintiffs have submitted

24  sufficient evidence to create a question of fact and, thus, preclude summary judgment on this

25  claim. Therefore, the Court denies Defendants' motion as to Plaintiffs' claim under Section

26  52.1.

27

28

14

United States District Court
For the Northern District of California

6.    **Negligence Claim Against the City.**

Both parties agree that while Plaintiffs may hold the City vicariously liable pursuant to California Government Code § 815.2(a) if any of the Defendant Officers are found liable, Plaintiffs may not bring an independent negligence claim against the City based on the City's conduct.  (Defendants' Mot. at 23; Plaintiffs' Opp. at 28.)  Therefore, the Court grants Defendants' motion as to Plaintiffs' negligence claim against the City to the extent Plaintiffs seek anything more than to hold the City vicariously liable pursuant to California Government Code § 815.2(a) if any of the Defendant Officers are found liable.

7.    **Punitive Damages.**

"Under California law, punitive damages are appropriate where a plaintiff establishes by *clear and convincing evidence* that the defendant is guilty of (1) fraud, (2) oppression or (3) malice."  *In re First Alliance Mortg. Co.*, 471 F.3d 977, 998 (9th Cir. 2006) (citing Cal. Civ.Code § 3294(a)).  Defendants argue that Plaintiffs lack evidence to sustain punitive damages.  Plaintiffs have not submitted any evidence, or even argument, in response.  Therefore, the Court grants Defendants' motion as to Plaintiffs' request for punitive damages.

## CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS IN PART and DENIES IN PART Defendants' cross-motion for summary judgment as follows:

(1)    The Court DENIES Defendants' motion with respect to whether Officer Morgado's initial entry was reasonable, whether the Defendant Officers used excessive force, Defendants' contention that they are immune pursuant to the California Penal Code §§ 196 and 835a and California Government Code § 821.6, Plaintiffs' negligence claim against the Defendant Officers to the extent Plaintiffs' claim is premised on the Defendants Officers' use of deadly force, and Plaintiffs' claim under California Civil Code § 52.1.

(2)    The Court GRANTS Defendants' motion with respect to Plaintiffs' claim for loss of familial relationship, Plaintiffs' *Monell* claim, Plaintiffs' negligence claim

15

1  against the Defendant Officers to the extent Plaintiffs' claim is premised on the

2  Defendants Officers' pre-shooting tactics, Plaintiffs' claim under California Civil

3  Code § 51.7, Plaintiffs' negligence claim against the City to the extent Plaintiffs

4  seek anything more than to hold the City vicariously liable pursuant to California

5  Government Code § 815.2(a) if any of the Defendant Officers are found liable,

6  and Plaintiffs' request for punitive damages.

7  **IT IS SO ORDERED.**

8

9  Dated: August 5, 2008

10  JEFFREY S. WHITE
    UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

16