UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| KATHLEEN SULLIVAN, et al., | ) Case No.: C06-04686 JSW |
| Plaintiffs, | ) **PLAINTIFFS' MOTION IN LIMINE NO.** |
| | ) **2 TO EXCLUDE OR LIMIT THE** |
| vs. | ) **TESTIMONY OF DEFENSE EXPERT,** |
| | ) **ALEXANDER JASON** |
| CITY AND COUNTY OF SAN | ) |
| FRANCISCO, et al., | ) Trial Date: December 2, 2013 |
| | ) Trial: 8:00 a.m. |
| Defendants. | ) Pretrial Conf.: April 1, 2013 |
| | ) Time: 2:00 p.m. |
| | ) Courtroom 11, 19th Floor |
| | ) The Honorable Jeffrey S. White |
| | ) |
| | ) |

# EXHIBIT 2

Plaintiffs' Motion in Limine No. 2 to Exclude or Limit Testimony of Alexander Jason
Espinosa v. City and County of San Francisco, Case No.  C06-04686 JSW

1          I have H marked one through seven.

2      Q.    Okay.  Now, looking at H1, is that -- what does

3   that depict?

4      A.    That is an area of the eyeglass case that has

5   transfer blood on it.

6      Q.    And do you know if that's a -- do you know

7   which side of the eyeglass case that is?

8      A.    That's the underside, the bottom of the

9   eyeglass case.

10      Q.    Okay.  Given that it looks like there was

11   transfer blood on both ends of the eyeglass case, do you

12   know which end that is?

13      A.    I do not.

14      Q.    And do you have any independent recollection of

15   what end that is?

16      A.    No, I don't.

17      Q.    Okay.  Moving to H2.

18      A.    H2 shows two, slightly out of focus, two blood

19   deposits which are sub one millimeters, small one

20   millimeters, very small blood deposits.

21      Q.    Are those spatters?

22      A.    Yes, they are.

23      Q.    Could they be anything other than spatters?

24      A.    They could be, but they look like bloodspatter

25   to me.

107

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1      Q.    Okay.  H3?

2      A.    H3 is a single drop, a single deposit, single

3   bloodspatter.

4      Q.    Okay.  Could that be anything other than

5   bloodspatter?

6      A.    It could be, but it looks like bloodspatter.

7      Q.    H4.

8      A.    Oh, gosh, I missed one.  I'll make this the

9   last one.

10      Q.    That's fine.  I don't have them in any

11   particular order.  That's fine.

12      A.    (Marking on photographs.)  So we are at H4

13   now.

14      Q.    I'm at the --

15      A.    What was the last H that I -- (Examining

16   photographs.)  Yeah, it was H4 -- H3.

17      Q.    We should be on H4 now.

18      A.    H4 is the area of the underside of the bottom

19   of the eyeglass case that has transfer blood.

20      Q.    Okay.

21      A.    H5.

22      Q.    Hold on.

23            Do you know what side of the case that is?

24      A.    I do not.

25            MR. LOEBS:  Side, you mean left or right?

108

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1          MR. NISENBAUM:  Right, left or right.

2     Q.   And the next in order?

3     A.   H5 is showing two blood, blood spatter deposits

4  without a scale.  So it's not very useful.

5     Q.   Okay.

6     A.   I just gave you all my pictures.

7     Q.   Could those be anything other than spatter?

8     A.   They could be, but they look like bloodspatter

9  to me.

10    Q.   Okay.  Next in order?

11    A.   H6 is an area with a scale.

12         Once again, this is the bottom of the eyeglass

13 case.  And it has two, perhaps a third blood spatter

14 deposit.  They are very small consistent with gunshot

15 wounds.

16    Q.   Could that be anything other than spatter?

17    A.   It could be, but it looks to me like

18 bloodspatter.

19    Q.   Next in order?

20    A.   H7 is an area of transfer blood deposits.  And

21 I don't know what side, left or right, this is.  But

22 this is from the underside of the bottom of the eyeglass

23 case.

24    Q.   Could that be anything other than blood?

25    A.   It could be, but it looks like bloodspatter or

                                                      109

1    blood -- transfer blood deposits, to me.

2         Q.    H8?

3         A.    H8 is an area resembles another picture.  It

4    might be the same.

5               (Examining photograph.)  Yeah, this is the same

6    area as H6 showing a blood spatter deposit, very, very

7    small blood spatter deposit.

8         Q.    Okay.

9               MR. LOEBS:  Can we take a break for a few

10   minutes, Ben?

11              MR. NISENBAUM:  Sure.

12              **(WHEREUPON, a brief recess was taken.)**

13              MR. NISENBAUM:  Q.  Now, Mr. Jason you reviewed

14   the coroner's report in this case?

15        A.    I did.

16        Q.    Okay.  I am going to hand you a copy of the

17   coroner's report, and if you can look it over.  Do you

18   know if this is the report that you reviewed in this

19   case?

20        A.    (Examining documents.)

21        Q.    And I am going to mark this as next in order.

22        A.    Yes, it appears to be.

23              **(WHEREUPON, Plaintiff's Exhibit I was**

24              **marked for Identification, and is**

25              **attached, hereto.)**

                                                         110

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1              MR. NISENBAUM:   Q.   Okay.   You examined

2    Mr. Sullivan's pants; is that right?

3        A.    Yes.

4        Q.    Okay.   And were his pants bloody?

5        A.    Yes, they had blood on them.

6        Q.    And I take it, as of May 3- -- was it May 30

7    that you examined his pants in 2008 -- I am sorry --

8    April 30.

9        A.    April 30.

10       Q.    Okay.   April 30, 2008, I take it, the blood was

11   dry?

12       A.    Yes.

13       Q.    Did you examine the pockets of the pants?

14       A.    Inside the pockets?

15       Q.    Did you examine the pockets at all?

16       A.    I did not -- other than to note it that they

17   were not -- that they were empty.   But I, I smoothed the

18   pants out to photograph it.   But I did not look in the

19   pockets.

20       Q.    Do you know whether or not the pockets were

21   bloody?

22       A.    The interior of the pockets, no, I did not look

23   inside, no.

24       Q.    Okay.   In reviewing the coroner's report, did

25   you note whether or not any items retrieved from

                                                        111

1    Mr. Sullivan's pockets were bloody?

2        A.   I don't remember.  I can look at it now.

3        Q.   I will direct you to its Page One of the

4    report.  It's a few pages into the Exhibit, CCSF/ESPI

5    001469, Preliminary Examination.

6        A.   (Examining documents.)  Okay.  Yeah,

7    blood-stained piece of paper in the right front pocket.

8    And in the right back pocket is a blood-stained

9    probation department business card.  In the left front

10   pocket are several blood-stained white tissues.  In the

11   left back pocket of the pants are napkins.  It doesn't

12   say anything about blood on that.  But, yes, there were

13   some bloody objects in several pockets.

14       Q.   Okay.  Do you know if the transfer that you

15   observed -- strike that.

16            Do you know if the transfer bloodstains that

17   you observed on the eyeglass case could have come from

18   one of those bloody pockets?

19            MR. LOEBS:  Objection.  Vague and ambiguous.

20   Incomplete hypothetical.

21            THE WITNESS:  Well, we have to go back.

22            The type of spatter deposits on a glass case

23   are not consistent with it having been in the pockets

24   during the shooting.

25            Is that what you asking me?

                                                    112

1            MR. NISENBAUM:  Q.  That's all I'm asking.

2        I am asking you, you said that there were two

3    transfer stains on the pocket -- not on the pocket.

4    Strike that.

5        You said there were two transfer stains on the

6    bottom of the eyeglass case, one on either side,

7    correct?

8        A.    Correct.

9        Q.    Okay.  Now, if those two transfer stains, could

10   either of those stains, transfer stains have occurred --

11   strike that.

12       Could either of those two transfer stains have

13   happened when the -- if the eyeglass case was in the

14   pocket, one of Mr. Sullivan's pockets?

15           MR. LOEBS:  Object to the question.  It's an

16   incomplete hypothetical.

17       Are you asking him to assume that there were no

18   other stains on the pocket?

19           MR. NISENBAUM:  I am asking if that was

20   possible.

21           MR. LOEBS:  You are asking him to assume that

22   there were no other spatter mark stains on the glass

23   case, right?

24           MR. NISENBAUM:  I am just asking as to the

25   stains, without regard to the spatter marks.

113

**DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL**

1      THE WITNESS:  From the transfer marks alone, I
2  think it's unlikely that it could have been caused by
3  being in the pocket.  I'd have to look at the pockets.
4  I would expect there to be -- well, if it was in the
5  right front pocket, I would expect there to be a lot
6  more blood on the glass case than it was.
7      MR. NISENBAUM:  Q.  Okay.  And what is that
8  based on?
9      A.   The amount of blood that's on that area.  The
10  right front pocket would have a lot of blood on it
11  within it.  And it's very little blood transfer on the
12  glass case, really, for the amount of blood in the area,
13  especially in that right front pocket area.
14      Q.   Did you review any photographs of any items
15  that were removed from the glasses case?
16      A.   I looked at all of them, yes.
17      Q.   Okay.  And at this point I got my pictures
18  somewhat out of order, but if you will bear with me.
19      A.   I'd like to make a clarification, if I may.
20      Q.   Sure.
21      A.   Before the break you asked me about -- I forget
22  the exact question but it was something like Is it
23  possible that the glass case, the eyeglass case was in
24  the pocket, in one of the pockets?  And I'm not sure how
25  I answered that.  But what I wanted to say is I don't

114

1  believe glass -- I believe the physical evidence is

2  consistent with the glass case not being in the pocket

3  during the shooting, being in any pocket during the

4  shooting.

5       Q.   And that's because of the mark that you

6  observed on it that you say are -- what's the word for

7  it?

8       A.   Spattered?

9       Q.   Yes, spattered.

10      A.   Yeah, marks, blood deposits, yeah.  Yes.

11      Q.   You haven't done any testing of the blood

12  deposit, though, have you?  We already asked that.

13      A.   You already asked me that.

14      Q.   Okay.

15           We'll make this exhibit next order, CCSF/ESPI

16  000957.

17           **(WHEREUPON, Plaintiff's Exhibit J was**

18           **marked for Identification, and is**

19           **attached, hereto.)**

20           MR. NISENBAUM:  Q.  If you can take a look at

21  Exhibit J and tell me if you have seen that before.

22      A.   (Examining photographs.)  Yes, I have.

23      Q.   What is it?

24      A.   This is the picture of the decedent at the

25  medical examiner's office lying on a gurney still

                                                    115

1   clothed and his hands back.

2       Q.   Now, does he appear to be lying on some type of

3   plastic sheeting?

4       A.   Yes, he does.  I think that's the opened body

5   bag.

6       Q.   Are there marks on that opened body bag?

7            MR. LOEBS:  Objection.  Vague and ambiguous.

8            What do you mean by marks?

9            MR. NISENBAUM:  Q.  Well, is there something

10  that's not plastic on that opened body bag?

11      A.   It appears to be blood.

12      Q.   Now, did you examine that body bag?

13      A.   No.

14      Q.   Do you know from that body bag, from looking at

15  it, do you know would you be able to differentiate

16  between spatter and the drops that are on the body

17  bag?

18           MR. LOEBS:  Object as vague and ambiguous,

19  incomplete.

20           THE WITNESS:  If I have a chance to examine the

21  bag then on that I think I could, yes.

22           MR. NISENBAUM:  Q.  We will come back to this.

23  At some point we will come back to that when I can find

24  the photographs.

25      A.   Okay.

116

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1      Q.    All right.  Now, April 30, 2008, you were at

2    2 Garces Drive?

3      A.    Yes.

4      Q.    And who was with you?

5      A.    Mr. Lobes and Officer Keesor, Officer Alvis,

6    Officer Morgado, Officer Oshita, and Doctor, Dr.

7    Mohandie, M-o-h-a-n-d-i-e, and doctor, I forget her

8    name.  If Mr. Lobes can remind me.

9      Q.    Dr. Karem?

10     A.    Dr. Karem.

11           THE REPORTER:  I'm sorry?

12           THE WITNESS:  K-a-r-e-m.  And I believe that

13   was all.

14           MR. NISENBAUM:  Q.  And did you have any

15   discussion with anyone at 2 Garces about whether or not

16   this was supposed -- whether or not this shooting was a

17   suicide by cop.

18     A.    I never discussed that with anybody.

19     Q.    Dr. Karem never told you that she thought this

20   was a suicide by cop?

21     A.    I never, other than meeting and greeting her

22   and a few questions -- I mean a few interchanges like

23   that, I never discussed the case with her.

24     Q.    Okay.  All right.  And your purpose of, of

25   April 30, 2008, at 2 Garces Drive was what?

117

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1    A.    To do a demonstration to use the officers and
2  have them show me exactly where they were in the attic
3  and where the decedent was, and then to photograph their
4  particular points of view from their locations in the
5  attic.
6    Q.    By the way, if you can move the exhibits back
7  here for the Court Reporter.
8    A.    (Handing documents to Counsel.)
9    Q.    And what kind of camera did you use to take
10  photographs?
11    A.    Yes, I used a Nikon D300 digital camera.
12    Q.    And you had video as well?
13    A.    No.
14    Q.    Okay.  And your intention was to have the
15  officers essentially run through what occurred in the
16  incident?
17        MR. LOEBS:  Objection.  Misstates his
18  testimony.
19        THE WITNESS:  I just had the officers to stand
20  in their locations.  And we didn't act out the entire
21  event.  We just we had one officer who was somewhat
22  similar to the height and weight of the decedent.  And
23  he sat in the location where the decedent was
24  photographed the day of the shooting where his body was.
25  And then the officers took their positions to -- they

118

1    took their positions where they were located during

2    the -- immediately prior to the shooting.

3              MR. NISENBAUM:  Q.  Okay.  So this focused

4    specifically on where the officers were immediately

5    prior to the shooting, right?

6         A.   That's right.

7         Q.   Okay.  I was trying to narrow that period.

8              And who was the officer who took Mr. Sullivan's

9    location?

10        A.   Let's see.  I have it in my notes here.

11   (Examining documents.)

12             I don't have his name down here.  And, also,

13   Don Cameron was there.  He is a police practices

14   expert.

15        Q.   Okay.

16        A.   I don't have his name down here.

17        Q.   Do you know if it was one of the defendants in

18   the case who assumed Mr. Sullivan's position?

19        A.   I believe it was not.  It wasn't Alvis or

20   Keesor or Oshita.  It wasn't one of the shooting

21   officers, I know that.

22        Q.   Oshita was not a shooting officer, was he?

23        A.   No.

24        Q.   Okay.

25        A.   It wasn't one of the officers who would have

                                                        119

1    been in -- who was in the attic at the time of the

2    shooting.

3        Q.   To your knowledge, the only officer present in

4    the attic with you at 2 Garces who was not in the attic

5    at the time of the shooting was Officer Oshita; is that

6    correct?

7            MR. LOEBS:  Misstates his testimony.

8            THE WITNESS:  Officer Oshita, my understanding

9    was he was in the attic partially during the shooting.

10           MR. NISENBAUM:  Q.  Okay.  There were four

11   officers with you, correct?

12       A.   It was Keesor, Alvis, Oshita -- Keesor, Alvis,

13   Oshita and Morgado.  There were four.  And then the

14   fifth person assuming the role of the decedent, position

15   of the decedent.

16       Q.   Is it fair to say the fifth person was not an

17   officer, the one who assumed the decedent's role?

18       A.   I believe he was, but I -- he wasn't wearing a

19   uniform.  So I don't know for sure.  I believe he was an

20   officer.

21       Q.   Now, looking at your notes -- let me go back to

22   this.  We have --

23       A.   (Examining documents.)

24       Q.   And I am looking at page three of Exhibit A,

25   which is dated -- oh, I am sorry.  This is actually

120

1   dated 17 April 2008.

2        A.    Yes.

3        Q.    Is that the date that you were in the attic?

4        A.    Yes.

5        Q.    Okay.   And again, "Exam of scene at 2 Ceres."

6   You mean Garces?

7        A.    I mean Garces.

8        Q.    Okay.   And it states here that -- well, let me

9   ask you this.   Of the people you have list- -- of the

10  names you have listed here, are those all the people who

11  were present?

12       A.    There was -- I left out Dr. Karem's name on the

13  bottom.

14       Q.    Okay.

15       A.    And then I left out the name of the person who

16  assumed the position of the decedent.

17       Q.    Okay.

18       A.    Other than that, I think that was all.

19       Q.    Is it your understanding that the person who

20  assumed the position of the decedent was not present at

21  the time at 2 Garces at the time the shooting

22  occurred?

23       A.    That's my understanding.

24       Q.    Okay.   And the purpose of this was -- well,

25  strike that.   I already asked that.

                                                          121

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1            Now, is it fair to say that one thing you did

2    not do was, was have the officers reenact their movement

3    through the attic up and to the final point of the

4    shooting?

5        A.    That's correct.  I didn't ask them, nor did

6    they do any movement other than to assume their

7    locations.

8        Q.    Okay.  Now, and from that you prepared a

9    certain computer model?

10       A.    Well, not from that.  But from my measurements

11   and photographs of the scene prior to that, I prepared a

12   computer model.

13       Q.    Let me ask you this.

14             Let's mark this as next in order.

15                 **(WHEREUPON, Plaintiff's Exhibit K was**

16                 **marked for Identification, and is**

17                 **attached, hereto.)**

18       MR. NISENBAUM:   Q.  Can you tell me what

19   Exhibit K reference?

20       A.    K is a rendering that I did of a computer model

21   that I created based on the measurements of the scene,

22   the attic, specifically, and of the condo apartment in

23   general.  And then there are blue objects.  There are

24   four blue objects and one green object.  The green

25   object represents the decedent and the blue object

                                                    122

1  represents the officers who were in the attic at the

2  time of the shooting.

3      Q.   Okay.  Now, can you tell me which, which blue

4  object represents which officer at the time of the

5  shooting?

6      A.   Yes.  Should I label them?

7      Q.   Yes, if you can label them, that would be

8  great.

9      A.   (Marking on photographs.)   I labeled them.

10  And in addition to that I annotated the decedent.

11      Q.   Now, it looks like you have off of the icons

12  labeled Morgado and Alvis appear to be vertical, while

13  the --

14      A.   Oh, wait a second.  I left out Keesor.  I'm

15  sorry.

16          Oh, yeah, I got --

17          MR. LOEBS:  It's hard to tell.

18          MR. NISENBAUM:  Q.  The icons labeled Morgado

19  and Alvis appear to be upright, while the icons

20  labeled --

21      A.   -- Keesor.

22      Q.   While Keesor and the DEC, decedent, appear to

23  be horizontal?

24      A.   Well, the Keesor one is horizontal.  The

25  decedent one -- I am using these general shapes to

123

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1  represent the body positions.

2          If you look closely, it's hard to tell from

3  that, but it shows him sitting down with his legs in

4  front of him flat on the attic floor and then his torso

5  upward.

6      Q.   I see.

7      A.   That's what it supposed to represent.

8      Q.   Okay.  And the, the vertical icon on the bottom

9  left, is that Oshita?

10     A.   That's Oshita, and he is half in and half

11  out.

12     Q.   Okay.  Where Oshita is, is that where the

13  attic access is?

14     A.   Yes.

15     Q.   Okay.  And to your understanding that below

16  Oshita is kind of is a closet?

17     A.   Yes.

18     Q.   And are these intended to express any

19  particular height of Officer Morgado or Alvis?

20     A.   It's just generally, but not, not trying to

21  represent their height, their scale height, no.

22     Q.   Okay.  Do you know how far from the decedent

23  Officer Alvis was in this?

24          MR. LOEBS:  Objection.  Vague and ambiguous as

25  to what portion of the body you are measuring from.

                                                    **124**

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1          MR. NISENBAUM:  Q.  Approximately.

2     A.    How far Morgado is from Alvis?

3     Q.    As Alvis is from the decedent?

4     A.    Oh, from the decedent.

5          MR. LOEBS:  Objection.  Vague and ambiguous as

6   to what portion of the body you are measuring from.

7          MR. NISENBAUM:  Q.  You can tell me what

8   portion of the body you are measuring from.

9     A.    Well, his feet are before him.  So they are

10  closer to her, to Alvis than his head.  So, and she is

11  standing upright, as depicted there.  So, if you measure

12  from her nose and from her outstretched hands to her gun

13  you'd get, you'd get different spaces.  But, I'd say, if

14  you go from head to head, that is, from her head to his

15  head, I would say there is two, four, six, seven, eight

16  feet, something like that.  Six to eight feet.

17    Q.    Did you, when you had the re-enactment done,

18  did you take measurements from head to head?

19    A.    No.

20         MR. LOEBS:  Objection.  It misstates his

21  testimony.

22         MR. NISENBAUM:  Maybe I am using the wrong word

23  there.

24    Q.    When you had the positioning done, did you take

25  measurements between the, between -- well, did you take

                                                    125

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1    measurements between Officer Alvis and the person who
2    played the role of the decedent?
3        A.    No.
4        Q.    Did you take measurements of any of the
5    officers relative to the decedent?
6        A.    No.
7        Q.    Did you take measurements of the officers
8    positioning relative to any location?
9        A.    No.  I took no measurements, no.
10       Q.    Okay.  So it's an estimation that Alvis head to
11   head was six --
12       A.    Was six to eight feet, yeah.
13       Q.    Okay.  And the decedent, as you understand it,
14   was, was in a somewhat seated somewhat lying position?
15       A.    That's how he was found and, yes, that's how he
16   was described as being, yes.
17       Q.    Do you know what the total length of the attic
18   is?
19       A.    I don't remember right now.  But I think
20   it's -- in that direction that you are indicating there,
21   from vent to vent?
22       Q.    Yes.
23       A.    I think it's 23 feet.  But that's just from
24   memory.
25       Q.    And is the spaces between the joists, are the

126

1    spaces uniform, to your knowledge?

2        A.    The spaces are the same except for bay one and

3    eleven.  When I say bay, I am talking about this area

4    here.  Here and here, these are more narrow than these.

5    (Indicating.)  These are all the same.

6        Q.    Okay.  And the ones that are all the same, what

7    is the distance between the joists?

8        A.    I don't remember.

9        Q.    Do you know if it's more or less than three

10   feet?

11       A.    I think it's less than three feet.

12       Q.    Okay.  And when the positioning was done at any

13   point in time did you have the person who played the

14   decedent point to -- point an arm at Officer Alvis?

15       A.    No.

16       Q.    Now, were you able to make any determinations

17   as to the visibility of the conditions in the attic?

18       A.    Yes.

19       Q.    And do you intend to express an opinion about

20   that?

21       A.    Yes.

22       Q.    Okay.  And that is -- maybe you can direct me

23   to the area where you intend to express an opinion.  It

24   may be page five of seven, I'm not certain.

25       A.    (Examining documents.)

127

1          MR. LOEBS:  Can I have that question back?  I

2     am sorry.

3          MR. NISENBAUM:  Maybe he can direct me to the

4     exhibit.

5          MR. LOEBS:  To the portion of the --

6          MR. NISENBAUM:  Page five of seven, I am not

7     certain.

8          MR. LOEBS:  I didn't -- I just don't understand

9     the question.

10          MR. NISENBAUM:  Q.  Okay.  The question is can

11     you direct me to the area of your report where you

12     intend to express an opinion with respect to visibility,

13     visibility conditions.

14     A.    Yeah, on page six of seven, the bottom point

15     says "Officer Keesor had the only viewing location which

16     allowed a view of the decedent's right hand when raised

17     above the floor joists."  And then it describes the

18     other positions and their, their views.

19     Q.    I see.

20          Now, do you know what portion of the decedent

21     was visible to Alvis from her position?

22     A.    First, you have to -- before I can answer that,

23     you have to realize that she was not locked in one

24     position.  She was locked in one location or she

25     remained in one location, but she was moving her head

128

1    from side to side to get, to get either side of the

2    intervening object.  So she had different views.  But

3    she could see his head sometimes.  And he also was

4    moving, by her description.  So she had some view of his

5    head.  But I think it's pretty well designed or

6    illustrated in the pictures that I had from the shooting

7    locations, which you have somewhere.

8        Q.   Certainly do.

9             Make this next in order.

10            **(WHEREUPON, Plaintiff's Exhibit L was**

11                **marked for Identification, and is**

12                **attached, hereto.)**

13            MR. NISENBAUM:  Q.  And the next exhibit has

14   been marked Exhibit L.  Can you tell me what Exhibit L

15   represents?

16       A.   Yeah.  (Examining photographs.)  Exhibit L is a

17   picture taken inside the attic with Officer Alvis in the

18   location where she was during the shooting.  And it's

19   just a picture of her standing holding her flashlight

20   and her right arm outstretched as if she were holding a

21   gun.

22       Q.   And then I have some photographs.  And I'm

23   going to show you the next, next seven photographs.  If

24   you can tell me what these are intended to represent.

25       A.   Should I number these?

129

1    Q.   Yes, if you can.

2    A.   Is this going to be part of the --

3    Q.   It will be --

4    A.   M?

5    Q.   Well, first, let me ask you this.  Are these

6    the next series of photographs intended to represent

7    what was visible from Alvis' position?

8         MR. LOEBS:  Wait a second.  I don't, I don't --

9    it's compound and a vague question.

10        You have 10, like, 20 -- how many, 15

11   photographs?

12        MR. NISENBAUM:  There is a series of

13   photographs and I am just --

14        THE WITNESS:  These photographs do not

15   represent Alvis' position or viewpoint.

16        MR. NISENBAUM:  Q.  Okay.  You did take

17   photographs from her position that were intended to show

18   her viewpoint, correct?

19   A.   Yes, I did.

20   Q.   Given in the stack of documents in the copy of

21   photographs that I, that I made for you that you took,

22   can you show me the photographs that are intended to

23   represent her viewpoint?

24        MR. LOEBS:  You want these back, Ben?

25        MR. NISENBAUM:  Yeah, please.

                                                      130

1          THE WITNESS:  (Examining photographs.)  Yeah,
2   there are two pictures here, which generally represent
3   her viewpoint from either side of the intervening
4   object.  These are -- should I mark these?
5          MR. NISENBAUM:  Q.  Let's make these -- if
6   these are intended to represent her viewpoint, let's
7   make them L1 and L2.
8      A.   (Marking on photographs.)  I've marked them L1
9   and L2 I will hand them to the Court Reporter.
10     Q.   Thank you.
11              (WHEREUPON, Plaintiff's Exhibit L1 and
12              Exhibit L2 was marked for Identification,
13              and is attached, hereto.)
14          THE WITNESS:  So this is not going to confuse
15   people, we have a L, and a L1 and a L2.  And this should
16   be a L0.  (Indicating.)
17          MR. NISENBAUM:  Q.  Okay.  I am going to ask
18   you one more question.
19          Did you take any photographs that were intended
20   to represent the decedent's view?
21     A.   No.
22     Q.   Okay.
23     A.   Not with the officers present.
24     Q.   At any point in time did you take any
25   photographs that were intended to represent the

                                                    131

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1   decedent's view?

2       A.    No, not, not, not with that intention.

3       Q.    Okay.  So Looking at L1, what is L1?

4       A.    (Examining photograph.)  L1 is a photograph

5   taken inside the attic from Officer Alvis' location

6   where her head, where her eyes were, looking at another

7   person who is seated in the location where the decedent

8   was located.

9             And L1 shows from the left side of an

10  intervening object, pipe and/or wooden support.

11      Q.    Okay.  Now, what time of day were you at 2

12  Garces?

13      A.    This was probably in the late afternoon, maybe

14  4:00 o'clock, something like that.

15      Q.    Okay.  And is L1 intended to represent the

16  similar lighting conditions in the attic as Alvis had at

17  the time of the incident?

18      A.    Yes.

19      Q.    And it appears that the decedent is illuminated

20  by some type of light in L1; is that correct?

21      A.    That's correct.

22      Q.    And whose light or what type of light?

23      A.    The lights that were used were the same

24  flashlights used by the officers who had flashlights.  I

25  had them use the same flashlights.

                                                    132

1    Q.   All right.  And L2 is similar to L1 but

2    slightly different?

3    A.   Slightly different, if you moved your head to

4    the right slightly on the right side of the intervening

5    air duct.

6    Q.   Let's go to K.

7    A.   (Examining photographs.)

8    Q.   Do you recognize Exhibit K?

9    A.   Is this K?

10   Q.   Well, I'm sorry.  It's going to be M -- strike

11   that.  I think it's Keesor, so.

12        Okay.  Do you recognize Exhibit M?

13   A.   (Examining photograph.)  Yes, I do.

14   Q.   And what is Exhibit M?

15   A.   This is a picture taken from inside the attic

16   showing Officer Keesor in his described location holding

17   a flashlight.  And it also shows Officer Oshita

18   partially, and partially Officer Morgado.

19        MR. NISENBAUM:  Make this Exhibit M.

20        **(WHEREUPON, Plaintiff's Exhibit M was**

21        **marked for Identification, and is**

22        **attached, hereto.)**

23        MR. NISENBAUM:  Q.  And going through your

24   stack of photographs, can you show me if there are any

25   photographs that are intended to depict Officer Keesor's

133

1    point of view?

2        A.    (Examining photographs.)  Yes, I have a

3    photograph here (indicating), which depicts Officer

4    Keesor's view.

5        Q.    Do you have other photographs that are intended

6    to depict his view?

7        A.    No.

8            MR. NISENBAUM:  Make this M1.

9            **(WHEREUPON, Plaintiff's Exhibit M1 was**

10           **marked for Identification, and is**

11           **attached, hereto.)**

12           MR. NISENBAUM:  Q.  Going back to Exhibit L.

13   Do you know if the -- do you have an understanding that

14   there was, like, a fluffy type of insulation in the

15   attic?

16       A.    Yes.

17       Q.    At the time of the incident, correct?

18       A.    Yes.

19       Q.    And similar to the fluffy type of insulation

20   that, that you can see somewhat in Exhibit L2?

21       A.    Yes.

22       Q.    Do you know if the officer who is -- I don't

23   want to say plain, but the officer who was, essentially,

24   taking Asa Sullivan's position, do you know whether or

25   not in this, in these photographs is he sitting in an

                                                    134

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1   area where there is fluffy insulation?

2       A.    Yes, he is.

3       Q.    Okay.  And from that, from Alvis' viewpoint is

4   the fluffy insulation visible?

5       A.    From?

6       Q.    Alvis' viewpoint.

7       A.    Yes.  Some of it is, yes.

8       Q.    Okay.  I think I asked you this already.  But

9   let me be clear.  Let me make sure.

10          Did you ever have the decedent make, or the

11  person who played the role of Asa Sullivan, make the

12  motion that Officer Keesor claimed to have observed?

13      A.    No.

14          MR. LOEBS:  Object.  Vague and ambiguous what

15  you mean played the role of.

16          MR. NISENBAUM:  I don't know how else to put

17  it, Blake.

18      Q.    Assume the position of the decedent in the

19  attic?

20          MR. LOEBS:  I think that's more accurate of his

21  testimony, than saying played a role.

22          MR. NISENBAUM:  Q.  Okay.  You never had the

23  person assume the position that Officer Keesor described

24  with respect to the arm, the decedent's arm movement

25  right before the decedent was shot; is that correct?

                                                    135

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1      A.    That's correct.

2      Q.    Okay.  Do you intend to, to do any work in that

3   regard?

4      A.    To, to have another demonstration like this

5   where you put people up there and have them, have

6   somebody --

7      Q.    Yeah.

8      A.    No, I have no plans to.

9      Q.    Okay.  Now, is it your understanding that, that

10   the decedent -- that flashlights were on the decedent

11   throughout the period of time of the officers, let's

12   say, the last five minutes before the shooting

13   occurred?

14      A.    There were flashlights on him.  The officers

15   just showed me how they aimed their flashlights.  And it

16   wasn't continuous events.  They were moving around.  So

17   it wasn't one static beam on him.

18      Q.    On page five of seven you have an opinion,

19   apparently, that "The physical evidence is consistent

20   with Officer Alvis' perception of apparent muzzle

21   flashes from the decedent's location," correct?

22      A.    Yes.

23      Q.    Is that an opinion you intend to express at

24   trial in this case?

25      A.    Yes.

136

1       Q.    Okay.  And your basis of that opinion is, is

2   what?

3       A.    The dynamics of the event in terms of

4   flashlights, combination of flashlights, darkened area,

5   reflective object and muzzle flashes, all intervene

6   combining during the event.

7       Q.    Do you believe that the decedent's metal-rimmed

8   glasses could, could reflect light in a manner to make

9   it appear that the decedent was firing gunshots?

10      A.    Yes.

11      Q.    And what are your qualifications to offer that

12  opinion?

13      A.    I am very experienced with firearms.  I'm -- I

14  think my most recent paper that was published in the

15  California Association of Criminalist, I was the

16  coauthor -- excuse me -- California Association of

17  Criminalist, I was coauthor of a paper on muzzle flash.

18  And I did some research on muzzle flash, the duration

19  and what -- I think it's called what people see,

20  something like that, about what you could see from

21  muzzle flashes.  So I am very familiar with muzzle

22  flashes.

23      Q.    Are you familiar with muzzle flash reflecting

24  off of officers --

25      A.    Yes.

                                                    137

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1     Q.   Now, in your view do you have an understanding

2    -- strike that.

3          My understanding, from your report, is that

4    according to you Officer Alvis was falling backwards

5    when she was shooting?

6     A.   Ask me that again, please.

7     Q.   My understanding from reading your report is

8    that you have an opinion that Officer Alvis was falling

9    backwards as she discharged her firearm?

10    A.   My opinion is that the physical evidence is

11   consistent with that description.

12    Q.   Okay.  From Officer Alvis' position, your

13   understanding of Officer Alvis' testimony is that she

14   never saw the decedent's right hand; is that accurate?

15    A.   That's my understanding, yes.

16    Q.   All right.  And Officer Alvis, in fact, fired

17   -- do you have an understanding that Officer Alvis fired

18   before she could see the decedent's right hand?

19         MR. LOEBS:  Objection.  It's argumentative and

20   it assumes facts not in evidence.  And it's vague and

21   ambiguous.

22         THE WITNESS:  I'm a little confused.  You

23   previously stated that she couldn't see -- she stated

24   that she couldn't see his right hand.

25         MR. NISENBAUM:  Q.  Right.

138

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1      A.   So she couldn't see his right hand.  That's her
2   statement.
3      Q.   Okay.  And from, from her position, if the
4   decedent's right arm was raised, she would be in a
5   position to see it, correct?
6      A.   No.
7      Q.   And let's go back to I think it was L, L1 and
8   L2.
9           So at no point, from looking at L1, at no point
10  would Officer Alvis be able to see the decedent's right
11  arm; is that correct?
12     A.   Well, first of all, depending on which side of
13  the duct she is looking at, if she is on the right side
14  or left side, and then depending on how he raised his
15  right arm, it's certainly possible that she didn't see
16  -- she could not see his right hand.  Depends on how he,
17  how he raised it and where she -- and where her head was
18  at the moment.
19     Q.   Okay.  It is your understanding that Officer
20  Keesor, when Officer Keesor fired his gun, it was after
21  the decedent had allegedly raised his right arm and
22  allegedly pointed an object, correct?
23          MR. LOEBS:  I object.  That misstates his
24  testimony; assume facts not in evidence.  It's
25  argumentative.

                                              139

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1           THE WITNESS:  My understanding is that Officer

2    Keesor stated that he fired after he saw the decedent

3    bring his right arm up with an object in it.

4           Does that answer your question?

5           MR. NISENBAUM:  Q.  Yes, it does.

6       A.    That's my understanding.

7       Q.    Do you have an opinion as to which officer

8    fired first?

9       A.    Not from physical evidence, no.

10      Q.    Okay.  And from the testimonial evidence, do

11   you have an opinion as to which officer fired first?

12      A.    I'm not sure if they are sure who fired first.

13   But I don't have an opinion on it.

14      Q.    Okay.  And you don't intend to offer an opinion

15   on that subject, do you?

16      A.    I, I might have reviewed Officer Keesor's

17   statement and -- yeah, all the officers' statements.

18   But Keesor may have stated that he fired first.  I don't

19   remember.

20      Q.    Now, is the physical evidence consistent with

21   Alvis' perception of apparent muzzle flashes consistent

22   with light from reflecting off of the decedent's

23   glasses?

24      A.    Yes.

25      Q.    And it's also consistent with light reflecting

                                                        140

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1    off of a watch that he had?

2        A.    Yes.

3        Q.    And you don't need to have actual muzzle

4    flashes to have that reflection; is that right?

5        A.    That's correct.

6        Q.    And now you have an opinion here on page five

7    of seven, The bullet that caused wound "N" in the left

8    forearm first struck and perforated a wooden membrane

9    before contacting the decedent?

10       A.    A wooden member.

11       Q.    A wooden member before contacting the decedent.

12             Do you know what it struck?

13       A.    I believe one of the wooden members.

14             You asked me which one?

15       Q.    Yeah.

16       A.    No, I don't know which one.

17       Q.    Did you actually observe a damage to a wooden

18   member?

19       A.    It was several, yes.

20       Q.    Okay.

21             MR. LOEBS:  Ben, just how long do you think you

22   might be?

23             MR. NISENBAUM:  Maybe 20 minutes or relatively

24   close.

25             MR. LOEBS:  Do you mind if I just take a quick

                                                         141

1    five-minute break?

2              MR. NISENBAUM:  Then we will call it 25

3    minutes.

4              MR. LOEBS:  Yeah.  I have to make a phone call.

5              MR. NISENBAUM:  Okay.

6              **(WHEREUPON, a brief recess was taken.)**

7              MR. NISENBAUM:  Q.  Now, do you know whether a

8    person seated in the decedent's position would have been

9    able to have had the same difficulty in viewing Officer

10   Alvis that Officer Alvis had from the decedent?

11        A.   Well, I could say there was certainly not a

12   clear view.  They had different perspectives because of

13   certain objects closer to them, so.  And someone seated

14   in the decedent's location would have -- would not have

15   a clear view of Officer Alvis.

16        Q.   Okay.  And does it make a difference that the

17   flashlight is being shined at the decedent to, to a

18   person in the decedent's position?

19        A.   Would that hinder his view?

20        Q.   Yes.

21        A.   Oh, yes, it could, yes.

22        Q.   Would it cause glare?

23        A.   Yes.

24        Q.   And if the person is wearing glasses, do you

25   know if that glare would be increased?

                                                        **142**

1      A.   I don't know if it makes much of a difference

2   in terms of the glare.  But if the flashlight is held in

3   front of Officer Alvis' face, it would be hard for him

4   to see her face.

5      Q.   And a person in Officer Keesor's position,

6   would it be difficult if Officer Keesor was shining a

7   flashlight -- strike that.  A person and Officer Keesor

8   were shining, were shining a flashlight at the decedent,

9   would it be difficult for a person in the decedent's

10  position to see Officer Keesor?

11     A.   To see his face perhaps a flashlight was next

12  to his face, it would, it would hinder his view, yes.

13     Q.   And it would hinder the view of his body as

14  well, correct?

15     A.   It could.

16     Q.   Now, the only sources of light that you are

17  aware of in the attic on the night of June 6, 2006,

18  during the subject incident, aside from any shots that

19  may have been fired were the officers' flashlights; is

20  that correct?

21     A.   There were some and there are still some vents

22  which allow lights, which allow light to come in.  It's

23  not clear to me how much light there was but, you know,

24  the time of the shooting, but I believe there was some

25  ambient outside lights that could have lit through.

                                                        143

1    But, essentially, it was, it was a very dark area.

2        Q.    And the light from that could have lit through,

3    would it make a difference if it was daytime or

4    nighttime?

5        A.    Yes.

6        Q.    And there would be a lot less light bleeding

7    through, if it were nighttime, correct?

8        A.    Yes.

9        Q.    And you understand that this incident of the

10   shooting occurred at night?

11       A.    Yes, but there was some, still some ambient

12   light.  But I, also, I covered up those vents for, for

13   my experiment.

14       Q.    Okay.  Do you intend to offer any opinion with

15   respect to the officers' ability to retreat in the attic

16   of 2 Garces Drive?

17       A.    To the extent that I am familiar with -- I

18   don't comment on police practices.  But to the extent

19   that I am aware that there is no -- there is nothing in

20   that attic that would protect an officer from a gunshot.

21   There is nothing you could hide behind that would stop a

22   bullet.

23       Q.    How about with respect to the layout of the

24   attic, itself, in terms of the officer's movement

25   backwards.

                                                        144

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1           MR. LOEBS:  Objection.

2           That was not a question.  It's just a

3    statement.

4           THE WITNESS:  I'm not sure what you are asking.

5           MR. NISENBAUM:  Q.  Well, I was asking about

6    it.  That was a question.

7           How about, well, you mentioned something about

8    the officers being protected from being shot, correct?

9       A.  I just said there is nothing, if I am asked,

10   there is nothing in the attic that would stop a bullet

11   that the officers could hide behind.

12      Q.  Right.  I guess my question is with respect to

13   -- well, strike that question.

14          You say that "The injury sustained by Officer

15   Alvis is consistent with having been caused by a

16   ricocheting bullet fragment or other small object"?

17      A.  Yes.

18      Q.  And what is that based on?

19      A.  That's based on many years of experience with

20   bullet injuries, bullet fragment injuries.  I have been

21   struck many times by bullet fragments at shooting

22   ranges.  And by my study of wound ballistics and, also,

23   my knowledge of what happens to a bullet striking wood

24   like these joists and vertical members and beams.  And

25   the fact that the jackets are often, the bullet jackets

                                                        145

1   are often chipped off the lead core and go flying

2   different directions.  The type of injury she sustained

3   is consistent with a bullet fragment injury.

4       Q.   How far did bullet fragments fly from the type

5   of guns the officers were using?

6           MR. LOEBS:  Objection.  Incomplete hypothetical

7   and vague.

8           THE WITNESS:  There is a great variation,

9   depending on what they had of a steel and what's most

10  important is the mass of the fragment, how heavy, heavy

11  it is, the further it can fly.

12          MR. NISENBAUM:  Q.  To your knowledge, the

13  abrasion to Alvis' ear, could that have been caused by

14  something other than, other than a fragment?

15      A.   Yes.

16      Q.   Aside from the officers' testimony, can you

17  tell independently what caused the injury to Alvis',

18  Officer Alvis' ear?

19      A.   Only that it's consistent with a bullet

20  fragment.  That's all I can say.

21      Q.   It's consistent with, with something else, too,

22  correct?

23      A.   It could be.

24      Q.   Okay.  And what is your understanding of when

25  Officer Alvis was first observed bleeding?

                                                    **146**

1      A.    At the scene there were descriptions, the

2    reports interviews from officers at the scene, described

3    her injury.  And then she was treated at the, at the

4    General Hospital.  I forget where, where it was.  But it

5    was a report generated.

6      Q.    Do you recall, do you recall officers at the

7    scene testifying in depositions who said that they

8    observed no injuries to Officer Alvis?

9      A.    I don't remember.

10      Q.    And I am talking at 2 Garces Drive.

11      A.    Yes, I don't remember one way or the other.

12      Q.    Okay.  Do you recall what officers -- or strike

13    that.

14            Do you recall who said they observed an injury

15    to Officer Alvis at the scene?

16      A.    I do not.

17      Q.    Okay.  You said "The eyeglass case can produce

18    a loud sound which could be reasonably interpreted as a

19    gunshot"?

20      A.    Yes.

21      Q.    And is that based on your experience hearing

22    guns fire?

23      A.    Yes.

24      Q.    Okay.  Now, I am not certain from your notes,

25    but it looks like that there were some measurements in

147

DEPOSITION OF ALEXANDER JASON - CONFIDENTIAL

1    STATE OF CALIFORNIA    )

2                           )    ss.

3    COUNTY OF SANTA CLARA  )

4

5           I hereby certify that the witness,
     ALEXANDER JASON , in the foregoing deposition appeared
     before me, BARBARA J. BUTLER, a Certified Shorthand
6    Reporter and a disinterested person.

7           Said witness was then and there at the time
     and place previously stated by me placed under oath to
8    tell the truth, the whole truth and nothing but the
     truth in the testimony given on the date of the within
9    deposition; that the deposition is a true record of the
     witness' testimony as reported by me.

10
            The testimony of the witness and all
11   questions and remarks requested by Counsel was reported
     under my direction and control, caused to be transcribed
12   into typewritten form by means of Computer-Aided
     Transcription.

13
            I am a Certified Shorthand Reporter licensed
14   by the State of California, and I further certify that I
     am not interested in the outcome of the said action, nor
15   connected with, nor related to any of the parties in
     said action, nor to their respective counsel.  I am not
16   of counsel or attorney for either or any of the parties
     to the case named in the within caption.

17
            IN WITNESS WHEREOF, I have hereunto affixed
18   my signature this 4th day of June, 2008.

19

20

21   BARBARA J. BUTLER
     Certified Shorthand Reporter
22   California License Number 5604

23
                       --o0o--
24

25
                                                      161