UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| KATHLEEN ESPINOSA, et al., | ) Case No.: C06-04686 JSW |
| Plaintiffs, | ) |
| | ) **PLAINTIFFS' MOTION IN LIMINE NO.** |
| vs. | ) **1 TO EXCLUDE TESTIMONY OF** |
| | ) **DEFENSE EXPERT WITNESS, EMILY A.** |
| | ) **KERAM, M.D., REFERENCES TO** |
| CITY AND COUNTY OF SAN | ) **"SUICIDE BY COP" AND PRIOR BAD** |
| FRANCISCO, et al., | ) **ACTS EVIDENCE** |
| | ) |
| Defendants. | ) Trial Date: December 2, 2013 |
| | ) Trial: 8:00 a.m. |
| | ) Pretrial Conf.: April 1, 2013 |
| | ) Time: 2:00 p.m. |
| | ) Courtroom 11, 19th Floor |
| | ) The Honorable Jeffrey S. White |

# **EXHIBIT 1**

Plaintiffs' Motion in Limine No. 1 to Exclude Testimony of E. Keram, Suicide by Cop, et al,
Espinosa v. City and County of San Francisco, Case No.  C06-04686 JSW

Emily A. Keram, MD
850 Second Street, Suite B
Santa Rosa, CA 95404

May 2, 2008

Peter Keith
Deputy City Attorney
City and County of San Francisco
1390 Market Street, 6th Floor
San Francisco, CA 94102

**Re:** *Espinosa v. City and County of San Francisco, et al.*
*U.S. District Court Northern District, Case No. C06–4686JSW*
Date of Incident: June 6, 2006

Dear Mr. Keith:

At your request, I have reviewed the documents, photographs, audiotapes, and other materials provided to me in the above-referenced matter. Additionally, on April 17, 2008 I visited the apartment and attic scene of the Officer Involved Shooting at 2 Garces, San Francisco, California.

The following report contains my evaluation and opinions in this matter. I reserve the right to modify or change my opinions should additional material become available in the future.

**Reason for Referral**
This matter was referred to me for evaluation and opinion regarding the following issues:

1. Mr. Sullivan's psychiatric diagnosis on June 6, 2006
2. Analysis of whether Mr. Sullivan's behavior on June 6, 2006 were consistent with those of decedents involved in Suicide by Cop (SBC) incidents
3. Impact of Mr. Sullivan's psychiatric diagnosis on his adult functioning

**Collateral Information**
Collateral information was obtained from the San Francisco City Attorney's Office. Please refer to Appendix A for a listing of materials reviewed.

Redacted

1

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*



Kathleen Espinosa also described Mr. Sullivan's social and developmental history. Ms. Espinosa stated that her children's father was abusive. [Kathleen Espinosa deposition, page 18, lines 15-20] He was a drug user and an alcoholic who kept the family very isolated. [Kathleen Espinosa deposition, page 19, lines 1-5] Mr. Sullivan's stepfather yelled "quite a lot" and had a tendency to overreact and put his hands on the kids "in a sense." [Kathleen Espinosa deposition, page 17, lines 4-9] Ms. Espinosa and her infant children were in an infant-parent therapy program because their father was abusive. [Kathleen Espinosa deposition, page 18, lines 11-20]

Mr. Sullivan was the victim of a knife attack on 6/8/94. The police report noted that he was the victim of attempted murder and assault and battery via knife slash to the throat and side of the face and a punch to the head. [Daly City Police Department Case No. 94-5839. San Mateo County criminal records. (no Bates stamp)]

Redacted

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*



Redacted

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*



Redacted

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*



Redacted

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*



Redacted

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

On 12/5/99 Mr. Sullivan was admitted to San Francisco General Hospital after a motor vehicle accident. His blood alcohol content was found to be 155 mg/dL. [San Francisco General Hospital records, page 00001]

On several admissions to the San Francisco Jail, Mr. Sullivan substance use was noted. On 2/15/99 he stated that he "drinks occasionally" and smelled of alcohol. [San Francisco Jail records, 000001]

Redacted

Jason Martin had seen Mr. Sullivan use marijuana, hashish, and methamphetamine. He last saw Mr. Sullivan use methamphetamine "probably a couple of days" before 6/6/06. This occurred at 2 Garces. Mr. Sullivan smoked the methamphetamine with a pipe. Mr. Martin observed Mr. Sullivan using methamphetamine three of four times over the course of Mr. Sullivan's stay at 2 Garces. He did not think that Mr. Sullivan had a problem with methamphetamine or was addicted to it. Mr. Martin believed that Mr. Sullivan was "toning down" his use of methamphetamine by the time of the incident. Mr. Sullivan had previously used it daily, but had stopped for four or five months before starting again, using it once or twice a week. Mr. Sullivan had been using methamphetamine "heavy a couple of years ago" and had probably restarted using it "a couple of months" before the incident." [Martin deposition, page 134, line 2-page 137, line 10] Mr. Martin estimated that in the month prior to the incident, he and Mr. Sullivan used methamphetamine together five or six times. He used methamphetamine with Mr. Sullivan a day and a half to two days prior to the incident. [Martin deposition, page 169, lines 1-19]

Mr. Russell smoked methamphetamine with Mr. Sullivan a couple of times. [Russell deposition, page 62, lines 2-5] He observed Mr. Martin or Mr. Sullivan waiting with "bated breath" at the door for drug dealers to come over "a couple of times." Mr. Sullivan liked pot. Mr. Russell thought he used it daily. [Russell deposition, page 75, lines 3-20] Mr. Russell observed Mr. Sullivan using crystal meth four or five times. In a statement he recalled seeing Mr. Sullivan using crystal meth eight to ten times. This occurred over a month and a half period. [Russell deposition, page 84, line 15-page 86,

7

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

line 8] Mr. Russell estimated that he last saw Mr. Sullivan using crystal meth was one to three days before the incident. [Russell deposition, page 89, lines 16-21]

Sangh Sullivan did not think that Mr. Sullivan was addicted to methamphetamine. [Sangh Sullivan deposition, page 11, lines 1-4]

Ms. Espinosa stated that when he lived with Ms. Espinosa closer to the time he died, Mr. Sullivan was not using alcohol and was in a program. [Kathleen Espinosa deposition, page 32, lines 5-13]

Toxicology results from the autopsy of Mr. Sullivan indicated the presence of amphetamine, methamphetamine, alcohol, cocaine, and benzoylecgonine (a metabolite of cocaine.) [CCSF/ESPI 00702]

**Additional adult psychiatric history**
In a letter to his mother postmarked 11/6/98, Mr. Sullivan indicated that he was attending a drug program five days a week while in jail and was getting a lot out of it. [Correspondence from Asa Sullivan to Kathleen (Plummer) Espinosa]



On 3/8/04 Mr. Sullivan violated the terms of probation by failing to submit proof of participation or completion in a counseling treatment program as ordered by the court. [San Mateo County criminal records, no Bates stamp]

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

In a report dated 1/18/06 titled Substance Abuse Education Program Report, Angela
Wilson noted that Mr. Sullivan attended 23 sessions with no absences. His attendance,
participation, understanding/awareness of effects of alcohol and drug use was excellent.
He was commuting from San Jose six days a week. [San Mateo County criminal records,
no Bates stamp]

**Adult criminal history**

On 7/12/99 Mr. Sullivan plead guilty to one felony count of 212.5(c) PC (robbery), his
first strike offense. He served eight months of jail time and was placed on four years of
probation. During his probation, he was referred on three occasions to have his probation
revoked due to poor performance and served additional jail time. Additionally, his
probation was extended by one year. This offense occurred in San Mateo County. Brass
report, pages 1 and 2]

On 5/27/05 Mr. Sullivan plead guilty to one felony count of 11359 of the H&S Code,
possession of marijuana. He was placed on probation. He violated probation, served
additional jail time, and agreed to serve six months in county jail through the Sheriff's
work alternative program (SWAP) or other programs supervised by the Sheriff's
Department. His probation was extended to 6/9/08. He failed to report to the SWAP
program and a warrant could have been issued for him. His additional sentence would
have been done in jail at that point. This offense occurred in San Francisco County.
[Brass report, pages 1 and 3]

On 5/8/06 Mr. Sullivan plead *nolo contendre* to one felony count each of 460(b) PC and
666 PC, theft and theft after conviction for robbery. The plea bargain stipulated that Mr.
Sullivan would serve no more than 32 months in State Prison and that the sentencing
court would consider a "Romero" motion. This offense occurred in San Mateo County.
[Brass report, pages 1, 3-5]

**Employment history**
Employment records indicate the following:
1. Mr. Sullivan worked at Sears in South San Francisco for ten days,
   11/16/99-11/26/99, at which point his employment terminated. No reason
   for this is given. On his job application, Mr. Sullivan listed previous
   experience as, "I have experience moving heavy objects and doing odd
   jobs for moving companies." The section on work experience requests
   information about the four most recent employers. This section reads,
   "N/A." [Sears records, 00001-4]
2. Mr. Sullivan applied for membership in the Operative Plasterers and
   Cement Masons on 12/18/01. [Cement Mason's Local 300, Area 583
   records, 000015] He indicated less than one year full-time employment to
   date and no dependents. [Cement Mason's Local 300, Area 583 records,
   000012]. He was dropped from the apprenticeship program effective
   4/8/02 for failure to meet class requirements. [Cement Mason's Local
   300, Area 583 records, 000006] This decision was successfully appealed
   on 5/14/02 and he was allowed to re-apply to the apprenticeship program,

9

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

with a waiver of the one year waiting period. [Cement Mason's Local 300, Area 583 records, 000007] Training commenced 6/17/02, in an apprenticeship to last 4200 hours within three years, 8 hours a day, 40 hours a week. The employer is listed as Pankow Co. Builders, LTD. Signed Asa Sullivan 7/3/02. [Cement Mason's Local 300, Area 583 records, 000004] Two months later Mr. Sullivan voluntarily resigned from the Northern California Cement Masons Apprenticeship Program effective, 9/6/02. No reason is given. A handwritten note on this page indicates, "Never rejoined, never worked, per George Brown." [Cement Mason's Local 300, Area 583 records, 000002] A 3/16/03 Letter from Donald Jingles, Mr. Sullivan's supervisor, to Judge H. James Ellis, San Mateo Superior Court states that "I found him to be a reliable, personable employee eager to learn his craft. I feel confident, if given the opportunity, Mr. Sullivan will continue to be a good employee worthy of his trade." The time span during which Mr. Jingles supervised Mr. Sullivan is not listed. [Letter from Donald Jingles, master cement mason, to Judge H. James Ellis, San Mateo Superior Court, 3/16/03]

3. The reviewed materials contain a Goodwill Career Services Contract, attendance contract, from April 27-May 27, signed Asa Sullivan, 4/27/06. This is the only documentation provided from Goodwill.

4. In a 2006 resume, Mr. Sullivan noted the following:
   i. Objective to gain employment as a Retail Sales Associate with possible career advancement.
   ii. Employment experience
      > March 2006 – present Goodwill Industries
      > February – March 2006 Just Unique Auto Detailers
      > October 2001 Apprentice Cement Mason
      > 1999 Sears

Ms. Espinosa related her understanding of Mr. Sullivan's employment history. She stated that Mr. Sullivan had several jobs and left them for "whatever reasons." She did not consider him to be a person that lost jobs. Mr. Sullivan was on General Assistance and never complained about struggling financially. [Kathleen Espinosa deposition, page 24, lines 2-10]

Sangh Sullivan thought that Mr. Sullivan was working three jobs at the time of his death and wanted to provide financial support for his son. The jobs were at a car wash, at Goodwill, and at a union. [Sangh Sullivan deposition, page 8, lines 2-15] [Records do not support his account of Mr. Sullivan's employment.]

Jason Martin thought Mr. Sullivan had a job at the Salvation Army as a sales clerk for approximately one month prior to moving into 2 Garces, and had quit the job. [Martin deposition, page 84, lines 9-22] Mr. Sullivan did not have a job at the time of the incident. He last had a job a month or two before the incident, either at the Salvation Army or Goodwill. That was the only job Mr. Sullivan had during the time Mr. Martin knew him. He thinks Mr. Sullivan worked there for two or three months. [Martin deposition, page 199, line 10-page 200, line 12]

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

Mr. Russell did not think that Mr. Sullivan had a job while he was living at 2 Garces. [Russell deposition, page 93, lines 13-15]

**Opinions and Bases**
The following are my opinions in this matter, to a reasonable degree of medical certainty.

## Mr. Sullivan's psychiatric diagnosis on June 6, 2006

It is my opinion that, in accordance with the Diagnostic and Statistical Manual of the American Psychiatric Association, fourth edition, Text Revision, Mr. Sullivan's psychiatric diagnosis on June 6, 2006 was as follows:

Axis I:        Methamphetamine intoxication
               Methamphetamine abuse
               Alcohol abuse
               Rule-out cocaine and marijuana abuse
               History of Major Depressive Disorder

Axis II:

Axis III:

Axis IV:      Psychosocial stressors:
               1. Pending incarceration
               2. Homelessness
               3. Unemployment
               4. Inadequate finances
               5. Inadequate social support

Axis V:       Global Assessment of Functioning (GAF) cannot be determined due to lack of information

Mr. Sullivan is given a diagnosis of methamphetamine intoxication as his post-mortem blood level was 0.2 mg/L. This level is substantial and likely contributed to behaviors encountered by SFPD officers. [Mendelson report, page 2] As indicated in the Substance Abuse History section above, Mr. Sullivan had history of alcohol abuse and methamphetamine abuse       **Redacted**      continuing to the time of his death, as alcohol and methamphetamine were present in post-mortem toxicology. Therefore the diagnoses of alcohol abuse and methamphetamine abuse are given as well. Post-mortem toxicology was also positive for cocaine and marijuana. There is not enough information in the records reviewed to diagnose Mr. Sullivan with cocaine abuse or marijuana abuse to a reasonable degree of medical certainty. Thus, these diagnoses are considered, and additional information is necessary to either include them or rule them out.

11

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

Redacted

In between episodes of low mood and impaired function, people with this disorder exhibit normal range of mood with return to normal functioning. A diagnosis of Major Depression cannot be made during periods of substance abuse, as substances themselves may cause the symptoms of Major Depression. Thus a diagnosis of Major Depression is not given to Mr. Sullivan, as a result of his polysubstance abuse at the time of his death.

Mr. Sullivan meets diagnostic criteria for Antisocial Personality Disorder, a pervasive pattern of disregard for and violation of the rights of others occurring

# Redacted

Redacted    These are reflected in his criminal history, chronic unemployment, homelessness, and failure to contribute meaningfully to the financial support of his son.

**Evaluation and opinion of whether Mr. Sullivan's behavior on June 6, 2006 was consistent with those of decedents involved in Suicide by Cop (SBC) incidents**

It is my opinion that Mr. Sullivan's behavior on June 6, 2006 was consistent with those of decedents involved in SBC incidents and that Mr. Sullivan engaged in behavior which posed an apparent risk of serious injury or death, with the intent to precipitate the use of deadly force by law enforcement personnel.

Precipitators of SBC may be classified by the timing of their development of suicidal intent and SBC plan in relation to the time at which they come to law enforcement attention. Three categories of precipitators have been identified:

1. Precipitators who are not imminently suicidal and who therefore do not have an SBC plan prior to coming to law enforcement attention, and for whom the consequence of law enforcement contact is unacceptable. These precipitators do not engage in behavior designed to bring them to law enforcement. They typically come to law enforcement attention through inadvertent means, such as a traffic stop, the unexpected serving of a warrant, or an attempt to flee a crime that has caused unwanted law enforcement contact. The consequence of law enforcement contact is unacceptable because it will result in lengthy, or life, imprisonment. Precipitators usually have an outstanding warrant, are on probation, or are second strikers who are committing their third strike offense when they come to law enforcement attention. Precipitators may try to flee law enforcement, only to turn to their SBC plan when the possibility of escape becomes impossible.

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

2. Precipitators who are imminently suicidal but who do not have an SBC plan prior to coming to law enforcement attention. These precipitators also do not engage in behavior designed to bring them to law enforcement attention. Rather, they are typically interrupted during a suicide attempt by a citizen who then calls 911. Once the police are on scene, the precipitator develops the SBC plan, taking advantage of the opportunity that unanticipated law enforcement presence presents.

3. Precipitators who are imminently suicidal, who have an SBC plan, and who intentionally bring themselves to law enforcement attention as a means of carrying out this plan.

Research on SBC has identified a variety of reasons for choosing this as a method of suicide. These include, but are not limited to, refusal to be incarcerated, religious proscription against suicide, fear of failing at one's own suicide, a belief that law enforcement will succeed in using lethal force, desire to "go out in a blaze of glory," desire to inflict psychological trauma on law enforcement officers, and desire to allow survivors to prevail in subsequent civil litigation.

Regardless of the reason for choosing SBC as their method of suicide, once precipitators have come to law enforcement attention they must engage in behavior that poses an apparent risk of serious injury or death, in order to cause the deployment of deadly force by law enforcement personnel. Individuals may exhibit similar behaviors during their confrontation with law enforcement in their attempt to precipitate the use of deadly force. These include making threatening statements to law enforcement; asking or telling law enforcement to kill them; non-compliance with commands, especially commands to show their hands; and presenting escalating levels of threat if they are not successful in initially causing deployment of lethal force. Precipitators may not be aware of the use of force spectrum available to law enforcement as well as use of force training. They may not know what behaviors they must exhibit in order to precipitate the use of lethal force. If they are not initially successful in causing the deployment of lethal force, they may engage in increasingly more threatening behavior in order to convince the officers of their intent to cause injury or death. For example, they may first refuse to show their hands and later make a gesture or point an object or weapon at officers. Precipitators may even engage in the use of lethal force themselves. In one SBC study, three of eleven precipitators of SBC shot police officers.

Finally, three patterns of behavior have been identified as indicators of the immediate provocation of lethal force in SBC events. "Counting down," in which the precipitator actually counts up or down to a pre-determined, and sometimes stated, number; "cadence," in which the precipitator engages in rocking or some other stereotyped behavior which may come to an abrupt stop; and "pumping up," in which the precipitator takes one or more deep breaths prior to escalating their level of threat. In SBC trainings, law enforcement officers are taught to be vigilant for these three indicators of possible imminent escalation of threat.

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

It is my opinion that on the evening of June 6, 2006, Mr. Sullivan had risk factors for the first type of SBC described above. Research in SBC has demonstrated demographic factors found among SBC precipitators. These include factors present in Mr. Sullivan's history, such as unemployment, criminal history, [Redacted] substance abuse history, and history of suicide attempts. It is my opinion that the common demographic characteristics Mr. Sullivan shared with SBC precipitators, combined with his pending incarceration, placed him at high risk for SBC in the event that he came to law enforcement attention. Although there is not enough information to assess whether he was suicidal prior to coming to law enforcement attention on that day, the consequences of that attention were unacceptable to him. At the time that he came to law enforcement attention, Mr. Sullivan had an outstanding SWAP warrant as a result of his failure to report to the court ordered work program. Therefore, he would have been immediately arrested and incarcerated without bail. In addition, he would have been transferred to San Mateo County for sentencing on an adjudicated felony theft conviction as a result of a plea bargain he had entered on May 8, 2006. As a result of this he would be sentenced to 32 months in State Prison, and would have served 27 months. [Brass report, page 1] Statements that Mr. Sullivan made to Officer Keesor on 6/6/06 indicate that Mr. Sullivan was aware of his pending incarceration. Mr. Sullivan told Officer Keesor, "I had a shitty attorney. If I did anything wrong I'd be going back for six years straight. I'm not going back." [Keesor homicide statement, pages 6-7]

It is also my opinion that on the evening of June 6, 2006, Mr. Sullivan engaged in multiple behaviors characteristic of SBC incidents. These include making threatening statements to law enforcement; telling law enforcement to kill him; non-compliance with commands to surrender and show his hands; and presenting escalating levels of threat after he was not initially successful in precipitating the use of lethal force. Finally, Mr. Sullivan exhibited "pumping up" behavior immediately prior to engaging in the behavior which lead Officers Keesor and Alvis to use lethal force.

Mr. Sullivan made multiple threatening statements to law enforcement and told them to kill him. Additionally, he instructed them to give messages to family. Officer Alvis stated that she heard Mr. Sullivan "saying something about to tell his baby's momma something." [Alvis deposition. Vol. II, page 25, lines 9-10] Mr. Sullivan said, "Kill me or I'm going to kill you." "The only way I can come out of here is dead," "Shoot me." "There's no way I'm going back." [Alvis deposition. Vol. II, page 26, line 18-page 27 line 7]

Officer Keesor reported that Mr. Sullivan said, "You are not going to take me alive." [Keesor deposition, page 138, lines 23-24] Officer Keesor asked Mr. Sullivan, "What's going on? What's wrong?" Mr. Sullivan said, "I can't go back. I can't go back." [Keesor homicide statement, page 5] Officer Keesor said, "What's up with going back?" Mr. Sullivan said, "I had a shitty attorney. If I did anything wrong I'd be going back for six years straight. I'm not going back." Officer Keesor said, "Look man, we don't know if you did anything wrong. We just wanna know what's going on with you, okay? I wanna know who you are." Mr. Sullivan said, "No, no, no, no, I'm not going back. I'm not going back, you can't take me." He continued, "You ready to earn your medal? You

14

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

wanna get a medal?" Officer Keesor told Mr. Sullivan that he didn't want to do anything
on 5/6/06, as he could go to a bad place if that happens. Mr. Sullivan said, "Jail or hell,
either way, jail is hell, and I don't believe in it anyway, so I don't care." Mr. Sullivan
mentioned the medal again and asked, "Are you ready to shoot me?" [Keesor homicide
statement, pages 6-7]

Officer Morgado heard Mr. Sullivan say, "Tell my mom I love her, and my girl I love
her." Mr. Sullivan continued, "Tell my mom I love her, tell my girl I love her, because
when I do what I am about to do, you guys are going to be sorry." [Morgado deposition,
page 172, line 1-7] Mr. Sullivan made the comment regarding what to tell his family
over five times, throughout the conversation, in a loud tone of voice. [Morgado
deposition, page 181, lines 1-22] Mr. Martin told Mr. Sullivan "Something along the
lines of 'Why are you doing this; just come down; they are not going to hurt you.'" Mr.
Sullivan responded that "he is not going back." [Morgado deposition, page 177, lines 3-
19] Mr. Sullivan said, "You guys aren't gonna take me into custody. You're gonna have
to fight, 'cause I'm not gonna go down." "I'm not going, they're not gonna take me."
"Tell my mama I love her, tell my girlfriend I love her. And when I make my move, this
is how it's gonna go." [Morgado homicide statement, page 5]

Officer Oshita reported that Mr. Sullivan said, "The only way you're gonna get me out is
you shoot me, you shoot me, kill me, come on, kill me." [Oshita homicide statement,
page 4] He heard Mr. Sullivan call down to Mr. Martin, "Hey, tell my mom and tell my
girl I love her. I'm gonna make my move and you guys are gonna be sorry." [Oshita
homicide statement, page 5]

Beneath Mr. Sullivan, from his position in the hallway and bathroom, Officer Leung told
Mr. Sullivan to give up and walk out. Mr. Sullivan responded, "not in a nice way but in a
pretty aggressive way, 'Come and get me,' in a very loud, aggressive, challenging
manner." [Leung deposition, page 82, line 12-page 84, line 5]

Also consistent with the behavior of precipitators of SBC, Mr. Sullivan refused to follow
officers' commands to show his hands. [Keesor deposition, page 140, line 9-page 141,
line 19] [Alvis deposition. Vol. I, page 194, lines 6-14] [Morgado deposition, page 166,
line 24-page 168, line 6] [O'Leary homicide statement, page 4] [Leung deposition, page
82, line 12-page 84, line 5] [Cboy deposition, page 166, line 12-page 167, line 21]

As noted above, precipitators of SBC may engage in an escalating level of threat if they
are not successful in initially causing deployment of lethal force. Mr. Sullivan presented
SFPD officers with such an escalating level of threat. He made verbal statements to the
police that they could kill him or he would kill them. He refused to comply with law
enforcement commands to show them his hands. He kept his right hand hidden in the
insulation and moved it toward his back. Finally, he made a sudden movement. Officers
Alvis and Morgado described this as Mr. Sullivan bringing his right shoulder or arm
toward his left front. Officer Keesor described as Mr. Sullivan bringing his right hand up
and out toward Officer Keesor, holding a black object that he thought was a gun. This
movement resulted in Officer Keesor and Officer Alvis deciding to fire their weapons.
Officer Morgado was unable to do so, as Officer Keesor had moved into his line of fire.

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

Officer Morgado therefore released the trigger without firing. [Keesor deposition, page 160, lines 8-25; page 163, line 1-page 164, line 5; page 165, lines 4-10; page 171, lines 16-19] [Keesor homicide statement, pages 6-7] [Alvis deposition. Vol. II, page 31, line 7-page 32, line 20; page 41, lines 14-23; page 43, line 20-page 48, line 13] [Morgado deposition, page 182, line 3-page 185, line 24; page 186, line 22-page 187, line 15; page 220, line 6-page 221, line 13]

Finally, with respect to additional behavior of Mr. Sullivan's that supports the conclusion that he committed an SBC, Officer Keesor observed behavior that is consistent with the phenomenon of "pumping up," in which the SBC precipitator takes one or more deep breaths prior to escalating their level of threat. "Immediately before I fired at Mr. Sullivan, he looked right at me. He took a deep breath. And whether with his right hand or his left hand or both hands, he sat up forward and he punched his arms straight out and pointed an object, long, black slender object, which at that moment I believed to be a gun towards the direction of Officer Alvis." [Keesor deposition, page 160, lines 8-25] "And then all of a sudden he looks at me, and takes...He looks at me, and he gives me this weird look, and he takes a deep breath, and all at once, like...I'm, I'm over here and he's facing Officer Alvis. He takes a deep breath, and he goes, he's looking at me really funny, and he goes, and he goes forward, and he's got something black in his hand. [Keesor homicide statement, pages 6-7]

**Impact of Mr. Sullivan's psychiatric diagnosis on his adult functioning**

Redacted

Redacted   As a result, and despite his considerable intelligence and potential, Mr. Sullivan did not develop the capacity to establish healthy relationships, sustained academic success, or employment. He continued to engage in substance abuse and antisocial behavior until the time of his death.

Redacted

Redacted   People who experience the severe lack of childhood security and support sustained by Mr. Sullivan learn from an early age that other people cannot be counted upon and that they must take care of themselves. However, because they lack good role models, they never learn to do so appropriately. Additionally, without early meaningful and safe bonding experiences, their later relationships tend to be superficial and without emotional intimacy. The capacity to experience empathy is impaired as a result of not having this modeled by adults as well.   Redacted

Redacted

16

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

# Redacted

Redacted    In her deposition, Ms. Espinosa did not recall the turmoil that characterized their relationship. She stated that as a teenager, Mr. Sullivan "has always been respectful to me, always been loving. There have been some problems with his emotions." She did describe that there was "the other side where he was a difficult child." [Kathleen Espinosa deposition, page 22, lines 4-15] Ms. Espinosa did describe behaviors in Mr. Sullivan consistent with his inability to form intimate relationships. She reported that as an adult, it was typical for Mr. Sullivan to "disappear" or for her not to hear about him sometimes. [Kathleen Espinosa deposition. Page 34, lines 3-12] Ms. Espinosa did not hear from Mr. Sullivan after she left for Southern California at the end of April 2006. [Kathleen Espinosa deposition. Page 35, lines 10-19] As further evidence of this lack of intimacy, Mr. Sullivan did not accurately convey his circumstances to Ms. Espinosa, who was unaware of his ongoing substance abuse, ongoing unemployment, and legal situation.

Mr. Sullivan continued to rely on his mother financially into his adulthood. He used her cell phone or she gave him phone cards. Additionally, when he lived with her, he did not assist with rent. Ms. Espinosa stated that Mr. Sullivan did share food and was good at cleaning up the house and helping her with chores and errands. [Kathleen Espinosa deposition, page 25, lines 17-24] However, when she was in the process of moving to Southern California in the spring of 2006 she had to take Mr. Sullivan's bed and other belongings from her house to a girl's house. The girl then paid for it to be stored for Mr. Sullivan. [Kathleen Espinosa deposition, page 31, lines 20-25]

Thus, it is my opinion that Mr. Sullivan's ability to have an appropriately healthy, nurturing, and close adult relationship with his mother was impaired by his lack of internal psychological resources, difficulty in understanding the feelings of others, ongoing antisocial behavior, and substance abuse. His chronic unemployment obviously impaired his ability to assist his mother financially.

Sangh Sullivan stated that he saw his brother everyday in the few years before Mr. Sullivan died. "We slept in cars together." In San Francisco. [Sangh Sullivan deposition. Page 5, lines 17-21] However, their relationship was characterized by fighting and lack of intimacy. Sangh Sullivan was also unaware of Mr. Sullivan's substance abuse, ongoing unemployment, and legal situation.

Mr. Sullivan did not form a sustained healthy relationship with Ms. Guerra. She reported that after the birth of their son, they did not have a relationship as "boyfriend and

17

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

girlfriend." [Guerra deposition, page 49, lines 11-13] Mr. Sullivan moved out after three
months because of differences about the way they wanted to raise their son. [Guerra
deposition, page 49, lines 11-13] Mr. Sullivan did not pay rent during the three months
that he lived with Ms. Guerra. He did bring home food and shared the bill when they ate
out. He did not have a job and so did not contribute otherwise to the financial support of
their son. Ms. Guerra does not know the source of the money Mr. Sullivan did
contribute. [Guerra deposition, page 27, line 14-page 29, line 10] Ms. Guerra felt that
Mr. Sullivan's homelessness interfered with his ability to hold a job. She did not know
why he had a hard time finding places to stay. He did not stay with her because they each
had their own lives. [Guerra deposition, page 53, lines 16-21]

## Redacted

Mr. Sullivan was around "a lot" in the first year of their son's life. He took care of their
son while Ms. Guerra was at work for the first two weeks after their son's birth. Mr.
Sullivan also saw their son "a lot of days" during the week after that. [Guerra deposition,
page 36, line 17-page 37, line 24 and page 40, lines 21-25] During the second and third
years of their son's life, Mr. Sullivan saw their son "it would be two weeks that he
wuodn't see Asa, and then the next week he would see Asa for two or three days or four
days, and then he woudn't see him and then maybe the next week he see him for a
day..." [Guerra deposition, page 42, lines 7-15] There were times when Mr. Sullivan
took their son for a couple of days. Ms. Guerra did not know how many times that
happened. [Guerra deposition, page 43, lines 13-25] Mr. Sullivan never picked up or
dropped off their son at school. He never met his son's kindergarten teacher. He went to
their son's doctor's appointments twice. [Guerra deposition, page 44, line 13-page 45,
line 4] There were months at a time when Mr. Sullivan would not see Ms. Guerra or his
son. These occurred when he had a girlfriend. The longest time was "maybe a month
and a half." Ms. Guerra took some responsibility for that, as she was mad he had a
girlfriend. [Guerra deposition, page 57, line 9-page 58, line 10] Ms. Guerra does think
that Mr. Sullivan was present for each of their son's birthdays. [Guerra deposition, page
59, line 4]

Mr. Martin, with whom Mr. Sullivan was staying prior to his death, thinks he met Mr.
Sullivan's son on one occasion. Mr. Sullivan spoke about his son, "A little bit every now
and then." During the time that Mr. Martin "hung out" with Mr. Sullivan, "he'd only see
his kid every now and then, from what I knew." When Mr. Sullivan was getting along
with his son's mother he would go see his son. As far as Mr. Martin knew, Mr. Sullivan
missed being with his son. Mr. Sullivan argued a lot with the mother of his son. [Martin
deposition, page 194, line 9-page 196, line 4]

Mr. Sullivan never provided regular financial support for their son. He did get him shoes
and some clothes "here and there." [Guerra deposition, page 29, line 11-page 30, line 24]
Before Mr. Sullivan died there was a period of time when he provided no support of any
kind for his son. Ms. Guerra could not define this time period. "Asa had a crazy life. I
had a crazy life. My son was in the middle of it." [Guerra deposition, page 32, lines 2-

18

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

14] During the times that Mr. Sullivan was working, he did not contribute financial support to their son because he and Ms. Guerra were not speaking at that time because they were arguing. [Guerra deposition, page 32, line 24-page 33, line 16] Throughout their son's life Ms. Guerra received one check of child support from Mr. Sullivan, a couple of months before he died. [Guerra deposition, page 46, line 5-7]

Mr. Sullivan's son likely enjoyed his father's presence and attention when Mr. Sullivan did see him. However, Mr. Sullivan does not appear to have been a strong and consistent presence in his son's life. It also appears that he did not take steps to improve this, by, for example, seeing his son on a regular schedule, working with Ms. Guerra to decrease the friction between them in the best interest of their child, abstaining from substances, and obtaining sustained employment in order to contribute financial support to his son. Mr. Sullivan's lack of internal psychological resources, difficulty in understanding the feelings of others, ongoing antisocial behavior, and substance abuse impaired his ability to have a healthy relationship with his son. His chronic unemployment obviously impaired his ability to assist his son financially. Additionally, and despite that fact that he almost certainly loved his son, because Mr. Sullivan did not experience adequate empathy and nurturance as a child, it is likely that he would not have been able to form a healthy, nurturing, and intimate bond with his son.

Finally, it is my opinion that Mr. Sullivan's past history and ongoing participation in high risk behaviors place him at risk of premature death, further compromising his ability to provide care and support to family members. Among the factors that place him at risk of premature death include his past history of depression, suicide attempts, chronic substance abuse, non-compliance with mental health treatment, and criminal behavior.

Thank you for referring this matter to me for evaluation and report.

Sincerely,

Emily A. Keram, MD

19

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

## Appendix A

### Collateral Information Reviewed

**San Francisco Police Department Records, Officer Involved Shooting Investigation,
Case No. 060601331, Inspectors Lynch and Cleary**

1. SFPD Incident Report No. 051-401-609, December 14, 2005. Warrant arrest for David Russell. CCSF/ESPI 00033-34
2. SFPD Incident Report No. 060596588, June 5, 2006. Suspicious occurrence near 509 Gonzalez Drive. CCSF/ESPI 00030-32
3. SFPD Incident Report No. 060601331, June 16, 2006. Burglary. CCSF/ESPI 00035-40
4. Chronological of Investigation, CCSF/ESPI 00041-43
5. Event History Detail, CCSF/ESPI 00042-56
6. San Francisco Sheriff's Department Order for Return to Custody for Asa Sullivan dated May 24, 2006, CCSF/ESPI 00057
7. SFPD Person, Incident, and Field Interview Report, CCSF/ESPI 00058-61
8. Certificate of Release for Jason Martin, June 7, 2006, CCSF/ESPI 00062
9. Witness interviews by Inspectors Cleary and Lynch
   a. David Russell, June 28, 2006, CCSF/ESPI 00063-69, repeated CCSF/ESPI 00081-83, 00100, notes, audio file, and transcript
   b. Karina Lee Mathisen, 507 Gonzalez, June 12, 2006, CCSF/ESPI 00070-76, notes and audio file
   c. John E. Sarmiento, 507 Gonzalez, June 12, 2006, CCSF/ESPI 00077-80, notes, audio file, and transcript
   d. Sergeant Darren Choy, June 7, 2006, CCSF/ESPI 00084-88, notes, audio file, and transcript
   e. Officer Erik Leung, June 7, 2006, CCSF/ESPI 00089-91, notes, audio file, and transcript
   f. Officer Molly O'Leary, June 7, 2006, CCSF/ESPI 00092, notes, audio file, and transcript
   g. Officer Patrice Scanlon, June 7, 2006, CCSF/ESPI 00093, notes, audio file, and transcript
   h. Officer Yukio (Chris) Oshita, June 7, 2006, CCSF/ESPI 00094-95, notes, audio file, and transcript
   i. Roberto Castillo, King Security, June 7, 2006, CCSF/ESPI 00096, notes, audio file, and transcript
   j. Manuel Chavez, June 7, 2006, CCSF/ESPI 00097, notes, audio file, and transcript
   k. Officer Alan Lamb, June 7, 2006, CCSF/ESPI 00098, notes, audio file, and transcript
   l. Margarita Michelle Wynn, General Manager of The Villas Parkmerced, June 12, 2006, CCSF/ESPI 00099, 00101-07, notes
   m. Sergeant Fitzgerald Wong, June 7, 2006, CCSF/ESPI 00108, notes, audio file, and transcript

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

        n.  Sangh Sullivan, undated, CCSF/ESPI 00109, 00138-40
             (handwritten notes only)

        o.  Lisa Jean Carella, 505 Gonzalez, June 8, 2006, CCSF/ESPI 00110-
             11, 00141-43, notes, audio file, and transcript

        p.  Colleen Vignati, 509 Gonzalez, June 8, 2006, CCSF/ESPI 00112-
             19, notes, audio file, and transcript

        q.  Gina Vignati, 509 Gonzalez, June 8, 2006, CCSF/ESPI 00120-27,
             notes, audio file, and transcript

        r.  Kristen Marie Marcos, 106 Garces, June 8, 2006, CCSF/ESPI
             00128-33, notes and audio file

        s.  Jarrett E. Schank, 2 Garces lease, June 7, 2006, CCSF/ESPI
             00134-37, notes, audio file, and transcript

        t.  Lt. John Dobson, June 7, 2006, CCSF/ESPI 00144-48, notes

        u.  Jason Ramone Martin, June 7, 2006, CCSF/ESPI 00149-55, notes,
             audio file, and transcript

        v.  Officer Paulo Morgado, June 7, 2006, CCSF/ESPI 00156-67,
             notes, audio file, and transcript

        w.  Officer Michelle Alvis, June 7, 2006, CCSF/ESPI 00168-74, notes,
             audio file, and transcript

        x.  Officer John Keesor, June 7, 2006, CCSF/ESPI 00175-83, notes,
             audio file, and transcript

        y.  Officer Joe Chang, June 7, 2006, audio file and transcript

        z.  Officer Molly O'Leary, June 7, 2006, audio file and transcript

        aa. Sangh Sullivan, June 23, 2008, audio file and transcript

10. SFPD Crime Scene Investigations Unit report, CCSF/ESPI 00184-202

11. Map of area, CCSF/ESPI 00203

12. Request for Narcotic Analysis, June 15, 2006 and Report of Laboratory
    Examination, June 20, 2006, CCSF/ESPI 00204-7

13. Ballistics, firearms, and fingerprint analysis, CCSF/ESPI 00208-234

14. Photographs of eyeglasses case, CCSF/ESPI 00235-240

15. Evidence bag list, CCSF/ESPI 00241

16. Media reports, CCSF/ESPI 00242-47

17. SFPD and Pathology evidence logs, CCSF/ESPI 00248-69

18. Miscellaneous notes, reports, records, media, CAD transcripts, etc.,
    CCSF/ESPI 00270-670

19. SFPD Incident Report 060601331 with statements, Burglary, June 7,
    2006, CCSF/ESPI 00671-81

20. Worker's Compensations records, CCSF/ESPI 00682-90

21. Medical Examiner's Register, Case No. 2006-0573, October 12, 2006,
    CCSF/ESPI 00691-710, repeated CCSF/ESPI 01464-01489

**Mental health and medical records**

Redacted

  3.  San Francisco General Hospital. Pages 00001-131

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

    4. San Mateo County Office of Mental Health. Volumes 1 & 2. Pages 000001-433

    5. San Francisco County Mental Health. Pages 000003-7

**Jail mental health and medical records**

    1. San Francisco Jail, records from admissions dated 2/15/99, 12/10/00, 7/6/2001, 12/11/02, 2/23/03, 5/4/05, 10/15/05. Pages 000001-48

**Employment records**

    1. Sears Roebuck & Co. Pages 000001-11.

    2. Cement Mason's Local 300, Area 583. Pages 000001-23.

**Criminal records**

    1. San Francisco Sheriff's Department, CCSF/ESPI 01512-534

    2. San Mateo County law enforcement agencies, no Bates numbers

**Plaintiff's disclosures**

    1. Birth certificate

    2. Duplicates of records from Cement Mason's Local 300, Area 583

    3. Substance Abuse Education Progress Report, City and County of San Francisco, Office of the Sheriff, 1/18/06, no Bates numbers

    4. Goodwill Career Services Contract, 4/27/06

    5. Correspondence between Asa Sullivan and Kathleen (Plummer) Espinosa, 1998

    6. Letter from Donald Jingles, master cement mason, to Judge H. James Ellis, San Mateo Superior Court, 3/16/03

    7. Photographs

    8. Duplicate autopsy report

    9. Media and online reports

    10. Notice of funeral service

    11. Undated resume of Asa Sullivan

    12. Records from Office of Citizens Complaints, City and County of San Francisco

    13. Documents from The Villas, Parkmerced management

    14. Settlement agreement and stipulation for voluntary vacation of rental unit

    15. Documents regarding Brian Gudor and The Villas, Parkmerced

    16. Records relating to child support order

    17. Optometry and ophthalmology records

    18. Billing records, San Francisco General Hospital

    19. Billing regarding funeral expenses

    20. Stolen Lives, killed by law enforcement, update booklet, written and distributed by the October 22nd Coalition

    21. Application for victim compensation, Kathleen Espinosa

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

**Depositions**

**Law enforcement**

1. Officer Erik Leung, October 24, 2007
2. Inspector Ronan Shouldice, October 24, 2007
3. Sergeant Tracy McCray, October 25, 2007
4. Sergeant Darren Choy, January 10, 2008
5. Officer John Keesor, February 12, 2008
6. Officer Michelle Alvis, February 22, 2008
7. Officer Paulo Morgado, February 27, 2008
8. Sergeant Jeremiah Morgan, March 5, 2008

**Civilians**

1. Margarita Wynn, March 15, 2007
2. Colleen Vignati, July 17, 2007
3. Gina Vignati, July 17, 2007
4. Lisa Carella, July 24, 2007
5. Jason Ramone Martin, volume I, July 25, 2007, volume II, January 8, 2008
6. David Russell, March 24, 2008

**Relatives and former girlfriend of Mr. Sullivan**

1. Sangh Sullivan, December 18, 2008
2. Kathleen Espinosa, January 18, 2008
   a. Photographs and correspondence produced at deposition
3. Nicole Guerra, January 18, 2008

**Additional interviews**

1. Jason Martin, interview by plaintiff's investigator Ralph Hernandez, 6/9/06
2. Officer Keesor, Management Control Division interview, 6/12/06 and 4/30/07
3. Officer Keesor, Office of Citizen Complaints interview, 1/29/07
4. Officer Alvis, Management Control Division interview, 6/12/06 and 4/26/07
5. Officer Alvis, Office of Citizen Complaints interview, 1/25/07
6. Officer Morgado, Management Control Division interview, 6/12/06
7. Officer Morgado, Office of Citizen Complaints interview, 1/24/07
8. Officer Oshita, Management Control Division interview, 6/12/06
9. Officer Oshita, Office of Citizen Complaints interview, 1/11/07
10. Officer Leung, Management Control Division interview, 7/5/06
11. Officer Leung, Office of Citizen Complaints interview, 1/11/07

**Reports of expert witnesses**

1. Report of Anthony J. Brass, Attorney at Law, April 24, 2008
2. Report of John Mendelson, MD, April 28, 2008

**San Francisco Police Department General Orders and Training Materials**

1. SFPD General Order 6.14, Psychological Evaluation of Adults, July 27, 1994, 00711-17

23

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

2. Learning Domain 37, Mental Illness, 00718-59
3. SFPD General Order 5.01, Use of Force, October 4, 1995, 00760-70
4. SFPD General Order 5.02, Use of Firearms, November 1, 1995, 00771-73
5. Learning Domain 20, Use of Force, 00774-00885
6. SFPD General Order 8.01, Critical Incident Evaluation and Notification, August 3, 2004, 00886-87
7. SFPD General Order 8.02, Hostage and Barricaded Suspect Incidents, August 3, 1994, 00888-91
8. SFPD General Order 8.04, Critical Incident Response Team, August 3, 1994, 00892-93
9. SFPD Department Bulletin, Ramey-Entering a Home to Make an Arrest, November 11, 2006, 00894-96
10. Learning Domain 16, Warrantless Searches and Seizures, 00897-940

**Declarations**

1. Transcript of Audio Dispatch Recording of CAD #3604. Declaration of Daneshia Adamson in Support of Defendants City and County of San Francisco, et al., Motion for Summary Judgment

**Videotapes**

1. Crime Scene Video, Espinosa vs. CCSF 00668
2. KTVU Fox 2, Espinosa vs. CCSF 061556
3. KGO Channel 7, Espinosa vs. CCSF 061556
4. KRON 4, Espinosa vs. CCSF 061556

**Audio files**

1. CAD audio #3604 (edited) 061556
2. MCD interview of Sergeant Tracy McCray, July 13, 2006

**Additional photographs**

1. Photographs from San Francisco Police Department Evidence Log
2. Photographs taken by City Attorney's Office investigator

**Research article**

Hutson HR, Anglin D, Yarbrough J, Hardaway K, Russell M, Strote J, Canter M, Blum B. Suicide by cop. Ann Emerg Med. 1998 Dec;32(6):665-9.

In addition, the following records have been requested, but have not been received as of the date of this report:



1.
2.
3.
4.
5.
6.
7.

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

Redacted

9.  Employment records, Just Unique Auto Detail Service
10. Employment records, Salvation Army Thrift Store
11. San Francisco State University Police Department records re: Jarrett Edward
    Schank

Redacted

25

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

## Appendix B

### Fee schedule of Emily A. Keram, M. D.

I charge $500 an hour for all activities related to medical legal evaluations.

*Report of Emily A. Keram, MD*
*Re: Asa Sullivan*

## Appendix C

### Rule 26
### Deposition and Trial Testimony of Emily A. Keram, MD

**Deposition testimony**
    2004
        *DeBoer v. City of Olympia, et al.*

    2005
        *Drypen et al. v. County of Oakland, et al.*
        *Flanary v. City of Kelso, et al.*
        *Franks v. Costco, et al.*

    2007
        *Boyd v. City and County of San Francisco, et al.*

    2008
        *Zehra A.., et al, vs. Calvin Cat, State of California, et al.*
        *Minnard v. Rotech Healthcare, Inc.*

**Trial testimony**
    2005
        *Flanary v. City of Kelso, et al.*

    2007
        *Boyd v. City and County of San Francisco, et al.*

**Daubert hearing**
    2007
        *Boyd v. City and County of San Francisco, et al.*

**Involuntary medication for incompetent defendant hearing**
    2008
        *California v. Olian Byrd, Jr.*