UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| KATHLEEN ESPINOSA, et al., | Case No.: C06-04686 JSW |
| Plaintiffs, | **PLAINTIFFS' MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY OF DEFENSE EXPERT WITNESS, EMILY A. KERAM, M.D., REFERENCES TO "SUICIDE BY COP" AND PRIOR BAD ACTS EVIDENCE** |
| vs. | |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | Trial Date: December 2, 2013<br>Trial: 8:00 a.m.<br>Pretrial Conf.: April 1, 2013<br>Time: 2:00 p.m.<br>Courtroom 11, 19th Floor<br>The Honorable Jeffrey S. White |

# EXHIBIT 2

Plaintiffs' Motion in Limine No. 1 to Exclude Testimony of E. Keram, Suicide by Cop, et al,
Espinosa v. City and County of San Francisco, Case No. C06-04686 JSW

# EXHIBIT A

## TO

**DECLARATION OF EMILY A. KERAM, M.D. IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE #2:
MOTION TO EXCLUDE SUICIDE BY COP AND TESTIMONY
OF DR. EMILY KERAM**

EXHIBIT 2

EMILY A. KERAM, M.D.
850 SECOND STREET, SUITE D
SANTA ROSA, CA 95404

TELEPHONE: (707) 525-0800

March 29, 2007

Scott Wiener
Deputy City Attorney –
City and County of San Francisco
1390 Market Street, 6th Floor
San Francisco, CA 94102

> Re:   *Boyd v. City and County of San Francisco, et al.*
> *U.S. District Court Case No. C04-5459*

Dear Mr. Wiener:

At your request, I have reviewed the documents, videotapes, and other materials provided
to me in the above-referenced matter. The following report contains my evaluation and
opinions in this matter. I reserve the right to modify or change my opinions should
additional material become available in the future.

**Reason for Referral**

This matter was referred to me for evaluation and opinion regarding the following issues:

1. Mr. Boyd's psychiatric diagnosis on the evening of May 5, 2004
2. Analysis of whether Mr. Boyd's behavior in the days preceding, and on the
   evening of May 5, 2004 were consistent with those of decedents involved in
   Suicide by Cop (SBC) incidents

**Collateral Information**

Collateral information was obtained from the San Francisco City Attorney's Office and
included the following:

**San Francisco Police Department Records Regarding Mr. Boyd**
1. Officer Involved Shooting Report, Case Number 040 510 902, O.I.S. 04-05,
   Investigation by Inspector James Spillane #484 and Inspector Thomas Cleary
   #721, Investigations Bureau-Homicide Detail, San Francisco Police
   Department.
2. Officer Involved Shooting Report supporting documents, San Francisco
   Police Department, including the following:
   a. Traffic Collision Report, California Highway Patrol, Number 4 200,
      April 20, 1993

*Report of Emily A. Keram, MD*
*Re:  Cammerin Boyd*

    b.  Incident Report number 931741771, San Francisco Police Department,
      date of incident November 19th 1993, relating to Mr. Boyd's charge of
      possession of a loaded sawed off shotgun

    c.  Incident Report number 991305674, San Francisco Police Department,
      date of the incident October 25, 1999, relating to a semiautomatic
      pistol recovered from under the driver's seat of a stolen vehicle

    d.  Incident Report number 030-466-234, San Francisco Police
      Department, date of incident April 21, 2003, relating to Mr. Boyd's
      arrest for robbery in a street or public place with a gun, and possession
      of a firearm by a prohibited person

    e.  Crime Report, RD number 04-40179, Oakland Police Department,
      date of incident May 2, 2004

    f.  Computer-Aided Dispatch Tape, File Number 041651, Re: Mr. Boyd
      v CCSF, May 6, 2004

    g.  Incident Reports

    h.  Chronological of Investigation

    i.  Unit History Details for involved police vehicles

    j.  Handwritten notes and transcripts of witness interviews

    k.  Incident Name History, San Francisco Police Department

    l.  Defendant status and San Francisco Police Department Person,
      Incident, and Field Interview Report

    m.  Records related to *Smallwood v Bertek Pharmaceutical*, San Mateo
      County Superior Court, Case Number CIV420769

    n.  Color photographs

    o.  City and County of San Francisco Medical Examiner/Investigator's
      Report, Case Number 2004-0544

    p.  Report of Laboratory Examination-Amended Report-2

### Jail and Prison Medical Records

1.  San Francisco County Jail
2.  California Department of Corrections
3.  Santa Rita County Jail

### Depositions

#### Law Enforcement Witnesses

1.  Officer Timothy Paine, San Francisco Police Department, February 8,
    2006 and August 14, 2006

2.  Officer James O'Malley, San Francisco Police Department, August 14,
    2006

3.  Officer William Elieff, San Francisco Police Department, August 15,
    2006

4.  Officer Steven Stearns, San Francisco Police Department August 17,
    2006

5.  Officer Greg Kane, San Francisco Police Department, August 17, 2006

6.  Officer Scott Warnke, San Francisco Police Department, November 9,
    2006

*Report of Emily A. Kerum, MD*
*Re:  Cammerin Boyd*

### Citizen Witnesses
1.  Tiffany Williams, January 19, 2006
2.  Synell Wilson, January 30, 2006
3.  Carlyce Ingram, February 13, 2006
4.  Vitaliy Khalafyan, March 1, 2006
5.  Natasha Gatto, April 14, 2006
6.  De'Aries Jefferson, June 27, 2006
7.  Tatanika Hogan, June 28, 2006
8.  Mario Lonza Rogers Sr., December 1, 2006
9.  Michelle Cranshaw, December 12, 2006
10. Joe Campos, February 2, 2007
11. Betrice Yvonne Jackson, February 14, 2007
12. Otis Harris Jr., February 28, 2007

### San Francisco Police Department OIS Investigation
1.  Inspector James Spillane, San Francisco Police Department, December 14, 2006 and February 26, 2007
2.  Inspector Thomas Cleary, San Francisco Police Department, February 2, 2007
3.  Inspector Ronan Shouldice, San Francisco Police Department, February 26, 2007
4.  Jon Smith, M.D., Assistant Medical Examiner, City and County of San Francisco, November 9, 2006
5.  Sandra Sachs, Ph.D., Assistant Forensic Toxicologist, San Francisco Medical Examiner's Office, February 27, 2007
6.  Steven J. Dowell, Criminalist, Los Angeles County Department of Coroner, January 11, 2007

### Relatives and Girlfriend of Mr. Boyd
1.  Marylon Boyd (mother), August, 16, 2006
2.  Lois Boyd (aunt), November 14, 2006
3.  Ranett Boyd (cousin), January 8, 2007
4.  Kamilah Boyd (ex-wife), August 3, 2006
5.  Isela Gonzalez (girlfriend), August 3, 2006

### Other Depositions
1.  Silvia Comparini, M.D., forensic pathologist, January 12, 2007

### Other Collateral Information
1.  Supplemental Trajectory Analysis, January 31, 2005
2.  Report of John Mendelsohn M. D., November 29, 2006
3.  Report of Anthony J. Brass, Attorney at Law, February 14, 2007
4.  Report of Alexander Jason, Certified Senior Crime Scene Analyst, March 29, 2007

3

*Report of Emily A. Keram, MD*
*Re: Cammerin Boyd*

    5. Declaration of Cammerin K. Boyd In Support of Motion to Allow My Release on Home Detention, January 5, 1995

**Law Enforcement General Orders and Training Materials**
1. San Francisco Police Department General Order 5.01, Use of Force, Revised October 4, 1995
2. San Francisco Police Department General Order 5.02, Use of Firearms, Revised November 1, 1995
3. San Francisco Law Enforcement Regional Training Center Basic Course, Arrest and Control Manual
4. California Commission on Peace Officer Standards and Training, Basic Course Workbook Series, Student Materials, Use of Force, Learning Domain 20

**Videotapes**
1. TV News Tapes 1 and 2, May 5 and 6, 2004
2. 600 Block of Larch, May 5, 2004
3. OIS Homicide Detail, May 14, 2004

**Audio File**
1. Recording of phone conversation

**Powerpoint Presentation**
1. Boyd v CCSF, Homicide PowerPoint presentation, March 9, 2005

**Opinions and Bases**

The following are my opinions in this matter, to a reasonable degree of medical certainty.

**Mr. Boyd's psychiatric diagnosis on the evening of May 5, 2004**

It is my opinion that, in accordance with the Diagnostic and Statistical Manual of the American Psychiatric Association, fourth edition, Text Revision, Mr. Boyd's psychiatric diagnosis on the evening of May 5, 2004 was as follows:

| | |
|---|---|
| Axis I: | Methylenedioxyamphetamine (MDA), methamphetamine, and marijuana intoxication |
| | Rule-out Substance-induced psychotic disorder, with paranoid delusions |
| Axis II: | Rule-out Antisocial personality disorder |
| Axis III: | Bilateral below the knee amputations |

4

*Report of Emily A. Keram, MD*
*Re: Cammerin Boyd*

Axis IV:    Psychosocial stressors: These cannot be fully assessed due to the lack of comprehensive knowledge regarding Mr. Boyd's psychosocial status at the time of his death. However, he had criminal charges pending (including two counts of assault with a firearm and felon in possession of a firearm) that had the potential of leading to a lengthy prison sentence. [Brass report, pages 2-4]]

Axis V:    Global Assessment of Functioning (GAF) cannot be determined due to lack of information.

MDA, methamphetamine and marijuana or their metabolites were present in Mr. Boyd's blood and urine on autopsy. [Bates Stamp 00660] Mr. Boyd's behavior on the evening of May 5, 2004 was consistent with recent ingestion of these substances and was maladaptive. Other than Mr. Boyd's bilateral below the knee amputations, he was in apparent good health, and did not have a medical condition that could have caused his behavioral disturbance.

Dr. Mendelsohn noted that the amphetamine present in Mr. Boyd's urine was produced by catabolism of methamphetamine. He suspects that Mr. Boyd ingested methamphetamine as a contaminant of MDA. Dr. Mendelsohn indicated that it is difficult to determine the time at which Mr. Boyd ingested the substances. The urine and blood levels suggest that Mr. Boyd consumed the drugs within 48 hours of his death. His behavior is consistent with acute intoxication with MDA, with ingestion within six hours of his death. [Mendelsohn report, page 2]

Acute adverse effects of MDA intoxication can include severe disorientation, anxiety, depression, thought disorder, paranoia, and depersonalization. These effects usually last several hours and rarely require treatment. Severe acute behavioral toxicity may present with bizarre self-destructive behavior. Dr. Mendelsohn indicated that Mr. Boyd's abuse of marijuana may have worsened the anxiety and behavioral dyscontrol associated with MDA. [Mendelsohn report, page 3]

Although abuse of MDA, methamphetamine, and marijuana is generally associated with reversible psychoactive effects, ingestion of any of them may give rise to a longer lasting or even permanent psychosis. For some individuals, abuse of these substances may lead to chronic paranoid delusions, even with eventual abstinence from these substances, or in periods between active substance use. These chronic delusions are thought to be secondary to permanent changes in brain biochemistry caused by substance abuse.

Mr. Boyd told several individuals that members of the San Francisco Police Department wanted to kill him. [Marylon Boyd deposition, pages 134-135, lines 13-17, Bates Stamp 00239] On the evening of May 5, 2005 Mr. Boyd told Marylon and Lois Boyd that he had spoken with someone who told him that San Francisco Police officers were looking for him and wanted to kill him. [Marylon Boyd deposition, page 132, lines 10- 22; Lois Boyd deposition, page 48, lines 7-9] On Larch Way, Mr. Boyd made statements to

*Report of Emily A. Keram, MD*
*Re: Cammerin Boyd*

citizens that the police were going to kill him. [Roger's deposition, pages 17-18, lines 22-12; Jackson deposition, page 24, lines 18-19 and pages 34-35, lines 23-3; Harris deposition, pages 22-23, lines 25-9]

Possible explanations for Mr. Boyd's statements that members of the San Francisco Police Department wanted to kill him include that based on his life experiences and beliefs about law enforcement attitudes toward African-Americans, Mr. Boyd developed the conviction that the police wanted to kill him. Alternatively his belief may have been delusional, caused by a permanent change in brain biochemistry due to his history of substance abuse or acute effects of substance abuse. It is also possible that Mr. Boyd may not, in fact, have truly believed these statements, but may have had some reason for making them. This will be discussed in greater detail below. It is not possible to determine with certainty which of these possibilities is the underlying cause of Mr. Boyd's statements that the members of the San Francisco Police Department wanted to kill him. Thus, I have indicated a diagnosis of Rule-out Substance-induced Psychotic Disorder, with paranoid delusions, as Mr. Boyd's statements may be the product of delusional thinking.

Finally, although Mr. Boyd certainly has some of the diagnostic criteria of Antisocial Personality Disorder, a definitive diagnosis cannot be made without obtaining additional history.

**Evaluation and Opinion of whether Mr. Boyd's behavior in the days preceding, and on the evening of May 5, 2004 were consistent with those of decedents involved in Suicide by Cop (SBC) incidents**

It is my opinion that Mr. Boyd's statements and behavior in the days preceding and on the evening of May 5, 2004 were consistent with those of decedents involved in SBC incidents.

Precipitators of SBC incidents choose this as their method of suicide for a variety of reasons. These include, but are not limited to, religious proscription against suicide, belief that law enforcement officers will "get the job done," desire to cause psychological harm to law enforcement officers, desire to "go out in a blaze of glory," and the possibility that loved ones may prevail in subsequent civil litigation. There are also cases of precipitators of SBC choosing this as their method of suicide secondary to delusional beliefs.

Precipitators of SBC may be categorized by the timing of the development of their suicidal intent in relation to the development of their SBC plan. Through my research in SBC and my clinical practice I have identified the following categories of precipitators of SBC:

1. Precipitators who are not imminently suicidal and have no SBC plan, but who come into contact with law enforcement unexpectedly and with unacceptable consequences. For example, a second striker who comes to law enforcement

**Report of Emily A. Keram, MD**
**Re: Cannerin Boyd**

attention during the commission of a third strike offense, and instigates an SBC spontaneously, because the possibility of a lengthy sentence or life imprisonment is unacceptable to them.

2. Precipitators who are actively suicidal, unintentionally come to law enforcement attention, and who develop an SBC plan on contact with law enforcement. For example, a suicide-in-progress that is interrupted by the police. The person may decide to precipitate an SBC knowing that if they present a serious enough threat, the police will kill them.

3. Precipitators who are actively suicidal and who have actively planned an SBC. For example, a suicidal person who fears that they will not be able to go through with it, whose religious belief prohibits suicide, or who want to create the potential for loved ones to prevail in subsequent civil litigation.

Individual precipitors of this third category, "pre-mediated" SBC, exhibit similar behaviors. Through my research in SBC and in my clinical practice, I have learned that some precipitators of SBC "practice" for the event. Practicing consists of a precipitator causing themselves to come into contact with law enforcement and engaging in some of the behaviors they will later exhibit during the actual SBC event. Practicing gives the precipitator the opportunity to expose themselves to anxiety-provoking situations and extinguish their anxiety. It also allows them to learn about police policy and procedures, thereby providing an opportunity to refine their SBC plan in order to maximize their chance of success.

Precipitators of pre-meditated SBC share the problem of determining how they will initiate their contact with law enforcement officers. Early researchers in SBC described behaviors designed to force law enforcement contact as "outrageous acts." However, not all precipitators' actions are truly outrageous. I prefer the term, "abnormally abnormal" behavior. It is abnormal to rob a convenience store. It is "abnormally abnormal" to then wait outside for the police to arrive. It is abnormal to be involved in a law enforcement pursuit. It is "abnormally abnormal" to conduct the pursuit in a manner that is unlikely to lead to successful escape. "Abnormally abnormal" behaviors are designed to bring the precipitator to law enforcement attention and to maintain that attention. Thus, precipitators of SBC are likely to exhibit behaviors that may seem inexplicable to law enforcement officers, who are used to a suspect having the desire to escape from or evade the police.

Finally, individual precipitators of SBC may exhibit similar behaviors in the final moments of their separate SBC event, as they present increasingly dangerous levels of threat to police. Law enforcement officers have a variety of use of force options available to them and are trained to use lethal force only when they perceive an immediate and credible threat to their lives or the lives of citizens. Precipitators may be unfamiliar with behaviors they must exhibit in order to precipitate the use of lethal force by law enforcement personnel. Thus, it is not uncommon for precipitators to evidence an escalation in the level of threat they present to law enforcement, as they attempt to appear

7

*Report of Emily A. Keram, MD*
*Re: Cammerin Boyd*

increasingly dangerous. For example, a precipitator may first be non-compliant with law
enforcement commands or tell officers to shoot them, and then engage in an action
designed to give the impression that they are armed, or that they are reaching for a
weapon. A precipitator's action that is not successful in eliciting the use of lethal force
by law enforcement may be followed by an action designed to "up the ante."
Precipitators may even engage in the use of lethal force themselves. In one SBC study,
three of eleven precipitators of SBC shot police officers.

In the days preceding, and on May 5, 2005, Mr. Boyd engaged in behavior consistent
with "practicing" for an SBC event, "abnormally abnormal" behavior in bringing himself
to law enforcement attention, and, at the final incident, escalating the level of apparent
threat he presented to law enforcement personnel.

Mr. Boyd's contact with Oakland Police Department on May 2, 2004 is consistent with
"practicing" behavior. [Bates Stamp 00224-51] He also engaged in "abnormally
abnormal" behavior in the manner in which he brought himself to law enforcement
attention and maintained that attention. At approximately 2 p.m. on that date, Oakland
police officers observed Mr. Boyd driving a black Mercedes on International Boulevard
in Oakland. Mr. Boyd was estimated to be traveling between 75 to 80 mph. Officers
initiated a pursuit that was terminated because of high speeds and the amount of vehicle
and pedestrian traffic in the area. Approximately 20 to 30 minutes later the Mercedes
was observed in a parking lot nearby. Mr. Boyd had not left the area, indicating that he
did not want to evade the police. A second pursuit ensued but was again canceled due to
the high speeds involved. Mr. Boyd was again observed in nearby. He had continued to
remain in the area. Uniformed officers moved toward the Mercedes. Mr. Boyd began to
yell through the open driver side window, "Fuck you. Just shoot me. Fuck you." After
Mr. Boyd finally stopped the car he got out and placed himself on the ground. [Bates
Stamp 00231, 00236, 00241, 00247] He was placed into handcuffs. As the officer began
to cuff him, Mr. Boyd began to yell, "They're trying to kill me!" [Bates Stamp 00231]
This is behavior that he exhibited on May 5, 2004 again indicating that he was
was "practicing" for an SBC event. Mr. Boyd was eventually taken into custody. His
mother bailed him out the next morning. Later that morning (May 3, 2004) and again
that afternoon Mr. Boyd was observed to be driving around the Oakland Police
Administration Building, indicating yet again that he did not leave the area. [Bates
Stamp 00218] He did not initiate law enforcement contact on that date.

Mr. Boyd's behavior on the evening of May 5, 2004 was also consistent with
precipitators of SBC incidents, in that he again exhibited "abnormally abnormal"
behavior in coming in contact with law enforcement personnel. Sometime between 6
p.m. and 7:30 p.m. Mr. Boyd told his mother and aunt that he had been told that San
Francisco police were looking for him and wanted to shoot him. [Marylon Boyd
deposition, page 132, lines 10- 22; Lois Boyd deposition, page 48, lines 7-9] Shortly
thereafter Tiffany Williams observed a subject matching Mr. Boyd's description, driving
a vehicle similar to the SUV, doing a "doughnut" at the intersection of Ellis and Jones,
near in the Tenderloin police station. This behavior did not bring the subject to law
enforcement attention. The subject motioned to Ms. Williams. Ms. Williams approached

8

**Report of Emily A. Keram, MD**
**Re: Cammerin Boyd**

the car and opened the door. The subject grabbed her "real quick" and Ms. Williams jumped back and slammed the car door. The subject appeared intoxicated and angry. Ms. Williams ran away from him on the sidewalk, against traffic. The subject followed Ms. Williams in his vehicle and brandished a weapon at her. This behavior also did not bring the subject to law enforcement attention. [Transcript of Williams interview]

Shortly after that incident, and near where it took place, Mr. Boyd brandished a weapon at Tatanika Hogan on Eddy. After she drove away from him he did not attempt to leave the area. He made a U-turn and followed her car. Ms. Hogan observed a police car on Webster and turned there. Mr. Boyd initially appeared to follow her, but then continued straight. Ms. Hogan told officers Robinson and Mason that a subject in a black Blazer had threatened her with a gun. The officers put out a description of Mr. Boyd and the vehicle. After Officer Elieff initiated a pursuit, Mr. Boyd again did not try to leave the area, instead returning to the same street on which Ms. Hogan had contacted police officers. [Bates Stamp 00430-33, 00438, and 00477-78] Mr. Boyd fled from Officer Elieff before Elieff activated his lights and sirens. During the pursuit Mr. Boyd engaged in extremely dangerous behavior, firing his weapon at officers while driving at high speed. [Transcript of Gatto and Alfaro interviews, Bates Stamp 00424, and 00472-76]

Mr. Boyd's behavior in coming to law enforcement attention is consistent with the escalating behavior of decedents in SBC incidents. Assuming that Mr. Boyd was the subject near the Tenderloin police station who "spun a donut" attempted to grab Ms. Williams, and brandished a weapon at her, he then followed this by escalating his behavior. Mr. Boyd next brandished a weapon at Ms. Hogan and remained driving in the area where Ms. Hogan contacted police officers, returning to the street on which she had made police contact. This is consistent with the manner in which precipitators of SBC incidents who, if they are initially unsuccessful in their attempt to draw law enforcement attention, escalate their behavior to increase the chance that more serious and overt action will bring them into contact with police. Mr. Boyd's subsequent behavior in firing his weapon during the pursuit made officers aware that Mr. Boyd was armed with a loaded and functioning weapon, which he would fire at them. This created law enforcement awareness of the potential for Mr. Boyd to use lethal force again.

Finally, Mr. Boyd's behavior after he drove to Larch Way was also consistent with precipitators of SBC. Assuming the officers' and Mr. Campo's accounts are correct the following behaviors ensued. Mr. Boyd initially stopped his vehicle. When Officer O'Malley yelled at him to put his hands up, Mr. Boyd drove toward Officer O'Malley, again creating the perception of imminent dangerousness. Officer O'Malley and other officers fired at Mr. Boyd but did not strike him. Mr. Boyd stopped his car and exited the vehicle, but remained non-compliant with law enforcement commands to keep his hands in view and to get on the ground. Mr. Boyd turned toward the car and started to reach inside. Officers did not respond with force, continuing to give verbal commands. Mr. Boyd at one point did raise his hands. Officers again refrained from using lethal force. Mr. Boyd then turned toward the car again and appeared to reach under the driver's seat. At that point lethal force was used against him. [Transcript of interviews with Paine, O'Malley, Warnke, and Elieff; Bates Stamp 00357-87]

9

*Report of Emily A. Keram, MD*
*Re: Cammerin Boyd*

In considering whether Mr. Boyd's actions in the days prior to, and on May 5, 2004 were consistent with decedents in SBC incidents, I evaluated Mr. Boyd's risk factors for suicide. I identified two known factors consistent with SBC scenarios; the fact that Mr. Boyd was facing a potentially long prison sentence, and the fact that his actions were consistent with creating the potential for a loved one to prevail in subsequent civil litigation.

As noted above, Mr. Boyd's pending legal charges had the potential to result in a lengthy prison sentence. [Brass report] This is a risk factor for suicide in precipitators of SBC. There is abundant evidence that Mr. Boyd's time spent in jail and prison was extremely difficult for him. There are a multitude of examples of Mr. Boyd being treated for stump breakdown and peri-anal pressure sores and fistulas. Mr. Boyd told an ER physician who recommended that he stay off of his prosthesis until his left stump could heal, that he "continued to use the prosthesis on a daily basis in order to stay in a safe position, in which he may have to defend himself against fighting or getting away from fights of other people." [Bates Stamp 000272] Mr. Boyd was consistently assigned a lower bunk on a bottom tier [Bates Stamp 000029, 000194] the least desirable location in any prison due to the lack of light and air. Mr. Boyd himself wrote about his difficulty during incarceration as a bilateral amputee. [Boyd declaration]

Mr. Boyd's actions on the evening of May 5, 2004 were consistent with decedents of SBC who desire to create the potential for a loved one to prevail in subsequent civil litigation. The concern that he may have wanted to do so stems from the following information. Mr. Boyd had been represented by his mother, Marylon Boyd in previous civil litigation he filed against law enforcement agencies. One of these lawsuits related to the incident that resulted in Mr. Boyd's legs being amputated below the knees. Another related to conditions present during his incarceration. [Marylon Boyd deposition, page 65-68, lines 1-23] Kathleen Rand Reed indicated that at the end of 2003, Ms. Boyd's finances were in jeopardy as a result of a lawsuit she had taken on. Her ability to keep her law office was at risk because of the case. On December 22, 2003 Ms. Reed observed Ms. Boyd with a gun, which Ms. Boyd identified as belonging to her son. Ms. Boyd acknowledged to Ms. Reed that Boyd was depressed and that she had worried about whether Mr. Boyd might engage in an SBC. [Bates Stamp 00801-02 and 00805-06]. Lois Boyd eventually stopped working for Ms. Boyd because Ms. Boyd could no longer afford to pay her. [Lois Boyd deposition, page 17, line 6] On May 3, 2004 Mr. Boyd and his mother attempted to find and interview witnesses to his incident May 2, 2004 incident with Oakland Police Department officers. [Marlyon Boyd deposition, pages 65, lines 1-23 and pages 127-28, lines 23-24]

Evidence that Mr. Boyd's behavior on the evening of May 5, 2004 were consistent with a pre-meditated SBC designed to create the potential for a civil lawsuit is as follows. On May 5, 2004, Mr. Boyd told his mother and aunt that a person with whom he had just spoken by telephone had told him that San Francisco police officers were looking for him and wanted to kill him. [Marylon Boyd deposition, page 132, lines 10- 22; Lois Boyd deposition, page 48, lines 7-9] This created in his mother and aunt such a fear that San

10

Report of Emily A. Keram, MD
Re: Cammerin Boyd

Francisco Police officers were imminently planning to kill Mr. Boyd that they began to plan for him to leave San Francisco that evening. Mr. Boyd then left Marylon Boyd's office to take his things out of the rented SUV but did not return. [Lois Boyd deposition, page 49, lines 6-11 and pages 50-51, lines 25-16] His subsequent behavior of "spinning doughnuts", grabbing at Ms. Williams, brandishing a weapon at her (all while near the Tenderloin police station), and later brandishing a weapon at Ms. Hogan is consistent with persistent attempts to draw law enforcement attention. His staying in the same area, and even driving back to the street on which Ms. Hogan contacted the police are consistent with attempts to ensure he would attract and maintain the attention of the police.

As noted above, by brandishing a weapon at Ms. Williams and Ms. Hogan, Mr. Boyd initiated the pursuit in a manner that allowed law enforcement to know that he was armed. He fired the weapon during the pursuit, ensuring that police would know his weapon was loaded and functioning. Mr. Boyd chose to drive to an area where witnesses would be hostile to law enforcement. Once on Larch Way he made statements to civilian witnesses that law enforcement officers intended to kill him. [Rogers deposition, pages 17-18, lines 22-12, Jackson deposition, page 24, lines 18-19, Harris deposition, page 22-23, lines 25-9] When Mr. Boyd put his hands in the air, civilian witnesses were left with the impression that he was surrendering to police.

In assessing explanations for Mr. Boyd's behavior on the evening of May 5, 2004, I considered factors other than SBC. As noted in the diagnosis section above, it is possible that Mr. Boyd was suffering a paranoid delusion that law enforcement officers wanted to kill him, and that his behavior on the evening of his death was influenced by this delusion. However, this explanation does not account for his behavior in "spinning donuts," near the Tenderloin police station, grabbing at Ms. Williams, and brandishing a weapon at both Ms. Williams and Ms. Hogan. These behaviors are better accounted for by Mr. Boyd attempting to come to law enforcement attention to enact an SBC. Thus Mr. Boyd's behavior on the evening of May 5, 2004 is most consistent with precipitators of Suicide by Cop.

Thank you for referring this matter to me for evaluation and report.

Sincerely,

Emily A. Keram, M.D.

11

*Report of Emily A. Keram, MD*
*Re: Cammerin Boyd*

Appendix 2

### Fee schedule of Emily A. Keram, M. D.

I charge $400 an hour for all activities related to medical legal evaluations.

*Report of Emily A. Keram, MD*
*Re: Cammerin Boyd*

Appendix 3

## Rule 26
### Deposition and Trial Testimony of Emily A. Keram M. D.

## DEPOSITION TESTIMONY

**2003**
Jung v. Jung          –

**2004**
DeBoer v. City of Olympia, et al.

**2005**
Drypen, et al v. County of Oakland, et al
Flanary v. City of Kelso, et al.
Franks v Costco, et al.

## TRIAL TESTIMONY

**2003**
U.S. v. Herrera

**2005**
Flanary v. City of Kelso, et al.

13

## CURRICULUM VITAE

Prepared: 11/3/05

| | |
|---|---|
| **Name:** | Emily A. Kerum, M.D. |
| **Academic Title:** | Assistant Clinical Professor of Psychiatry<br>Psychiatry and the Law Program<br>University of California San Francisco |
| **Practice Address:** | 850 Second Street, Ste. B<br>Santa Rosa, CA 95404 |
| **Phone:** | (707) 525-0800 |
| **Fax:** | (707) 523-7063 |

### EDUCATION:

| Dates | Institution Attended & Location | Degree or Status | Major Subjects |
|---|---|---|---|
| 1978-1981 | Duke University, Durham, NC | 1981, B.S., magna cum laude | Zoology |
| 1984-1988 | University of North Carolina Chapel Hill, School of Medicine | 1988, M.D. | Medicine |
| 1988-1992 | University of North Carolina Hospitals, Chapel Hill, North Carolina | Intern & Resident | Psychiatry |
| 1991-1992 | U.S. Department of Justice, FCI-Butner, Butner, North Carolina | Fellowship | Forensic Psychiatry |

### LICENSES, CERTIFCATIONS:

| | |
|---|---|
| 1990 | Medical License, North Carolina 39185 (inactive) |
| 1991 | Medical License, California A49929 (active) |
| 1994 | Diplomate, American Board of Psychiatry & Neurology (field: psychiatry) |
| 1998 | Diplomate, American Board of Psychiatry & Neurology, sub-specialty certification in Forensic Psychiatry |

### EMPLOYMENT:

| | |
|---|---|
| 1992-1996 | Director, Consultation-Liaison Psychiatry<br>Sonoma County Community Hospital, Santa Rosa, California |
| 1992-1996<br>2003-present | Clinical Psychiatry Private Practice<br>Santa Rosa, California |
| 1992-2000<br>2003-present | Forensic Psychiatry Private Practice<br>Santa Rosa, California |
| 1996-2000 | Clinical Chief<br>Santa Rosa VA Mental Health Clinic<br>Santa Rosa, California |
| 2000-present | Assistant Clinical Professor of Psychiatry<br>Psychiatry and the Law Program<br>University of California, San Francisco |

Emily A. Keram, M.D.
Page 2

| 2004-present | Staff Physician<br>Santa Rosa VA Mental Health Clinic<br>Santa Rosa, California | |

## CORRECTIONAL EXPERIENCE:

| 1990-1992 | North Carolina Correctional Center for Women | Staff Psychiatrist to<br>General Population and<br>Death Row |
| 1991 | North Carolina Department of Corrections | Staff Psychiatrist to<br>General Population in<br>Juvenile Facility |

## MEMBERSHIPS IN PROFESSIONAL ORGANIZATIONS:

| 1985-2002 | American Medical Association |
| 1986-present | American Psychiatric Association |
| 1986-1992 | North Carolina Psychiatric Society |
| 1991-present | American Academy of Psychiatry and the Law |
| 1991-2003 | American Psychosomatic Society |
| 1992-1997 | Sonoma County Medical Association |
| 1992-1997 | California Medical Association |
| 1992-present | Northern California Psychiatric Society |

## PROFESSIONAL ORGANIZATION ACTIVITIES:

| 1992-1995 | Sonoma County Medical Association | Physician Well-Being Committee |
| 1992-1995 | Sonoma County Medical Association | Women in Medicine Committee |
| 1993-1995 | Sonoma County Medical Association | Mentor, High School Students<br>Planning to Pursue Medicine |
| 1995-1997 | Sonoma County Medical Association | Professional Standards and<br>Conduct Committee |
| 1993-1999 | American Academy of Psychiatry and the Law | Private Practice Committee |
| 1994-1998 | American Academy of Psychiatry and the Law | Founder and Chair, Early<br>Career Development Committee |
| 1996-1999 | American Academy of Psychiatry and the Law | Councilor |
| 1997-present | American Academy of Psychiatry and the Law | Program Committee |
| 1998-2001 | American Academy of Psychiatry and the Law | Chair of Membership Committee |
| 2000-present | California Psychiatric Association | Judicial Action Committee |
| 2000-present | American Academy of Psychiatry and the Law | Law Enforcement Liaison<br>Committee |
| 2000-2002 | American Academy of Psychiatry and the Law | Secretary |
| 2001 | American Academy of Psychiatry and the Law | Chair of Annual Meeting Program<br>Committee |
| 1998-present | American Academy of Psychiatry and the Law | Membership Committee |
| 2005-present | American Academy of Psychiatry and the Law | Chair, Law Enforcement Liaison<br>Committee |

## OTHER PROFESSIONAL ACTIVITIES, AWARDS, AND PROFESSIONAL COMPETENCE:

Executive Council of American Academy of Psychiatry and the Law: 1996-1999, 2000-2002
Practice Guidelines for Insanity Defense Evaluations Task Force, American Academy of Psychiatry and the Law: 1999-2002
Presidential Appointee to Committee for Recertification in Forensic Psychiatry, American Board of Psychiatry and Neurology: 2000-2002

Emily A. Keram, M.D.
Page 3

Member, California Commission on Peace Officers Standards and Training Committee on the Menally III and Developmentally Disabled, 2001-2002

Senior Reviewer, Mental Health Policies, Procedures, Contracts and Use of Force, United States Department of Justice Federal Consent Decree with Los Angeles Police Department, 2001-2002

Invited Participant, Violence in the Workplace Symposium, National Center for the Analysis of Violent Crime, Federal Bureau of Investigation, June 2002

Rossiter Award for Outstanding Achievement in Forensic Mental Health, Forensic Mental Health Association of California, 2004

**PRESENTATIONS AT SCIENTIFIC AND PROFESSIONAL MEETINGS:**

**NATIONAL:**

American Psychiatric Association Annual Meetings:

1995, 1996, 1998   Course on Forensic Psychiatry, "Overview of the Judicial System,"

American Academy of Psychiatry and the Law Annual Meetings:

1998   Course on Private Practice, "Forensic Psychiatry Report Writing,"

1998   Panel Chair and Organizer, "Forensic Psychiatry Unchained: Practicing Outside the Box", Presented "Consultation to Law Enforcement Agencies:
Focus on the FBI's EAP Program"

1999   Panel Chair and Organizer, "Suicide by Cop"

1999   Panel Chair and Organizer, "Playing Doctor: The Physician Imposter"

2000   Panel Chair and Organizer, "Suicide by Cop: Incident Management in Canada and the U.S."

2000   Panel Presenter, "Draft AAPL Practice Guidelines for NGRI Evaluations-Presentation of the Task Force

2001   Panel Chair and Organizer, "Mental Health Training for Law Enforcement:

2001   Panel Presenter, "Law Enforcement Liaison: Models of Cooperation"

2002   Panel Presenter, "Consultation to Law Enforcement: Ethical Concerns"

2003   Research in Progress, "Evaluating Suspected Cases of Suicide by Cop."

2004   Debate Participant, "Resolved: Psychiatrists Should Not Assist with Police

2005   Panel Chair and Organizer at Guantanamo Bay: "Honor Bound Interrogations"

**REGIONAL:**

1993   Sonoma County Academy of Family Physicians
"The Real Fifteen-Minute Hour: When Fifteen Minutes Feels Like Sixty,"

1994   Sonoma County Medical Association, Senior Physicians Committee
"Treatment Defense Evaluations"

1994   California Academy of Family Physicians Annual Meeting
Workshop, "Antidepressant Update"

1998   Northern California Psychiatric Society
Course, "Forensic Psychiatry Practice Opportunities for the Clinician"

2001   Forensic Mental Health Association of California
"Suicide by Cop,"

2001   Risk Management and City Attorney's Offices
City of Santa Rosa, California

2002   Forensic Mental Health Association of California
"Workplace Violence Risk Assessment and Management"

2003   Stepping in Conference (Law Enforcement and Mental Health Professionals
"Insanity Defense Evaluations on Trial: Insanity Defense Evaluations in the Post-Hinckley Era"

2004   Forensic Mental Health Association of California
"The Insanity Defense,"

2004   "The Death Penalty and the Mentally III"

Emily A. Keram, M.D.
Page 4

2004          "Forensic Aspects of Consultation-Liaison Psychiatry," San Francisco Society of
              Consultation-Liaison Psychiatrists

## PRESENTATIONS TO LAW ENFORCEMENT:

1999          Paper, "Suicide by Cop: Issues in Outcome and Analysis"
              Suicide and Law Enforcement Conference
              Behavioral Science Unit. FBI Academy, Quantico, Virginia
2000          "Suicide by Cop: An Overview"
              Behavioral Sciences Unit
              San Francisco Police Department
2000          "Suicide by Cop: Decedent Profiles and Typology"
              Crisis Negotiation Team
              Oakland Police Department
2001-present  "Major Mental Disorders, Cognitive Disorders and Personality Disorders"
              "Suicide by Cop"
              Crisis Intervention Training (training given quarterly)
              San Francisco Police Department
2002          "Suicide by Cop"
              Crisis Intervention Training
              San Jose Police Department
2004          "Post-traumatic Stress Disorder"
              Peer Counselor Training
              San Rafael Police Department

## CONTINUING MEDICAL EDUCATION COURSES ATTENDED:

1992-present  Attended sufficient continuing education courses to maintain licensure.

## PUBLIC SERVICE:

1990-1991     Volunteer, "Physicians On-Call", WTVD (television), Raleigh, NC
1994-1995     Guest, "The Allen Stock Show", KSRO (radio), Santa Rosa, CA. Topics: Holiday
              Blues, Recovered Memory and False Memory Syndrome, National Depression Screening
              Day, Women in Medicine
1994-1995     Guest, Local Evening News, KFTY (television), Santa Rosa, CA. Topics: National
              Depression Screening Day, False Memory Syndrome Litigation
1994, 1995    Organizer, National Depression Screening Day, Sonoma County, CA
1996          Lecturer, "Women and Depression", Women's Health Fair, sponsored by Health Plan of
              the Redwoods, Santa Rosa, CA
2002-present  Member, Board of Directors and Volunteer Clinician, West Coast Post-trauma Retreat

## SERVICE TO PROFESSIONAL PUBLICATIONS:

| | | |
|---|---|---|
| 1995-1999 | Bulletin of the American Academy of Psychiatry and the Law | Reviewer |
| 1999-present | Journal of the American Academy of Psychiatry and the Law | Reviewer |
| 2001-present | Journal of the American Academy of Psychiatry and the Law | Editorial Board |

## ADMINISTRATIVE EXPERIENCE:

1993-1994     Chair, Utilization Review Committee, CPC Redwoods Hospital, Santa Rosa, CA
              Responsible for overseeing utilization review protocols for inpatient psychiatric hospital.
1993-1995     Chief Financial Officer, Pacific Health Associates, AMC, a multi-disciplinary mental
              health group practice. Responsible for securing financing, accounting, payroll, and
              financial and tax reports.

Emily A. Keram, M.D.
Page 5

1995-1996    President, Pacific Health Associates, AMC. Responsible for developing and
             implementing marketing strategy, contract negotiations, oversight of other officers.

1996-2000    Clinical Chief, Santa Rosa VA Mental Health Clinic. Administrative and clinical
             responsibility for delivery of services by psychiatrists, psychologists, nurses, social
             workers, and primary care residents. Oversee 1450 active cases. Developed and
             implemented individual and group programs in PTSD, Substance Abuse, Affective
             Disorders, Psychotic Disorders, Pain Management and Medical-Psychiatric Liaison.
             Conduct quality improvement reviews. Prepare and administer Mental Health portion of
             overall clinic budget of $272,500.

2000-2004    UCSF Psychiatry and the Law Program. Primary responsibility for developing and
             implementing criminal portion of curriculum and annual Criminal Mock Trial. Assist in
             civil and administrative curriculum development and implementation, recruitment and
             interview of fellowship applicants. Primary responsibility for development of Federal
             and State Court referral sources of criminal evaluations for faculty and forensic fellows.
             Primary responsibility for developing, implementing and maintaining billing and
             receivables accounting system and tracking system for fellows' cases. Assist in
             developing, implementing and maintaining records for maintenance of ACGME
             accreditation of program.

## TEACHING:

| Academic Year | Course | Nature of Contribution | Class Size |
|---|---|---|---|
| 1992-2000 | Supervision of Family Practice Residents on Behavioral Science Rotation, UCSF-affiliated Family Practice Residency, Sutter Hospital, Santa Rosa, CA | Supervision and teaching of assessment, psychopharmacology, psychiatric consultation-liaison, management of the high-utilizing patient. | 1-2 |
| 1992-2000 | Third year medical students, Family Practice rotation | Psychopharmacology, Personality Styles in Medical Practice | 2-6 |
| 1993-2003 | Family Practice Board Review Course, UCSF Department of Family and Community Medicine | Psychiatry Section | 200-300 |
| 1998 | PTSD Team Weekly Seminar San Francisco VAMC | Sexual Dysfunction in PTSD | 15 |
| 1999 | PTSD Team Weekly Seminar San Francisco VAMC | Insanity Defense Evaluations | 15 |
| 2000 | Grand Rounds Department of Psychiatry UCSF | Suicide by Cop | 50 |
| 2000 | Criminal Law Class University of California Hastings School of the Law | Insanity Defense Evaluations | 50 |
| 2000-present | Didactic Seminar Psychiatry and the Law Program UCSF | Teach selected topics related to civil, criminal and consultative forensic psychiatry | 5 |
| 2000-2004 | Landmark Case Seminar Psychiatry and the Law Program UCSF | Teach criminal case curriculum | 5 |
| 2000-2004 | Forensic Case Conference Psychiatry and the Law Program UCSF | Case consultation to faculty and forensic fellows | 5 |
| 2000-present | Tutorial on Civil and Criminal Cases Psychiatry and the Law Program | Supervision of forensic fellows | 2 |

Emily A. Keram. M.D.
Page 6

| | UCSF | | |
|------|------|------|------|
| 2000-2004 | Forensic Research Seminar Psychiatry and the Law Program UCSF | Consultation regarding program research | 9 |
| 2002 | Grand Rounds Department of Psychiatry | Playing Doctor. Physician Imposters | 50 |
| 2002 | Mental Health Law Course University of California Boalt Hall School of Law | Treatment Issues | 30 |

## UNDERGRADUATE AND MEDICAL SCHOOL RESEARCH:

| | |
|------|------|
| 1979-1981 | Member, Duke University Goat Watching Society Sensory Dependent Development of Maternal/Neonatic Attachment |
| 1980-1981 | Work/Study Student, Duke University Department of Biochemistry Assisted Frederick Schachat, Ph.D. with nematode physiology studies |
| 1982-1984 | Laboratory Technician, University of North Carolina, Chapel Hill Department of Neuropharmacology, Laboratory of Richard Mailman, Ph.D. Characterized aspects of dopamine receptor binding using radioreceptor assays |
| 1984 | Summer Research Intern, University of Vienna, Vienna, Austria Allegemeines Krankenhaus, Laboratory of Oleh Hornykiewicz, Ph.D. Radioligand tagging of benzodiazepines |
| 1985 | Summer Research Intern, University of Groningen, Groningen, The Netherlands Department of Neuropharmacology, Laboratory of Haas Rollema, Ph.D. Characterized aspects of catechol-o-methyl transferase |

## POSTGRADUATE RESEARCH:

| | |
|------|------|
| 1992 | Evaluation of Competency in the Deaf Defendant |
| 1993-1995 | Project Director, Medical Cost Offset Project, Health Plan of the Redwoods |
| 1999-present | Law Enforcement-related research in Suicide by Cop and mental health curriculum development |

## ONLINE EXPERIENCE:

| | |
|------|------|
| 1994-1995 | Host, ShrinkRapWomen's Wire |
| 1994-1996 | Guest, Mystery Writer's Forum, America Online |
| 1995-1996 | Co-founder, Healix, Women's Wellness Community |

## ORIGINAL ARTICLES:

Mailman, RB, DeHaven, DL, Halpern (Keram), EA, Lewis, MH. Serum Effects Confound the Neuroleptic Radioreceptor Assay. Life Sci Mar 12; (11) 1057-1064, 1984

Piscitsky, II, Keram, EA, Drossman, DA. Building a Psychiatric-Medical Liaison: Observations of the Process. Psychiatr Med 10: 149-163, 1992

Keram, EA. Physicians and Gender. Sonoma County Physician 44;5:20, 1993

Keram, EA. Medical Cost Offset Program at HPR. Sonoma County Physician 45;5:25, 1994

Keram, EA. Preparing for the Forensic Psychiatry Board Examination: How to Create an Effective Study Plan. AAPL Newsletter 23(2): 8-9, 1998

Emily A. Keram, M.D.
Page 7

Keram, EA, Ferrell, BJ. Suicide by Cop: Issues in Outcome and Analysis. Suicide and Law Enforcement. FBI Behavioral Science Unit, 2002

Giorgi-Guarnieri D, Janofsky J, Keram EA, Lawsky S, Meredith P, Mossman D, Schwartz-Watts D, Scott C, Thompson J, Zonana H, AAPL Practice Guideline for Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense. J Am Acad Psychiatry Law 30 (2 Supp): S1-40, 2002

Keram EA, The Insanity Defense and Game Theory: Reflections of Texas v. Yates. J Am Acad Psychiatry Law 30(4):470-473, 2002

Keram EA, Commentary: A multidisciplinary approach to developing mental health training for law enforcement. J Am Acad Psychiatry Law 33(1):47-9, 2005