JOHN L. BURRIS, STATE BAR NO. 69888
BENJAMIN NISENBAUM, STATE BAR NO. 222173
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Road, Suite 1120
Oakland, California 94621
Telephone:    510.839.5200
Facsimile:    510.839.3882
Email: bnisenbaum@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| KATHLEEN ESPINOSA, et al; | CASE NO.  C06 04686 JSW |
|---|---|
| Plaintiffs, | PLAINTIFFS' AMENDED MEMORANDUM IN SUPPORT OF DISPUTED JURY INSTRUCTIONS |
| vs. | |
| | Trial Date: December 2, 2013<br>Trial:  8:00 a.m.<br>Further Pretrial Conf.: November 4, 2013 |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | Time:  2:00 p.m.<br>Courtroom 11, 19th Floor<br>The Honorable Jeffrey S. White |
| Defendants. | |

Plaintiffs submit the following Amended Memorandum in support of their disputed proposed jury instructions which are set forth in the "Jointly Submitted Proposed Jury Instructions" submitted by the parties:

**Disputed Instruction No. 1.2**

1

Espinosa v. City and County of San Francisco, Case No. C06 04686 JSW
Plaintiffs' Memorandum in Support of Disputed Jury Instructions

Plaintiffs' proposed instruction clearly sets forth all of the Plaintiffs' claims as well as the respective burdens of proof. Defendants' proposed instruction fails to do so and also uses the term, "lawful," which is not defined elsewhere in the instructions, is misleading and confusing.

**Disputed Instruction No. 3, Re: Consciousness of Guilt-Falsehood**

Plaintiffs modified the CALJIC 2.09 instruction on "consciousness of guilt" to reflect that this is a civil, rather than criminal action.  This instruction accurately states the law on consciousness of guilt/consciousness of liability on Plaintiffs' state law civil claims. See, e.g., *Donchin v. Guerrero* (1995) 34 Cal. App. 4th 1832, 1840:

> "Just as a criminal defendant's false exculpatory statement is evidence of his consciousness of guilt, a civil defendant's false exculpatory statement can be evidence of his consciousness of liability and casts doubt on his denial of knowledge affecting his liability…The law of California and other jurisdictions has long recognized a false exculpatory statement is evidence of a guilty conscience in the context of criminal cases.  The underlying principle is that a false statement is evidence of a declarant's state of mind and demonstrates his knowledge he has committed a wrong. Furthermore, from this consciousness of guilt the jury is entitled to infer other facts bearing on a defendant's guilt. The logic of this principle applies as much in civil cases as it does in criminal prosecutions."

Therefore, Plaintiffs' proposed instruction on consciousness of guilt is an appropriate and accurate statement of the law governing false exculpatory statements in civil actions.

**Disputed Instruction No. 4, Re: Efforts by Party to Fabricate Evidence**

Plaintiffs modified CALJIC 2.04 to reflect that it is being used in a civil, rather than criminal, action.  As noted above, a defendant's false statements are indicative of a consciousness of guilt/consciousness of liability.  This instruction accurately states the law on this subject.  See, e.g., *Donchin v. Guerrero* (1995) 34 Cal. App. 4th 1832, 1840*, supra*.

**Disputed Instruction No. 5, Re: Witness Willfully False**

Plaintiffs modified CALJIC 2.21.2 to reflect that it is being used in a civil, rather than criminal, action.  It is an accurate statement of the law.  See. e.g., *People v. Millwee*, 18 Cal. 4th 96, 159:

> "However, the challenged instruction has been repeatedly upheld as a correct statement of law.. .By its own terms, CALJIC No. 2.21.2 permits--but does not require--a general inference of distrust where testimony is "willfully false" in "material part." The instruction also authorizes rejection of the witness's testimony as a "whole" only where appropriate based on "all the evidence."

**Disputed Instruction No. 6: Willful Suppression of Evidence**

Plaintiffs proposed the California CACI 204 without modification.  The instruction permits the jury to draw adverse inferences from the defendants intentionally concealment and/or destruction (i.e., spoliation) of evidence.  The instruction is an accurate statement of the law.  *See, e.g., Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)(Spoliation, "refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation)."  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)(It is clearly established that "[a] federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence," and that this power "permit[s] a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior.)"  Accordingly, Plaintiffs respectfully submit that the instruction is an accurate  statement of the law on spoliation of evidence.

**Disputed Instruction No. 9.1 Re: Introductory Section 1983 Instruction**

Plaintiffs have included both the Plaintiff, Estate of Asa Sullivan, and the Minor Plaintiff, A.S., in this instruction since the Minor Plaintiff is the successor and real party in interest with respect to the damages stemming from the violation of the decedent's Constitutional rights under 42 U.S.C. Section 1983.

**Disputed Instruction No. 9.2 Re: Claim against Defendant in Individual Capacity – Elements and Burden of Proof**

Plaintiffs have proposed the Model Civil Instruction No. 9.2 and the only changes made by Plaintiffs were to refer to defendants and plaintiffs in the plural.  Ninth Circuit Model Instruction No. 1.5 clearly instructs the jury that it is required to separately consider the liability of each of the defendants.  The defendants' proposed instruction, which includes reference to the special verdict form, is confusing and argumentative in that it suggests that the jurors should refrain from answering or ignore questions on the special verdict form.

**Disputed Instructions No. 10(a)-(d), Re: Individual Liability/Duty to Intervene**

Plaintiffs have proposed alternative instructions to Defendants' Instruction No. 10 regarding the officers' duty to intervene to prevent and/or stop a Constitutional violation that occurs in their presence since Defendants' instruction erroneously would exclude the officers' liability for their failure to intervene.  See, e.g., *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1159-1160 (N.D. Cal. 2009):

> "Police officers have a duty to intercede when their fellow officers violate the constitutional rights of a citizen. Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) (internal citations omitted). The passive defendant violates a constitutional right that "is analytically the same as the right violated by the person who strikes the blows."   *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996).

Moreover, Plaintiffs believe that Model Instruction No. 1.5 adequately instructs the jury to consider the liability of each party separately and, as a result, Defendants' instruction No. 10 is cumulative and unnecessary.

**Disputed Instruction No. 11, Re: Causation: Substantial Factor**

Plaintiffs have also proposed the CACI instruction which clarifies that causation can be proved by showing the alleged conduct was a "substantial factor," in causing the harm with respect to the Plaintiffs' supplemental state law claims for civil assault. *See, e.g.*, *Tekle v.*

4

*United States*, 511 F.3d 839, 855 (9th Cir. 2009):

> "To establish civil assault, Tekle would need to establish that (1) the officers threatened to touch him in a harmful or offensive manner; (2) it reasonably appeared to him that they were about to carry out the threat; (3) he did not consent to the conduct; (4) he was harmed; and (5) *the officers' conduct was a substantial factor in causing the harm*."

(Emphasis added).

**Disputed Instruction No. 9.11: Re: Particular Rights – Fourth Amendment-Unreasonable Search-Generally**

Plaintiffs modified the 9th Circuit Model Civil Instruction No. 9.11 to 1) reflect the names of the defendants and to identify the location of the search.  Plaintiffs also modified the instruction to clarify that Mr. Sullivan was a guest at the private residence, where the search occurred.  This modification is in accord with the prevailing federal law on the Fourth Amendment rights of guests as stated by the Ninth Circuit in its decision in this case, *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010):  "An overnight guest in a home staying with the permission of the host has a reasonable expectation of privacy under the Fourth Amendment."  See also: *Minnesota v. Olson,* 495 U.S. 91, 96-97 (1990).

Plaintiffs also modified the instruction because the language in the Model Instruction concerning "intent" implies that the officers must have acted with specific intent when, in fact, Plaintiffs are not required to prove any state of mind by the officers in order to prevail on their 42 U.S.C. Section 1983 claims in this case.  *Caballero v. Concord*, 956 F.2d 204, 206 (9th Cir. 1992):

> "Rather, "the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting her, without regard to [her] underlying intent or motivation." Id. at 397. "

**Disputed Instruction Nos. 12, 15 and 16 Re: Abandonment**

Abandonment under the Fourth Amendment requires a showing that the person with the legal interest in the property voluntarily and permanently left it behind, relinquished all interest in it and no longer had any reasonable expectation of privacy in the property.  *See, e.g.*, *United States v. Jackson*,

5

544 F.2d 407, 409 (9th Cir. 1976) (citing *Abel v. United States*, 362 U.S. 217, 240-41 (1960); *United States v. Sledge*, 650 F.2d 1075, 1077 (9th Cir. 1981); *United States v. Veatch*, 674 F.2d 1217, 1220-21 (9th Cir. 1991); *United States v. Stephens*, 206 F.3d 914, 916-917 (9th Cir. 2000).

Plaintiffs object to any instruction being given on the issue of abandonment because there is no admissible evidence that the tenants of 2 Garces abandoned the premises prior to the search. Nevertheless, in the event that the Court decides to give an abandonment instruction, Plaintiffs have proposed their separate version of Instruction No. 12 and ask that it be given instead of Defendants' proposed Instructions No. 12, 15 and 16.

Preliminarily, the law is clearly established that a landlord generally lacks the necessary authority to consent to the search of a tenant's apartment. *See, e.g.*, *Chapman v. United States*, 365 U.S. 610, 615-18, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961) (holding that police officers' warrantless search of rented home, with consent of landlord but not tenant, violated tenant's Fourth Amendment rights); *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009)(Landlord generally lacks authority to consent to search of tenant's apartment). Furthermore, in *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990), the Supreme Court clearly held that "an overnight guest has a legitimate expectation of privacy in his host's home."

As the Ninth Circuit noted in this case when it rejected Defendants' interlocutory appeal in *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 533-34 (9th Cir. 2010), the evidence strongly supports the conclusion that Mr. Sullivan had a reasonable expectation of privacy in 2 Garces as an overnight guest at the premises. The Court specifically noted that there was evidence that Mr. Sullivan was staying in the apartment with the permission of a lease holder, Bryant Gudor, and another resident, Jason Martin. The evidence also strongly suggests that the lease holders were in possession of the apartment on the day of the entry and search because the lease holders were charged June rent for the apartment; the lease holders had not returned the keys for the apartment; and

management for the apartment testified that they considered the lease holders at that time to be in possession of the apartment.

Although defendants argued in the appeal that Mr. Sullivan had no privacy expectation, the Ninth Circuit disagreed, stating that because the evidence strongly indicates that Mr. Sullivan had permission to stay in the apartment from a lease holder, Bryant Gudor, and a resident, Jason Martin, defendants failed to show as a matter of law that Sullivan did not have a reasonable expectation of privacy. *Id.*

In *United States v. Washington, supra,* 573 F.3d at 284-85*,* the Court also noted that landlord-tenant law determines whether a person's expectation of privacy is objectively reasonable under the Fourth Amendment and the fact that the landlord made no attempt to evict the tenant or his guest from the apartment supported the conclusion that the guest was not a trespasser and had an expectation of privacy as a guest in the apartment, notwithstanding the tenant's breach of the lease and failure to pay rent.  The Court further noted that :

> "There are extensive legal procedures that a landlord must adhere to before occupants are lawfully dispossessed of property without their consent, and the landlord's failure to evict an occupant who is in technical violation of the lease effectively waives whatever authority the landlord has to treat a person as a trespasser. 49 AM. JUR. 2D Landlord and Tenant § 260 (2009) ("As general rule, any act of the landlord that affirms the existence of the lease and recognizes the tenant as lessee, after the landlord has knowledge of a breach of the lease which would constitute a cause to terminate the lease, results in a waiver by the landlord of the right to declare a forfeiture of the lease."); 52 C.J.S. Landlord & Tenant § 185 (2009) ("When a tenant demonstrates that a landlord long had knowledge of the breach of a real property lease, yet provided no notice of it to the tenant, the landlord is considered to have encouraged the default, and therefore, should not be allowed to take advantage of it by claiming forfeiture of lease by the breach.").

*Id*. at 284-85.

In concluding that the guest had a reasonable expectation of privacy notwithstanding the tenant's default on his lease agreement, the Court further noted that:

> "If a landlord's unexercised authority over a lodging with overdue rent alone divested any occupant  of a reasonable expectation of privacy, millions of tenants and their guests would be

7

deprived of Fourth Amendment protection. Paying late is a common occurrence, especially in economically turbulent times, and we reject the notion that the Constitution ceases to apply in these circumstances."

*Id.* at 285.

In the instant case, there is also no evidence that the landlord gave notice to the tenants of the premises that they considered 2 Garces to have been abandoned pursuant to California Civil Code Section 1951.3. Under Civil Code Section 1951.3, a landlord can terminate a lease if it gives written notice to a tenant of the landlord's belief of abandonment after a period of 14 days in which the tenant has failed to pay rent. Section 1951.3 may be used by the landlord in conjunction with the landlord serving a notice requiring the lessee to pay rent or quit as provided by California Code of Civil Procedure Sections 1161 and 1162.

While Defendants acknowledge that abandonment is ordinarily a question of intent, the objective facts in this case, including the sworn deposition testimony of the landlord's agent, Margarita Wynn, clearly establish that 2 Garces had not been abandoned by the tenants at the time of the subject incident. (Nisenbaum decl., Ex. 1, Excerpts of Deposition of M. Wynn). Moreover, even if the tenants had allowed other people to sublease the premises during the course of their tenancy, Ms. Wynn testified that they would be required to pursue legal process to evict the subleases and could not call the police to summarily dispossess them of the premises. Id.

Clearly, this case is distinguishable from *United States v. Sledge*, 650 F.2d 1075, 1076, n.1 (9th Cir. 1981), cited by Defendants. There, unlike the instant case, the landlord concluded the apartment had been abandoned after the door was left wide-open, *all* the furnishings that did not belong to the landlord had been removed and the landlord retook possession of the apartment. Here, as shown by Ms. Wynn's testimony, the landlord considered the unit occupied, charged rent to the tenants for the month of June 2006 and made no attempt to retake possession of the premises prior to the subject incident.

This case is also distinguishable from *United States v. Lavasseuer*, 816 F.2d 37, 43-44 (2nd. Cir. 1987), where suspects fled their leased residence to avoid arrest for their involvement in a ten year long underground conspiracy to bomb buildings.  In that case, there was overwhelming, admissible evidence that the suspects abandoned the residence to avoid arrest and did not plan to return to it, unlike the instant case where there is no such admissible evidence of abandonment.

 Plaintiffs also object to the instruction on abandonment because it is confusing and misleading, in that it would allow the jury to consider evidence irrelevant to the question of abandonment, such as whether the tenants had other residences, their payment or nonpayment of rent, how and by whom the property was being used, and other factors which might have bearing on an unlawful detainer action brought by the landlord, but which have no bearing on whether the premises had been abandoned.  *See, United States v. Washington*, *supra*.

Moreover, Defendants' instruction erroneously implies that a person abandons their interest in one residence if they are merely living somewhere else or moved some of their personal property out when, in fact, it is not uncommon for people to live at multiple locations or for tenants vacating one premises to have an overlapping interest in two leaseholds at the same time as they finalize their move.  Plaintiffs' proposed instruction also omits the argumentative language in Defendants' instruction which implies that factors such as the lack of security, the condition of the premises and other factors entirely unrelated to the intent of the tenants to abandon the premises, should be considered in deciding whether an abandonment had occurred.

Plaintiffs' proposed instruction does not contain the misstatement of the law concerning the burden of proving an exception to the warrant requirement that is contained in Defendants' proposed Instruction No. 15.  In *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009), *cert denied sub. nom., Bonvicino v. Hopkins*, ___U.S.___(2010), the Ninth Circuit made it clear that in determining whether an exception to the warrant requirement exists, "the Government bears the burden of

1   demonstrating that the search at issue meets these parameters." *Id*. at 764 (*citing, United States v.*

2   *Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005)); see also, *United States v. Struckman*, 603 F.3d 731,

3   739 (9th Cir. 2010)(Government bears the burden of establishing an exception to the Fourth

4   Amendment's warrant requirement); *Morales v. City of Delano*, 2012 U.S. Dist. LEXIS 40179 (E.D.

5   Cal.  March 23, 2012)(Same).

6

7        Plaintiffs also object to Defendants' proposed instructions on abandonment because they are

8   argumentative in that they isolate and highlight discrete facts that exclude other facts weighing

9   against abandonment. Furthermore, the isolated facts contained in Defendants' Instruction No. 16 do

10   not establish that the premises were abandoned by the tenants, even if they were true.  As even

11   Defendants recognize in their memorandum in support of their instructions, a party is not entitled to a

12   legal instruction, or a series of them, that single out and emphasize a particular facts at the expense of

13   other pertinent facts. "An instruction is viewed as argumentative if it emphasizes the testimony of one

14   witness while disregarding other relevant evidence." *Spesco Inc. v. General Electric Co.*, 719 F.2d

15   233, 239 (7th Cir. 1983).  Nevertheless, that is exactly what the Defendants have done in isolating

16   and highlighting certain facts in their proposed instructions on abandonment.

17

18        Furthermore, a separate instruction on qualified immunity is inappropriate because qualified

19   immunity is a matter of law to be determined by the Court . *Ruff v. County of Kings*, 2009 U.S. Dist.

20   LEXIS 110638 (E.D. Cal. 2011).  In *Ruff*, the Court denied defendants a new trial based on their

21   contention that the Court erroneously failed to instruct the jury on their affirmative qualified

22   immunity defense.  The Court noted that the "jury's only role in a qualified immunity dispute is to

23   resolve whether a constitutional right has been violated. Whether the constitutional right violated was

24   clearly established is a question of law for the Court. "

25

26

27

28

Espinosa v. City and County of San Francisco, Case No. C06 04686 JSW
Plaintiffs' Memorandum in Support of Disputed Jury Instructions

1    Therefore, if the Court decides that an abandonment instruction should be given following the

2    close of evidence, Plaintiffs submit that their version of Instruction No. 12 accurately states the law

3    on abandonment and object to the Defendants' proposed instruction Nos. 12, 15 and 16.

4    **Disputed Instruction Nos. 13 and 14 Re: Legitimate Expectation of Privacy**

5    Plaintiffs object to the Court giving a separate instruction on "legitimate expectation of

6    privacy" or limiting the scope of the expectation of privacy to exclude the area inside the front door

7    since it is indisputable that an overnight guest at a residence has a legitimate expectation of privacy

8    which requires the police to obtain a warrant to enter or search the premises.  *See, Minnesota v.*

9    *Olson*, 495 U.S. 91, 96-97 (1990);  *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 533

10   (9th Cir. 2010).   Moreover, there is no evidence which would support an instruction that Mr.

11   Sullivan lacked a reasonable expectation of privacy in the area inside the front door to the residence if

12   it is otherwise determined he was an overnight guest at the residence.  This is particularly true where

13   the evidence is not in dispute that Defendant Morgado had no access to the area inside the front door

14   until he forced open the front door without a warrant.

15   Furthermore, the issue of whether Mr. Sullivan was an overnight guest is already covered in

16   Plaintiffs' proposed Instruction 9.11. Nevertheless, Plaintiffs have proposed an alternative instruction

17   to Defendant's Instruction No. 13 on the issue of whether Mr. Sullivan was an overnight guest with

18   an expectation of privacy in 2 Garces if the Court believes that the jury should be given a specific

19   instruction on this issue.

20   Unlike Defendants' proposed Instruction Nos. 13 and 14, Plaintiffs' proposed instruction is

21   not argumentative or misleading.  As Defendants recognize in their memorandum in support of their

22   instructions, a party is not entitled to a legal instruction, or a series of them, that single out and

23   emphasize a particular fact at the expense of other pertinent facts. "An instruction is viewed as

24   argumentative if it emphasizes the testimony of one witness while disregarding other relevant

11

evidence." *Spesco Inc. v. General Electric Co*., 719 F.2d 233, 239 (7th Cir. 1983).  Nevertheless, that is exactly what the Defendants have done in isolating and highlighting certain facts in their proposed instruction Nos. 13 and 14 to the exclusion of facts weighing in favor of a finding that Mr. Sullivan was an overnight guest.

Therefore, if the Court determines that a separate instruction on the issue of whether Mr. Sullivan was an overnight guest at the premises with an expectation of privacy should be given to the jury, Plaintiffs request that their version of Instruction No. 13 be given and object to Defendants' Instructions Nos. 13 and 14.

**Disputed Instruction No. 9.15: Re: Emergency Exception to Warrant Requirement**

Plaintiffs modified the 9th Cir. Model Civil Instruction No. 9.15 to clarify that 1) the search was conducted at a private residence; 2) the search was conducted without a warrant; 3) the alleged exigent circumstances and/or need for a community caretaking function had to have been known to the officers in advance of the warrantless entry and, 4) the officers could not justify the warrantless search based on evidence they discovered following their entry into the premises.  *See, e.g., United States v. Sims*, 435 F. Supp. 2d 542, 549 (S.D. Miss. 2006):

> "The Court however is not persuaded that exigent circumstances existed. Assuming arguendo that Officer Sills had not prevented Sims from closing the door, the door would have shut, and if the door had shut, the officers would have had no reason to believe that Sims might be running to retrieve a weapon. At that point, no exigent circumstances would have existed. If exigent circumstances did exist under this scenario, then there would have been no reason to garner Ms. Crump's consent to search the house in the first place. Law enforcement officers could have simply entered the home based on their belief that Sims might be a threat to their safety. To say that exigent circumstances exist in this situation would be tantamount to allowing law enforcement officers to search a residence without a warrant or consent at any time, so long as they believe that someone inside the home might be armed and dangerous.
>
> Of course, the door was not allowed to shut in the instant case. Instead, Officer Sills prevented the door from shutting by pushing his way into the home. There were no exigent circumstances until the time he pushed the door in toward Sims. He, therefore, had no right to prevent Sims from shutting the door. It was only Officer Sills' unlawful intrusion into the privacy of the home -- preventing the door from shutting -- that allowed him to observe Sims running down the hallway. *Thus, any "exigent circumstances" arose*

Espinosa v. City and County of San Francisco, Case No. C06 04686 JSW
Plaintiffs' Memorandum in Support of Disputed Jury Instructions

1

*after the constitutional violation had occurred and therefore would not retroactively justify the warrantless intrusion.*(Emphasis added)."

2

3    The instruction was also modified to reflect that Defendants have the burden of establishing

4    that the warrantless entry and search were justified by an exception to the warrant requirement under

5    the Fourth Amendment.  *See, e.g.*, *Hopkins v. Bonvicino*, 573 F.3d 752, 764 (9th Cir. 2009),

6    c*ertiorari denied by, Bonvicino v. Hopkins*, __U.S.___( 2010):

7
8        "We must 'judge whether or not the emergency exception applies in any given situation
         based on the totality of the circumstances, and, as with other exceptions to the warrant
9        requirement, *the Government bears the burden of demonstrating that the search at issue
         meets these parameters*.' *United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005)."

10
11   (Emphasis added).

12   Plaintiffs object to Defendant's instruction No. 9.15 because it contains erroneous statements

13   of the law, is misleading and confusing.

14   **Disputed Instruction No. 19, Re: Provoking a Confrontation**

15       Plaintiffs' proposed instruction sets forth the appropriate legal standard under *Alexander v.*

16   *City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994) for the jury to consider in

17   determining whether the officers intentionally or recklessly provoked a violent confrontation with the

18   decedent which led to their defensive use of deadly force.  See also, *Billington v. Smith,* 292 F.3d

19   1177, 1189 (9th Cir.2002) and *Espinosa v. City and County of San Francisco,* 598 F.3d 528, 537-539

20   (9th Cir. 2010).  Plaintiffs object to Defendants' proposed instruction because it misstates the law and

21   is confusing in that it appears to require that the jury find a "prior" violation of Mr. Sullivan's

22   constitutional rights in order to support a claim under *Alexander.*  Clearly, the jury is not required to

23   find a "prior" violation of Mr. Sullivan's rights because under *Alexander,* the jury could find that the

24   officers' *concurrent* unreasonable, provocative entry, search and the seizure of Mr. Sullivan, were

25   independent violations that provoked the violent confrontation and led to the use of deadly force.

26   There is no requirement under *Alexander* or *Billington* that the independent violation had to be

27   "prior" to the officers' use of force to support such a claim.

28

Espinosa v. City and County of San Francisco, Case No. C06 04686 JSW
Plaintiffs' Memorandum in Support of Disputed Jury Instructions

**Disputed Instruction Nos. 19.5, Re: Recklessness**

Plaintiffs' instruction, which was based on the definition of recklessness contained in the Ninth Circuit Model Instruction 5.5 (where the court defined recklessness for purposes of punitive damages) is an accurate statement of the law.

Plaintiffs object to Defendants' proposed instruction No. 19.5 because it does not contain an accurate statement of the law, is misleading, argumentative and confusing.

**Disputed Instruction No. 9.18: Re: Particular Rights-Fourth Amendment-Unreasonable Seizure of Person – Generally**

Plaintiffs modified the 9th Circuit Model Civil Instruction No. 9.18 to reflect the names of the officers and the decedent.  Plaintiffs also modified the language regarding intent because it was confusing and a jury could erroneously conclude that Plaintiffs must prove specific intent in order to establish a Fourth Amendment seizure claim.  See, e.g., *Caballero v. Concord*, 956 F.2d 204, 206 (9th Cir. 1992):

> "We first consider whether the district court erred in instructing the jury that, in order to prevail on his § 1983 claim for false arrest, Caballero was required to show that Officer Perryman specifically intended to deprive him of his constitutional rights....

> "Nor is specific intent required in order to establish a violation of the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 397-98, 104 L. Ed. 2d 443 , 109 S. Ct. 1865 (1989). Rather, "the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting her, without regard to [her] underlying intent or motivation." Id. at 397…."

Based on the foregoing, the 9th Circuit's Model Instruction 9.22 must be modified to reflect that Plaintiffs are not required to prove specific intent.

**Disputed Instruction No. 9.22: Particular Rights – Fourth Amendment – Unreasonable Seizure of Person – Excessive (Deadly and Nondeadly) Force**

Plaintiffs proposed the 9th Circuit Model Civil Instruction No. 9.22, with modifications to reflect the names of the parties and to add language relating to Plaintiffs' claim that the officers

provoked the confrontation which resulted in their use of force against Mr. Sullivan.   See, *Espinosa*

*v. City and County of San Francisco*, 598 F.3d 528, 538-539 (9th Cir. 2010):

> "Where a police officer "intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). If an officer intentionally or recklessly violates a suspect's constitutional rights, then the violation may be a provocation creating a situation in which force was  necessary and such force would have been legal but for the initial violation.

Plaintiffs' instruction contains an accurate statement of the law regarding the right to be free

from the use of unreasonable force.

**Disputed Instruction No. 37, Re: Limiting Instruction Regarding Information about Asa Sullivan's Background and History**

Plaintiffs have proposed this limiting instruction because the Defendants have represented that

they intend to offer evidence of Mr. Sullivan's background and history on the issues of "suicide by

cop" and damages.  The Court denied Plaintiffs' motions in limine seeking to exclude or limit the

introduction of this evidence at trial and also denied Plaintiffs' motion to bifurcate liability and

damages despite the extremely prejudicial nature of this evidence.  Therefore, without waiving

Plaintiffs' objections to the admission of this evidence, Plaintiffs request that the Court give the jury a

limiting instruction to prevent the jury from using this evidence as improper character evidence or for

other improper purposes.  *United States v. Huddleston*, 485 U.S. 681, 691-92 (1988) (stating that a

limiting instruction reduces the danger a jury will improperly use prior bad acts evidence as character

evidence under F.R.E. 404).

Since the Defendants have represented that this evidence is relevant to their "suicide by cop"

theory and on the issue of damages, Plaintiffs believe that a limiting instruction, which clearly

informs the jury about the limited purpose of this evidence, must be given in light of the Court's

denial of Plaintiffs' motions in limine because of its extremely prejudicial nature and the likelihood

that the jury could improperly use it as character evidence.

**Disputed Instruction No. 38 Re: Assault – Essential Factual Elements**

Plaintiffs modified the California CACI 1301 instruction on assault to include the names of the parties. Under California law, the elements of a cause of action for assault were summarized in *So v. Shin* (2013) 212 Cal. App. 4th 652, 668-669 as follows:

> "The essential elements of a cause of action for assault are: (1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm. (CACI No. 1301; Plotnik v. Meihaus (2012) 208 Cal.App.4th 1590, 1603–1604 [146 Cal. Rptr. 3d 585].)"

The instruction proposed by Plaintiffs accurately sets forth the elements of an assault claim under California law.

**Disputed Instruction No. 39. Re: Battery by a Police Officer**

Plaintiffs modified the California CACI 1305 instruction on battery by a police officer to reflect the names of the parties.  Plaintiffs deleted confusing language in the instruction that overlaps with the Fourth Amendment use of force instructions and more clearly defined the elements of a claim for battery under California.  The Court in *So v. Shin* (2013) 212 Cal. App. 4th at 669 set forth the elements of a battery claim under California law as follows:

> "The essential elements of a cause of action for battery are: (1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been  offended by the touching. (CACI No. 1300; see Kaplan v. Mamelak (2008) 162 Cal.App.4th 637, 645 [75 Cal. Rptr. 3d 861])."

Plaintiffs' proposed battery instruction sets forth these essential elements of a state law battery claim as stated in the *So* case.

**Disputed Instruction No. 40: Bane Act – Essential Elements (Civ. Code Section 52.1)**

Plaintiffs proposed the CACI 3066 instruction on the Plaintiffs' California Civil Code Section 52.1 claim and, in the alternative, also proposed the BAJI 7.90 instruction on this claim. Plaintiffs modified the CACI 3066 instruction to reflect the names of the parties and to add the Constitutional rights underlying the Plaintiffs' claim. The instructions proposed by Plaintiffs accurately summarize the law applicable to claims alleged under California Civil Code Section 52.1. See, e.g., *Venegas v. County of Los Angeles* (2007) 153 Cal. App. 4th 1230, 1239, *review denied by*, Venegas (David) v. County of Los Angeles, 2007 Cal. LEXIS 12579 (2007):

> "52.1, subdivision (a) provides for injunctive or other equitable relief against "a person or persons, whether or not acting  under color of law, [who] interferes by threats, intimidation, or coercion, … with the exercise or enjoyment by any individual or  individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Subdivision (b) of section 52.1 states "[a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States [or of this state] has been interfered with, or  attempted to be interfered with, as described in subdivision (a), may institute or prosecute … a civil action for damages … ."

Therefore, Plaintiffs' proposed instruction accurately states the elements of a cause of action under California Civil Code Section 52.1.

**Disputed Instruction No. 41, Re: Negligence – Essential Elements**

Plaintiffs proposed the California CACI 400 instruction on negligence, which was modified to include the names of the parties. This instruction accurately states the elements of a California state law negligence claim. See, e.g., Ladd v. County of San Mateo (1996) 12 Cal.4th 913, 917: "The elements of a cause of action for negligence are well established. They are "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury."

**Disputed Instruction No. 42, Re: Reliance on Good Conduct of Others**

1   Plaintiffs proposed the California CACI 411 instruction that accurately states the California

2   law that everyone has the right to expect that every other person will obey the law and use reasonable

3   care.  See, e.g., *Celli v. Sports Car Club, Inc.* (1972) 29 Cal. App. 3d 511, 523:

4

5   "Furthermore, every person has a right to presume that every other person will perform his
    duty and obey the law and in the absence of reasonable ground to think otherwise, it is not
6   negligence to assume that he is not exposed to danger which could come to him only
    from violation of law or duty by such other person."

7

**Disputed Instruction No. 43, Re: Civil Code Section 52.1 Civil Penalties**

8

9   Plaintiffs' proposed instruction No. 40 sets forth the elements of the Plaintiffs' claim under

10  California Civil Code Section 52.1(s).  This instruction relates to the civil penalty that is recoverable

11  by a Plaintiff bringing a claim under Section 52.1.  Specifically, California Civil Code Section

12  52.1(b) states that:

13  "*Any individual* whose exercise or enjoyment of rights secured by the Constitution or laws of
    the United States, or of rights secured by the Constitution or laws of this state, has been
14  interfered with, or attempted to be interfered with, as described in subdivision (a), *may
    institute and prosecute in his or her own name and on his or her own behalf a civil action for*
15  *damages, including, but not limited to, damages under Section 52, injunctive relief, and other*
    *appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or*
16  *rights secured.*"
17

18  (Emphasis added).

19  Thus, Civil Code Section 52.1(b) states without limitation that a Plaintiff in an action under

20  Civil Code Section 52.1 is entitled to recover relief that includes *any* of the damages available under

21  Civil Code Section 52, as well as all other appropriate relief.  Damages available under Civil Code

22  Section 52(b) include compensatory damages, as well as, a civil penalty of $25,000 for each

23  violation.  *Ventura v. ABM Industries Inc.*, 212 Cal. App. 4th 258, 261, fn.4.  Civil Code Section

24  52.1(g) also provides that:

25

26  "An action brought pursuant to this section is independent of any other action, remedy, or
    procedure that may be available to an aggrieved individual under any other provision of law,
27  including, but not limited to, an action, remedy, or procedure brought pursuant to Section
    51.7."
28

Based on the foregoing, it is clear that the damages available to a prevailing party on a claim brought under Civil Code Section 52.1 include compensatory damages, as well as, the $25,000 civil penalty. Therefore, the Plaintiffs' proposed instruction contains an accurate statement of the law and should be given to the jury.

Dated: April 15, 2013                    _____/S/_____
                                         Benjamin Nisenbaum
                                         Attorney for Plaintiffs

**DECLARATION OF PLAINTIFFS' COUNSEL**

I, Benjamin Nisenbaum, declare:

1.  I am an attorney licensed to practice law in the State of California and represent the Plaintiffs in this action.  I have personal knowledge of the matters stated herein and would testify to the same if called to do so in Court.

2.  I personally attended the deposition of Margarita Wynn in this action.  Attached and incorporated herein by reference as Exhibit 1 are excerpts from Ms. Wynn's deposition's transcript.

3.  I declare under penalty of perjury that the foregoing is true and correct of my personal knowledge.  Executed this 15th day of April 2013, at Oakland, California.


_____/S/_____
Benjamin Nisenbaum
Attorney for Plaintiffs

Espinosa v. City and County of San Francisco, Case No. C06 04686 JSW
Plaintiffs' Memorandum in Support of Disputed Jury Instructions

1           UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5  KATHLEEN ESPINOSA, INDIVIDUALLY
    AND REPRESENTATIVE OF THE ESTATE

6  OF DECEDENT ASA SULLIVAN;
    BY AND THROUGH HIS GUARDIAN

7  AD LITEM, NICOLE GUERRA,       **CERTIFIED**

8          PLAINTIFFS,         **COPY**

9  -VS-             CASE NO.  C06 04686 JSW

10  CCSF, A MUNICIPAL CORPORATION;
    HEATHER FONG, IN HER CAPACITY
    AS CHIEF OF POLICE FOR THE CCSF;

11  JOHN KEESOR, INDIVIDUALLY,
    AND IN HIS CAPACITY AS A POLICE

12  OFFICER FOR THE CCSF; MICHELLE ALVIS,
    INDIVIDUALLY AND IN HER CAPACITY

13  AS A POLICE OFFICER FOR THE CCSF;
    PAUL MORGADO, INDIVIDUALLY

14  AND IN HIS CAPACITY AS A POLICE OFFICER
    FOR THE CCSF;

15

16         DEFENDANTS.
    _____/

17

18        **DEPOSITION OF MARGARITA WYNN**

19         **THURSDAY, MARCH 15TH, 2007**

20

21      REPORTED BY:  GINA L. PETERSEN
                CSR NO. 9447

22

23      **BONNIE L. WAGNER & ASSOCIATES**
       **41 SUTTER STREET, SUITE 1605**

24        **SAN FRANCISCO, CA 94104**
          **(415) 982-4849**

25

                          EXHIBIT 1

1 **A P P E A R A N C E S:**

2

3 FOR THE PLAINTIFFS:

                              LAW OFFICES OF JOHN L. BURRIS
4                               BY:  BEN NISENBAUM
                                 ATTORNEY AT LAW
5                               7677 OAKPORT STREET, SUITE 1120
                              OAKLAND, CALIFORNIA   94621

6

7 FOR THE DEFENDANTS:

                              OFFICE OF THE CITY ATTORNEY
8                               BY:  PETER KEITH
                                 ATTORNEY AT LAW
9                               1390 MARKET STREET, FIFTH FLOOR
10                             SAN FRANCISCO, CALIFORNIA   94102

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 1

# INDEX OF EXAMINATION

**EXAMINATION BY:**

PAGE

    MR. KEITH

5

    MR. NISENBAUM

65

**FURTHER EXAMINATION BY:**

    MR. KEITH

102

    MR. NISENBAUM

106

1
## E X H I B I T S
2

3  DEFENDANTS'                    DESCRIPTION                                    PAGE
4

5      1        A PHOTOCOPIED FILE OF VARIOUS                                      9
                DOCUMENTS
6

7      2        ONE-PAGE DOCUMENT ENTITLED,                                       11
                "STATEMENT/NARRATIVE FORM CONTINUED"

8      3        FIVE-PAGE DOCUMENT ENTITLED,                                      15
                "RESIDENTIAL TENANCY AGREEMENT"
9

10     4        ONE-PAGE LETTER DATED NOVEMBER 29,                                22
                2005, ADDRESSED TO BRYANT GUDOR FROM
11              DUKE ALEGRE

12     5        ONE-PAGE DOCUMENT ENTITLED, "30-DAY                              26
                NOTICE TO VACATE"

13     6        ONE-PAGE DOCUMENT ENTITLED, "RENT                               28
                PAYMENT"
14

15     7        ONE-PAGE DOCUMENT ENTITLED,                                      30
                "CONVERSATION LOG"

16     8        ONE-PAGE DOCUMENT ENTITLED, "RESIDENT                           42
                DETAIL"
17

18     9        TWO-PAGE DOCUMENT ENTITLED, "INCIDENT                           43
                REPORT FORM"

19     10       ONE-PAGE DOCUMENT ENTITLED, "RESIDENT                           55
                LEDGER"
20

21     11       ONE-PAGE DOCUMENT ENTITLED, "RESIDENT                           56
                CONVERSATION LOG"

22     12       ONE-PAGE LETTER DATED JUNE 13, 2006,                            58
                TO MS. WYNN FROM BRYANT L. GUDOR
23

24     13       ONE-PAGE FLYER ENTITLED, "SFPD                                  59
                PROTECTS FRIGHTENED RESIDENTS AT
                PARKMERCED FROM DANGEROUS HUMAN
25              BEINGS AND PARKMERCED MANAGEMENT
                NEGLECT"

1  THURSDAY, MARCH 15TH, 2007                10:00 O'CLOCK A.M.

2

3                              -oOo-

4                        MARGARITA WYNN,

5  BEING FIRST DULY SWORN BY THE CERTIFIED SHORTHAND REPORTER

6   TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE

7                  TRUTH, TESTIFIED AS FOLLOWS:

8

9                   EXAMINATION BY MR. KEITH

10

11  BY MR. KEITH:

12      Q.  MS. WYNN, MY NAME IS PETER KEITH, AND I'M AN

13  ATTORNEY FOR THE CITY AND COUNTY OF SAN FRANCISCO AND SOME

14  POLICE OFFICERS WHO ARE EMPLOYED BY THE CITY.

15          BEFORE WE GET GOING WITH THE QUESTION-AND-ANSWER

16  PORTION OF THE DEPOSITION, I WANTED TO GO OVER SOME OF THE

17  GROUND RULES FOR WHAT THIS PROCESS IS AND HOW IT WORKS.

18          FIRST THING YOU SHOULD KNOW IS THAT THE COURT

19  REPORTER IS TAKING DOWN THE OFFICIAL RECORD OF WHAT

20  HAPPENS TODAY, AND SHE CAN ONLY TAKE DOWN WORDS; AND, SHE

21  CAN ONLY TAKE DOWN WORDS IF WE ARE NOT TALKING OVER EACH

22  OTHER.

23          I'M GOING TO DO MY BEST TO MAKE SURE I LET YOU

24  FINISH YOUR ANSWER, AND YOU SHOULD DO YOUR BEST TO LET ME

25  FINISH MY QUESTION EVEN IF YOU THINK YOU KNOW WHERE I'M

1  PARKMERCED, "CAN YOU PROVIDE ME WITH THE FILE WITH THE
2  COURTESY PATROL LOGS AND DAILY REPORTS FROM KING"?
3       A.  YES, YES.
4           MR. KEITH:  I WOULD LIKE TO MARK ANOTHER DOCUMENT
5  AS AN EXHIBIT.
6                          (WHEREUPON, DEFENDANTS' EXHIBIT 3
7                          WAS MARKED FOR IDENTIFICATION.)
8           MR. KEITH:  OKAY.  I'M GOING TO HAND YOU
9  EXHIBIT 3.
10          THIS IS A FIVE-PAGE DOCUMENT BATES STAMP
11 PARKMERCED 19 THROUGH 23.
12 BY MR. KEITH:
13      Q.  WHAT IS THIS DOCUMENT?
14      A.  THIS IS THE LEASE AGREEMENT THAT WE HAVE BETWEEN
15 OURSELVES AS A LANDLORD AND THE LEASEHOLDERS OF 2 GARCES.
16      Q.  CAN YOU TELL ME WHO THE LEASEHOLDERS WERE THAT
17 THIS AGREEMENT PERTAINS TO?
18      A.  BRYANT GUDOR, G-U-D-O-R, AND JARRETT SCHANK.
19      Q.  WHEN DID MR. GUDOR AND MR. SCHANK FIRST MOVE INTO
20 2 GARCES?
21      A.  THEY ENTERED INTO A LEASE AGREEMENT TO OCCUPY 2
22 GARCES ON JUNE 27, 2003.
23      Q.  NOW, I NOTICED THAT IF YOU LOOK AT THIS LEASE
24 AGREEMENT THERE IS A BOX ON THE UPPER RIGHT-HAND CORNER OF
25 THE FIRST PAGE, PARKMERCED 19.

1      IT SAYS, "FOR THE PERIOD 6/27/03 TO 7/31/03." CAN
2  YOU EXPLAIN TO ME WHAT THAT PERIOD MEANS?

3      A.  IT REFERENCES THE AMOUNT OF THE RENT COLLECTED
4  THAT IS STATED RIGHT ABOVE.

5      TO GO THROUGH THE ENTIRE BOX, THERE IS A SECURITY
6  DEPOSIT THAT WAS COLLECTED FOR $1,000, RENT COLLECTED FOR
7  $2,147.67 AND THE PERIOD FOR WHICH THAT RENT WAS COLLECTED
8  WAS FOR JUNE 27, 2003, THROUGH JULY 31ST, 2003, AND THE
9  OTHER WOULD REFERENCE ANY AMOUNT OTHER THAN RENT THAT WAS
10 COLLECTED, I.E., PET RENT OR STORAGE RENT OF ANY SORT.

11     Q.  OKAY.  IF YOU LOOK AT PARAGRAPH TWO OF THE LEASE
12 EXHIBIT 3, IT REFERS TO A TERM.

13     CAN YOU TELL ME WHAT THAT PARAGRAPH MEANS?

14     A.  SURE.  THIS TERM REFERENCES THE INITIAL LEASE
15 PERIOD THAT BRYANT AND JARRETT ENTERED INTO, SO IT LOOKS
16 LIKE WHEN THEY SIGNED A LEASE AGREEMENT, IT WAS THEIR
17 INTENTION TO ONLY OCCUPY 2 GARCES THROUGH SEPTEMBER 30TH
18 OF 2003.

19     Q.  WHAT HAPPENED REGARDING THEIR OCCUPANCY OF 2
20 GARCES AFTER SEPTEMBER 30TH, 2003?

21     A.  IT REVERTED TO A MONTH-TO-MONTH TENANCY AFTER THE
22 EXPIRATION OF THAT LEASE TERM.

23     Q.  WITH MR. GUDOR AND MR. SCHANK AS THE TENANTS?
24     A.  CORRECT.

25     Q.  NOW, I WANTED TO ASK YOU ABOUT SOME OF THE OTHER

1          (WHEREUPON, DEFENDANTS' EXHIBIT 7

2          WAS MARKED FOR IDENTIFICATION.)

3          MR. KEITH:  I'M HANDING YOU EXHIBIT 7.  IT'S A

4   ONE-PAGE DOCUMENT BATES STAMPED PARKMERCED 38.

5   BY MR. KEITH:

6          Q.  WHAT KIND OF DOCUMENT IS THIS?

7          A.  THIS IS A CONVERSATION LOG THAT WE KEEP IN A

8   RESIDENT FILE TO DOCUMENT ANY CONVERSATIONS THAT WE MAY

9   HAVE WITH OCCUPANTS OF AN APARTMENT, SPECIFICALLY 2

10  GARCES.

11         Q.  THERE IS AN ENTRY ON THIS CONVERSATION LOG MAY

12  26, 2006.

13         FIRST OF ALL, CAN YOU TELL FROM THE INITIALS WHO

14  MADE THAT ENTRY?

15         A.  IT WAS A FORMER EMPLOYEE OF PARKMERCED WHOSE NAME

16  SLIPS MY MIND.  I DON'T REMEMBER HER NAME.

17         Q.  THERE IS A GENERAL REFERENCE HERE TO A MOVE-OUT

18  DATE AND NOT RECEIVING KEYS AND SO FORTH.

19         DO YOU KNOW ANYTHING ABOUT AN ISSUE REGARDING THE

20  MOVE-OUT DATE OR RECEIVING KEYS THAT OCCURRED AFTER MARCH

21  OF 2006 BUT BEFORE THE INCIDENT BETWEEN MR. SULLIVAN AND

22  THE POLICE?

23         A.  CORRECT.  IT LOOKS LIKE, ACCORDING TO THE 30-DAY

24  NOTICE, BRYANT GUDOR AND ALL OCCUPANTS WERE SCHEDULED TO

25  MOVE OUT AT THE END OF MARCH.

1    BY THE NOTE THAT IS MADE HERE ON THIS
2    CONVERSATION LOG, THE KEYS WEREN'T RECEIVED SO THAT WE DID
3    NOT REGAIN POSSESSION OF THE APARTMENT.  IT'S WHEN A
4    RESIDENT IS SCHEDULED TO MOVE OUT AND WE DON'T RECEIVE THE
5    KEYS, WE THEN MAKE FOLLOW-UP ATTEMPTS WITH THE OCCUPANTS,
6    SPECIFICALLY HERE WITH BRYANT GUDOR.

7    IT LOOKS LIKE THE MOVE-OUT DATE WAS PUSHED TO MAY
8    5TH, AND WE HAVEN'T RECEIVED THE KEY, AND WE WERE CALLING
9    TO FOLLOW UP AND LEFT A MESSAGE TO FIND OUT IF, IN FACT,
10   THEY HAD VACATED THE PREMISES.  IF THEY DID, WHERE DID
11   THEY LEAVE THE KEYS?  CAN WE GO IN AND TAKE POSSESSION OF
12   THE APARTMENT BACK?

13   Q.  I THINK THE MOVE-OUT DATE REFERENCE IN THE LOG IS
14   ACTUALLY MAY 1ST; IS THAT CORRECT?

15   A.  YES, MAY 1ST.

16   Q.  IF THE MOVE-OUT DATE IS GOING TO BE MOVED AFTER
17   SOMEBODY MADE A 30-DAY NOTICE THAT INDICATES A SPECIFIC
18   MOVE-OUT DATE, HOW DOES THAT PROCESS GENERALLY OCCUR?

19   A.  IF WE ARE IN CONTACT WITH A PERSON THAT IS
20   INTENDING TO VACATE, WE ASK THEY SUBMIT THEIR INTENTIONS
21   IN WRITING; HOWEVER, AT THE END OF EACH MONTH WHEN WE
22   PERFORM OUR -- WHEN WE CLOSE OUR BOOKS FOR THAT ACCOUNTING
23   PERIOD, PART OF THAT PROCESS IS TO MOVE ALL MOVE-OUT DATES
24   FORWARD, SO WHAT MAY HAVE HAPPENED IS AT THE END OF MARCH,
25   THEIR NOTICE TO VACATE WAS STILL SITTING ON THE BOOKS AND

1  IN ORDER TO CLOSE THE BOOKS, WE MOVED THEIR MOVE-OUT DATE

2  FORWARD, BUT WE DIDN'T GET THAT INTENTION IN WRITING IN

3  THE FILE.

4      Q.  TELL ME IF I UNDERSTAND YOU CORRECTLY.

5          THE FACT THE MOVE-OUT DATE WAS NOTED AS MAY 1ST

6  MEANS SIMPLY THAT THE PROCESS HADN'T ALREADY BEEN

7  COMPLETED AS OF APRIL 1ST, SO JUST AS A PROCEDURE

8  PARKMERCED MOVED IT FORWARD TO KEEP THE BOOKS --

9      A.  MOVED IT FORWARD, CORRECT.

10     Q.  THERE WASN'T NECESSARILY ANY CONVERSATION OR AN

11 AGREEMENT WITH THE TENANTS THAT THE MOVE-OUT DATE WOULD BE

12 MOVED FORWARD?

13     A.  THERE WASN'T A VERBAL AGREEMENT; HOWEVER, THEY

14 STILL REMAINED IN POSSESSION OF THE APARTMENT, SO THEY

15 WERE STILL OCCUPYING THE APARTMENT.

16     Q.  NOW, DO YOU HAVE ANY INFORMATION WHETHER THEY

17 WERE -- I GUESS WHEN MR. SCHANK AND MR. GUDOR PHYSICALLY,

18 THEMSELVES, MOVED OUT OF THE APARTMENT?

19         MR. NISENBAUM:  OBJECTION; ASSUMES FACTS NOT IN

20 EVIDENCE.

21         IT ASSUMES THEY DID MOVE OUT OF THE APARTMENT.

22         MR. KEITH:  I'LL STEP BACK AND ASK YOU A

23 DIFFERENT QUESTION.

24 BY MR. KEITH:

25     Q.  AT SOME POINT, DID IT COME TO YOUR ATTENTION THAT

1  MR. GUDOR OR MR. SCHANK WERE NO LONGER LIVING IN THE
2  APARTMENT?

3      A.  NO, NO.

4      Q.  SO, AFTER THE MAY 1ST CONVERSATION THAT IS NOTED,
5  THAT CONVERSATION LOG -- I'M SORRY, NOT MAY 1ST.

6      AFTER THE MAY 26TH CONVERSATION THAT IS NOTED IN
7  THE LOG -- I SHOULD SAY THIS IS NOT A CONVERSATION.  THIS
8  IS SOMEBODY IN YOUR OFFICE LEAVING A MESSAGE?

9      A.  CORRECT.

10     Q.  DO YOU HAVE ANY IDEA WHAT HAPPENED BETWEEN MARCH
11  31ST AND MAY 26, 2006, REGARDING THE OCCUPANCY OF THE
12  APARTMENT ONE WAY OR ANOTHER?

13     A.  TO MY KNOWLEDGE THE APARTMENT WAS STILL BEING
14  OCCUPIED.

15     Q.  WHEN YOU SAY "OCCUPIED," WHAT DOES THAT MEAN?

16     A.  THAT IN MY -- WHEN VIEWING THE FILE AND SEEING
17  THE INFORMATION THAT WAS IN THE FILE AND THE FACT THAT WE
18  DID NOT HAVE KEYS, BRYANT GUDOR -- IN OUR EYES, BRYANT
19  GUDOR WAS STILL IN POSSESSION OF THE APARTMENT.

20     Q.  THAT IS A LEGAL WAY TO SEE IT?

21     A.  YEAH, YEAH, TECHNICALLY AND FROM A LEGAL
22  STANDPOINT, WE WOULD CONSIDER THE APARTMENT STILL OCCUPIED
23  BY THE LEASEHOLDERS ON FILE.

24     Q.  BUT IN TERMS OF WHETHER THEY WERE ACTUALLY LIVING
25  THERE BETWEEN MARCH 31ST AND MAY 26TH, '06, DO YOU HAVE

1  ANY INFORMATION ONE WAY OR THE OTHER ON THAT ISSUE?

2       A.  THAT I DON'T KNOW, THAT I DON'T KNOW.

3       Q.  IN DEPOSITION, IT'S NORMAL TO TAKE A BREAK

4  WHENEVER SOMEBODY WANTS TO, USUALLY EVERY HOUR.

5            DO YOU WANT TO TAKE A BREAK?

6       A.  I'M FINE UNLESS ANYBODY ELSE WANTS TO.

7            MR. NISENBAUM:  ANYTIME YOU FEEL LIKE IT, JUST

8  ASK AND YOU CAN TAKE A BREAK.

9            THE WITNESS:  OKAY.  THANK YOU.

10  BY MR. KEITH:

11       Q.  I WANTED TO ASK YOU A FEW QUESTIONS NOW ABOUT THE

12  INCIDENT ITSELF AND WHAT YOU MAY HAVE OBSERVED OF THE

13  INCIDENT.

14            AGAIN, WHEN I TALK ABOUT "THIS INCIDENT," I AM

15  TALKING ABOUT THE INCIDENT WITH THE POLICE AND

16  MR. SULLIVAN ON JUNE 6TH, '06.  THAT IS AN EASY DATE TO

17  REMEMBER.

18            DID YOU GO OUT TO 102 GARCES ON THAT DATE?

19       A.  2 GARCES?

20       Q.  YES, SORRY, 2 GARCES.

21       A.  YES.

22       Q.  WHY DID YOU GO OUT THERE?

23       A.  AFTER HOURS, IF THERE IS ANY INCIDENT THAT

24  REQUIRES A MANAGER TO BE PRESENT, COURTESY PATROL WILL

25  CONTACT THE MANAGER ON CALL.  THAT MANAGER ON CALL WAS

1    HAVING PEOPLE IN THE APARTMENT WHO ARE NOT ON THE LEASE.

2         FROM WHAT I UNDERSTAND, THIS IS ACTUALLY WHAT IS

3    CALLED A CORRECTABLE MATTER; IS THAT TRUE?

4         MR. KEITH:  OBJECTION; VAGUE.

5    BY MR. NISENBAUM:

6         Q.  DO YOU UNDERSTAND WHAT I MEAN?

7         A.  IF I UNDERSTAND CORRECTLY, IT'S SOMETHING THAT

8    CAN BE CORRECTED.

9         Q.  SURE.

10        A.  I DON'T KNOW THAT I UNDERSTAND COMPLETELY.

11        Q.  WHAT IS THE SANCTION FOR HAVING PEOPLE WHO ARE

12   NOT ON THE LEASE, HAVING THEM AT THE APARTMENT FOR LONGER

13   THAN SEVEN DAYS CONSECUTIVELY, WHAT IS THE SANCTION?

14        A.  WHAT WE DO WHEN WE SUSPECT THAT THERE ARE WHAT WE

15   IN OUR OFFICE WOULD TERM AN ILLEGAL OCCUPANT, WE BEGIN BY

16   SENDING NOTIFICATION TO THE APARTMENT THAT WE BELIEVE THAT

17   THERE IS AN ILLEGAL OCCUPANT, AND WE REQUEST THAT THEY

18   VERIFY FOR OUR OFFICES WHO IS ACTUALLY LIVING IN THE

19   APARTMENT.

20        Q.  OKAY.  ULTIMATELY, IS IT TRUE THAT IF YOU DO

21   VERIFY THAT THERE IS AN ILLEGAL OCCUPANT, WHAT YOU CALL

22   ILLEGAL -- I TAKE IT THAT IS NOT ILLEGAL MEANING AGAINST

23   THE LAW BUT JUST ILLEGAL, NOT INCLUDED IN THE CONTRACT?

24        MR. KEITH:  OBJECTION; COMPOUND.

25   BY MR. NISENBAUM:

1      Q.  I CHANGED THE QUESTION HALFWAY THROUGH.

2          WHEN YOU SAY "ILLEGAL," DO YOU MEAN AGAINST THE

3   LAW LIKE A CRIME OR DO YOU --

4      A.  AGAINST OUR POLICIES AND PROCEDURES AND ILLEGAL

5   IN TERMS OF THE CONTRACT THAT IS ENTERED UPON WITH THE

6   LEASEHOLDERS IN OUR OFFICE, SO WE REFER BACK TO THE LEGAL

7   DOCUMENT OF THE LEASE AGREEMENT.

8      Q.  IF YOU DO FIND OUT THERE IS AN ILLEGAL SUBLETTER,

9   USING YOUR TERM "ILLEGAL," TYPICALLY YOU GUYS WOULD

10  THEN -- IS IT OFTEN THE PRACTICE THAT YOU ESSENTIALLY

11  NEGOTIATE A NEW LEASE WITH THEM WHEREBY YOU BYPASS RENT

12  CONTROL?

13     A.  IF IT FALLS WITHIN OUR POLICY AND PROCEDURE OF

14  HAVING A ONE-FOR-ONE PERSON, SO IF THERE ARE ADDITIONAL

15  PEOPLE THAT HAVE MOVED IN AND IT'S NOT A ONE-FOR-ONE

16  POLICY OR IT'S NOT A CHILD, THERE ARE A FEW EXCEPTIONS TO

17  ADDING SOMEBODY ON, SO IF YOU ARE MARRIED OR IF YOU HAVE A

18  CHILD, OBVIOUSLY, YOU HAVE TO BRING THEM IN TO LIVE WITH

19  YOU OR IF YOU HAVE TO CARE FOR AN ILL PARENT, AN IMMEDIATE

20  FAMILY MEMBER.

21         OTHER THAN THAT, IF THEY FALL WITHIN THE

22  ONE-FOR-ONE POLICY, THEY WILL HAVE TO GO THROUGH THE

23  APPLICATION PROCESS AS SET FORTH BY OUR OFFICE.

24     Q.  DURING THE TIME THAT THEY GO THROUGH THE

25  APPLICATION PROCESS, ARE THEY ALLOWED TO STAY IN THE

1 APARTMENT?

2    A.   YES.

3    Q.   HAVE YOU EVER HAD TO EVICT AN ILLEGAL SUBLETTER?

4    A.   YES.

5    Q.   ON HOW MANY OCCASIONS?

6    A.   PERSONALLY, I HAVE BEEN INVOLVED IN ONE SITUATION

7 WHERE THERE WAS A KNOWN ILLEGAL SUBLETTER, AND WE WENT

8 THROUGH THE WHOLE EVICTION PROCESS.

9    Q.   HOW LONG DID THAT EVICTION PROCESS TAKE?

10    A.   FROM WHAT I REMEMBER, IT TOOK ABOUT THREE MONTHS

11 TO GET THE APARTMENT COMPLETELY VACATED.

12    Q.   I TAKE IT YOU HAVE SOME FAMILIARITY WITH THE

13 PROCEDURES INVOLVED IN EVICTING A PERSON?

14    A.   YES.

15    Q.   JUST SO THAT I'M CLEAR, IF YOU FIND OUT THAT --

16 IF YOU ARE EVICTING A PERSON, YOU WOULD HAVE TO PROVIDE

17 NOTICE OF EVICTION AND THEN THERE IS SEVERAL PROCEEDINGS,

18 LEGAL PROCEEDINGS, THAT WOULD FOLLOW?

19    A.   CORRECT.   VERY QUICKLY, YOU HAVE TO SERVE BOTH

20 THE APARTMENT -- MAKE AN ATTEMPT TO SERVE THE PERSON

21 PERSONALLY.   IF NOT, YOU HAVE TO POST THE NOTICE ON THEIR

22 DOOR, WHETHER IT BE A THREE-DAY NOTICE TO QUIT IF THEY ARE

23 SUBLETTING OR TO PAY RENT OR QUIT, AND YOU MAIL A COPY OF

24 THAT NOTICE.

25     IF THERE IS NO CORRECTION FROM THE PERSON YOU ARE

1  SERVING, YOU NOTICE THAT THE RENT IS NOT PAID OR THE

2  ILLEGAL SUBLETTER DOESN'T MOVE OUT, THEN OUR ATTORNEY

3  FILES AN UNLAWFUL-DETAINER ACTION WITH THE SAN FRANCISCO

4  COURT AND GOES THROUGH THE PROCEDURE OF THEN GETTING THE

5  EVICTION.

6      Q.  IS IT FAIR TO SAY, THEN, THAT IN EVICTING A

7  PERSON, YOU HAVE TO FOLLOW THAT PROCESS BEFORE A PERSON

8  CAN BE FORCIBLY REMOVED FROM THE PREMISES?

9      A.  CORRECT.

10      Q.  IF IT WAS THE FIRST NOTICE THAT YOU HAD THAT A

11  PERSON WAS LIVING THERE SUBLETTING, IT WOULD NOT BE

12  ALLOWED FOR YOU TO CALL THE POLICE TO IMMEDIATELY FORCIBLY

13  REMOVE THEM UPON FIRST LEARNING OF THE ILLEGAL SUBLEASE?

14      A.  CORRECT.

15      Q.  OF COURSE, THIS INCIDENT ON JUNE 6, 2006, WAS NOT

16  RELATED TO SUBLEASING AT THE TIME TO YOUR KNOWLEDGE?

17      A.  I DON'T KNOW.

18      Q.  STRIKE THAT.  LET ME ASK THAT AGAIN.

19      TO YOUR KNOWLEDGE, THE POLICE WERE NOT CALLED TO

20  THE SCENE TO REMOVE ANYONE WHO WAS ILLEGALLY SUBLEASING OR

21  TO EVICT THEM?

22      A.  TO MY KNOWLEDGE, NO.  I DON'T KNOW WHY THEY WERE

23  ORIGINALLY CALLED.

24      Q.  GOING BACK TO WHAT IS MARKED PARKMERCED 58, WHICH

25  IS -- I APOLOGIZE.  I DON'T HAVE THE EXHIBIT NUMBER

1    A.  RESIDENT TURNS IN A CHECK TO OUR OFFICE.  AT THE

2    TIME, WE WEREN'T ISSUING RENT INVOICES TO RESIDENTS.

3    Q.  DO YOU HAVE ANY DOCUMENTATION OR ARE YOU AWARE OF

4    ANY DOCUMENTATION THAT WOULD INDICATE THAT, IN FACT,

5    ACCORDING TO THE COMPUTER, RENT WAS CONTINUING TO BE

6    COMPILED EACH MONTH FOLLOWING MARCH?

7    A.  YES.  THERE IS THE PAYMENT LEDGER, EXHIBIT NUMBER

8    10, WHERE IT NOTATES THAT THE RENT WAS CONTINUING TO BE

9    CHARGED FOR THIS APARTMENT.

10    Q.  WHAT IS THE LAST DATE IN THERE, TO YOUR

11    KNOWLEDGE, THAT RENT WAS BILLED -- I'M SORRY, NOT BILLED

12    BUT CHARGED?

13    A.  JUNE 1ST, 2006.

14    Q.  WAS THAT TO COVER THE PERIOD JUNE 1ST THROUGH

15    JUNE 31ST (SIC)?

16    A.  CORRECT.

17    Q.  ABSENT A THREE-DAY EVICTION OR FORCIBLE EVICTION,

18    MR. GUDOR AND MR. SCHANK WERE BILLED FOR THAT PERIOD OF

19    JUNE 1ST THROUGH JUNE 31ST (SIC)?  AND I DON'T MEAN BILLED

20    BUT THE ACCOUNT WAS CHARGED FOR THAT PERIOD?

21    A.  YES.

22    Q.  IF I SAY BILLED --

23    A.  THE WAY OUR BILLING WORKS IS ON THE FIRST OF THE

24    MONTH, WE RUN WHAT IS CALLED THE FIRST-OF-THE-MONTH

25    BILLING, SO EVERY APARTMENT IS CHARGED FOR A FULL 30 DAYS.

1        IF SOMEBODY WERE TO MOVE OUT MIDMONTH, THEIR

2  ACCOUNT WOULD AUTOMATICALLY BE CREDITED BACK ANY DAYS OVER

3  THEIR MOVE-OUT DATE THAT THEY MAY HAVE BEEN BILLED, SO IF

4  YOU MOVE OUT ON THE 15TH, YOU WOULD BE CREDITED BACK FOR

5  THE ADDITIONAL DAYS FOR THE REMAINDER OF THE MONTH.

6        Q.  WHEN I LOOK AT THIS AND IT SAYS MOVE-OUT DAY IS

7  6/2/2006, AND, OF COURSE, THAT IS THE BATES STAMP 58, AND

8  I LOOK AT THE EXHIBIT WHICH INDICATES THAT JUNE 1, 2006,

9  THE MONTHLY CHARGE --

10       A.  IT WAS ASSESSED.

11       Q.  SORRY, WAS ASSESSED.

12        IS THERE A REASON THAT IT WAS ASSESSED FOR A

13  PERIOD OF ONLY ONE DAY?

14       A.  THE SYSTEM AUTOMATICALLY CHARGES A FULL MONTH ON

15  THE FIRST.  AND THE STATUS ON THE APARTMENT THE DAY THAT

16  THAT PRINTOUT WAS DONE WAS, YOU WILL SEE, DATED THE 6TH

17  DOWN AT THE BOTTOM.  IT WAS PRINTED OUT ON JUNE 6TH..

18        THE MOVE-OUT DATE OF JUNE 2ND WAS THE NEW

19  EXPECTED MOVE-OUT DATE.  IF YOU REFER BACK TO THE STATUS,

20  IT WAS ON NOTICE, SO THEY HADN'T ACTUALLY MOVED OUT OF THE

21  APARTMENT YET.

22        ONCE THE MOVE OUT WOULD HAVE BEEN PROCESSED INTO

23  THE SYSTEM, YOU WOULD THEN SEE ON THE LINE RIGHT AFTER THE

24  PET RENT, YOU WOULD SEE A CREDIT BACK TO THE ACCOUNT FOR

25  ANY EXTRA DAYS AFTER THE MOVE OUT; THERE WOULD HAVE BEEN

1  AN ADJUSTMENT FOR THE ADDITIONAL DATES.

2  Q.  IS IT FAIR TO SAY THAT THERE WAS NO CONFIRMATION

3  THAT ANYBODY HAD MOVED OUT OF THE APARTMENT AS OF JUNE 6,

4  2006?

5  A.  THAT IS CORRECT.

6  Q.  PRIOR TO THIS, THERE ALREADY HAD BEEN NOTICE THAT

7  THE PEOPLE RENTING THE APARTMENT HAD INTENDED TO MOVE BUT,

8  IN FACT, DID NOT MOVE?

9  A.  CORRECT.

10  Q.  AND, OF COURSE, I'M REFERRING TO THE MARCH 31ST,

11  PERIOD?

12  A.  CORRECT.

13  MR. KEITH:  I'M GOING TO OBJECT -- AS THE ANSWER

14  FOLLOWED VERY QUICKLY ON THE QUESTION, BUT I'M GOING TO

15  OBJECT ON FOUNDATIONAL GROUNDS.

16  BY MR. NISENBAUM:

17  Q.  OKAY.  YOU DISCUSSED THERE A SEPARATE AREA WHERE

18  YOU MAINTAIN OLDER COURTESY PATROL REPORTS AND, I GUESS,

19  OLDER FILES?

20  A.  CORRECT.

21  Q.  CAN YOU DESCRIBE FOR ME, DO YOU MAINTAIN THAT

22  BASED UPON A PERIOD THAT IS ELAPSED OR BASED UPON WHAT

23  TYPE OF REPORT OR SECURITY LOG IT MAY BE?

24  A.  THERE ARE MULTIPLE WAYS WE MAINTAIN IT.  OUR

25  RESIDENT FILES ARE MOVED DOWN THERE UPON MOVE-OUT.

1   USUALLY WITHIN 60 DAYS OF MOVING OUT, THE RESIDENT, THE
2   PAST RESIDENT FILES ARE MOVED FROM THE ACCOUNTING
3   DEPARTMENT BACK INTO THE CENTRAL-STORAGE AREA, AND THE
4   COURTESY-PATROL REPORTS ARE USUALLY MOVED DOWN THERE
5   ANNUALLY. WE MOVE THEM DOWN INTO THE STORAGE AREA.

6      Q. WHEN YOU SAY "ANNUALLY," IS THERE A TYPICAL DATE
7   OF THE YEAR THAT OCCURS?

8      A. RIGHT AFTER THE FIRST OF THE YEAR WHEN WE ARE
9   PACKING UP OUR PREVIOUS YEAR'S REPORTS AND ACTIVITY, WE'LL
10  MOVE IT DOWN.

11     Q. IT'S AFTER THE FIRST OF THE YEAR NOW, SO FOR
12  EVENTS THAT OCCURRED IN 2006, WHEN YOU WENT BACK DOWN TO
13  THE OFFICE ON THAT NIGHT, DID YOU REVIEW THAT AREA AT ALL?

14     A. NO, I DID NOT.

15     Q. OKAY. SINCE THEN, HAVE YOU REVIEWED IT FOR ANY
16  DOCUMENTS PERTAINING TO 2 GARCES?

17     A. I HAVE NOT.

18     Q. AT THIS POINT, ANYTHING THAT OCCURRED UP THROUGH
19  JUNE 6, 2006, WOULD HAVE BEEN PACKED UP AND MOVED INTO
20  THAT STORAGE LOCATION?

21     A. CORRECT.

22     Q. THAT WOULD INCLUDE COMPLAINTS, COURTESY-PATROL
23  REPORTS, PATROL LOGS?

24     A. CORRECT.

25     Q. IS THAT NOT AN EXCLUSIVE LIST?

1       A.  WHAT DO YOU MEAN?

2       Q.  THERE MAY BE OTHER MATERIALS IN THERE AS WELL?

3       A.  YES, YES.

4       Q.  DO YOU KNOW THE TERM PRIVITY WHEN IT COMES TO

5 CONTRACTS?

6       A.  I DO NOT KNOW THE TERM.

7       Q.  AS TO THE CONTRACT THAT WAS SIGNED BY BRYANT

8 GUDOR OR AGREED TO BY BRYANT GUDOR AND JARRETT SCHANK --

9 AND I KNOW THIS IS PRETTY CLEAR BUT JUST TO BE CLEAR,

10 NEITHER ASA SULLIVAN OR JASON MURT (PHONETIC) WERE --

11       A.  SORRY, NO.

12       Q.  IN TERMS OF LOCKS THAT ARE ON APARTMENTS, HAVE

13 YOU HAD EXPERIENCE IN THE PAST WHERE TENANTS HAVE CHANGED

14 THE LOCKS?

15       A.  I HAVE NOT HAD PERSONAL EXPERIENCE WITH IT, NO.

16       Q.  IS THIS THE FIRST OCCASION YOU HAD A SITUATION

17 WHERE THE LOCKS HAD BEEN CHANGED?

18       A.  BY A RESIDENT TO THEIR OWN LOCKS, YES.

19       Q.  HAVE YOU HEARD OF ANY OTHER INCIDENTS WHERE THAT

20 HAD OCCURRED?

21       A.  YES, IT'S HAPPENED BEFORE.

22       Q.  WHAT IS THE CONSEQUENCE OF CHANGING THE LOCKS?

23       A.  WE IMMEDIATELY CHANGED THE LOCKS BACK TO

24 PARKMERCED LOCKS. WE'LL POST A NOTICE TO THE RESIDENTS

25 LETTING THEM KNOW WE CHANGED THE LOCKS AND TO CONTACT US,

1  SO WE CAN PROVIDE A KEY, AND WE ALSO CHARGE THEM THE

2  LOCK-CHANGE FEE AS WELL.

3     Q.  DO YOU KNOW WHETHER OR NOT ANYONE HAS EVER BEEN

4  EVICTED FROM PARKMERCED SOLELY BECAUSE THE LOCKS HAD BEEN

5  CHANGED?

6     A.  NO.

7     Q.  "NO"?

8     A.  NO, WE HAVE NOT EVICTED SOMEBODY FOR SOLELY

9  CHANGING THE LOCKS.

10    Q.  THANK YOU.  THE SAME THING IS TRUE WHEN IT COMES

11 TO SUBLEASING AND HAVING SUBTENANTS WHO ARE NEW ON THE

12 LEASE, YOU HAVE NEVER EVICTED A LEASOR PURELY BECAUSE THEY

13 HAD A SUBLEASOR; IS THAT TRUE?

14         MR. KEITH:  OBJECTION; VAGUE AND CONFUSING.

15         MR. NISENBAUM:  IT MAY BE CONFUSING.

16         THE WITNESS:  I UNDERSTAND THE QUESTION.  IT IS A

17 VIOLATION OF THE LEASE.  DO I KNOW OF INSTANCES WHERE WE

18 HAVE FILED AN EVICTION PROCEEDING, WHAT WE CALL AN

19 UNLAWFUL DETAINER FOR THE VIOLATION OF THAT SECTION OF THE

20 LEASE?  IN THE INSTANCES I'M PERSONALLY FAMILIAR WITH, THE

21 RESIDENT GAVE UP THE APARTMENT AND POSSESSION OF THE

22 APARTMENT AND ALL PARTIES VACATED PRIOR TO BEING LOCKED

23 OUT BY THE SHERIFF'S DEPARTMENT.

24 BY MR. NISENBAUM:

25    Q.  WE HAVE ALREADY DISCUSSED THE PROCESS INVOLVED IN

1  THAT?

2      A.  YES.

3      Q.  AS TO THE INCIDENT REGARDING A CAR THAT WAS

4  ATTRIBUTED TO MR. GUDOR OR MR. SCHANK THAT WAS IN

5  DISREPAIR AND MIGHT HAVE A HOMELESS PERSON LIVING IN IT,

6  DID YOU EVER OBSERVE THAT VEHICLE?

7      A.  I DID OBSERVE IT DRIVING PAST THEIR CARPORT.  I

8  DID SEE THAT VEHICLE PARKED IN THAT CARPORT SPACE, YES.

9      Q.  THAT VEHICLE WAS DRIVABLE?

10      A.  NO, IT WAS NOT OPERABLE.

11      Q.  OKAY.  YOU WERE DRIVING PAST IT AND YOU SAW IT?

12      A.  YES, YES.

13      Q.  MY MISUNDERSTANDING.

14          DO YOU KNOW WHETHER OR NOT THERE WAS ANY

15  FOLLOW-UP WITH RESPECT TO THAT VEHICLE?  WAS THERE A

16  FOLLOW-UP LETTER TO GUDOR OR SCHANK?

17      A.  I DO BELIEVE THAT WAS JARRETT WHO CAME TO THE

18  OFFICE VERY UPSET THAT WE HAD TOWED THE VEHICLE; HIMSELF

19  AND ANOTHER WOMAN WERE PRESENT IN MY OFFICE TO DISCUSS IT,

20  AND I REMINDED HIM AND SHOWED HIM THE HOUSE RULES THAT

21  THEY HAD ACKNOWLEDGED AND SIGNED STATING THAT VEHICLES

22  THAT WERE INOPERABLE COULD NOT BE STORED IN THE CARPORT

23  SPACE AND WOULD BE SUBJECT TO TOW IF DETERMINED TO BE IN

24  THAT CONDITION.  THAT WAS THE FOLLOW-UP TO THAT PART.

25      Q.  TO BE CLEAR, GOING BACK TO THE NOTICE TO VACATE

1   THAT WAS GIVEN TO PARKMERCED THAT THE APARTMENT WOULD BE

2   VACATED ON MARCH 31ST, 2006, THERE WAS NO CONFIRMING

3   LETTER SENT OUT TO THE OCCUPANTS, EITHER MR. SCHANK OR

4   MR. GUDOR?

5       A.   I DON'T KNOW THAT THE LETTERS WEREN'T SENT.  I

6   KNOW THEY ARE NOT IN THE FILE.  I CAN'T SAY THAT THEY

7   WEREN'T SENT.

8       Q.   WOULD IT BE TYPICAL TO SEND OUT A CONFIRMING

9   LETTER?

10      A.   YES, A PACKET OF INFORMATION WE SENT OUT TO THEM.

11      Q.   DO YOU KNOW OF ANY REASON IT WOULD NOT BE IN YOUR

12  FILE?

13      A.   YEAH, THERE -- IT IS AN ENORMOUS AMOUNT OF PAPER

14  WORK THAT IS KEPT FOR 3,200 APARTMENTS.  IT MAY HAVE

15  EASILY BEEN FILED OR MISFILED IN SOMEBODY ELSE'S RESIDENT

16  FILE AND NOT MADE IT BACK.  WE WERE IN THE PROCESS OF

17  TRANSITION AND CONSOLIDATING FOUR OFFICES INTO ONE RIGHT

18  AROUND THAT TIME, SO IT MAY HAVE EASILY BEEN MISFILED.

19      Q.   IS IT YOUR RECOLLECTION THAT YOUR FIRST AWARENESS

20  THAT YOU BELIEVE THAT THE APARTMENT WAS VACATED BY

21  MR. GUDOR AND MR. SCHANK WAS ON JUNE 6, 2006, WHEN YOU

22  WENT BACK TO YOUR OFFICE?

23      A.   YES.

24      Q.   DID YOU HAVE TO START UP YOUR COMPUTER?

25      A.   YES, I DID.

1    Q. DO YOU HAVE A LOG OF THE COMPUTER WHEN YOU

2    STARTED -- WHEN YOU OPEN FILES?

3    A. NO. I JUST HAVE THE PRINTOUT FROM THAT SCREEN

4    SHOT.

5    Q. IT DOESN'T SHOW THE TIME?

6    A. IT DOES NOT. IT JUST SHOWS THE DATE.

7    Q. OKAY.

8    A. IT JUST SHOWS THE DATE.

9    Q. BUT PRIOR TO GOING BACK TO YOUR OFFICE THAT NIGHT

10   OF JUNE 6, 2006, YOU STILL BELIEVED THAT MR. GUDOR AND

11   MR. SCHANK HAD POSSESSION AND WERE STILL AT THE PREMISE;

12   IS THAT CORRECT?

13        MR. KEITH: OBJECTION; FOUNDATION.

14        THE WITNESS: TO BE HONEST, I DIDN'T EVEN GIVE 2

15   GARCES A THOUGHT PRIOR TO THAT NIGHT. I'M NOT DIRECTLY

16   INVOLVED IN THE DAY-TO-DAY STUFF, SO JUST PICKING UP THE

17   FILE AND LOOKING AT THE JUNE 2ND DATE, INITIALLY, I

18   BELIEVED THAT THE APARTMENT HAD BEEN VACATED THAT DATE,

19   AND LOOKING FURTHER I SAW THAT IT WAS ON NOTICE, THAT WE

20   DID NOT PHYSICALLY HAVE CUSTODY OF THAT APARTMENT.

21   BY MR. NISENBAUM:

22        Q. WHAT I'M ASKING -- LET ME REPHRASE THE QUESTION:

23   YOU HAD NO REASON NOT TO BELIEVE -- STRIKE THAT.

24        YOU HAD NO REASON TO BELIEVE THAT THEY HAD

25   VACATED THE APARTMENT PRIOR TO RETURNING TO YOUR OFFICE

1    AND VIEWING THIS DOCUMENT THAT YOU PRINTED OUT?

2         A.   CORRECT.

3         Q.   IS IT YOUR UNDERSTANDING THAT THE INITIAL CALL

4    REGARDING A POTENTIAL BREAK-IN AT 2 GARCES DRIVE WAS TO

5    THE POLICE?

6         A.   YES.

7         Q.   IT WAS NOT TO SECURITY?

8         A.   CORRECT.

9         Q.   THEN POLICE THEN CALLED SECURITY?

10        A.   CORRECT.

11        Q.   THEN SECURITY CONTACTED YOU?

12        A.   CORRECT.

13        Q.   LISA GONZALES, THAT IS HER NAME?

14        A.   THAT IS NOT HER LAST NAME.   SHE LIVES AT 505

15   GONZALES.

16        Q.   CARELLA?

17        A.   YES.

18        Q.   LISA CARELLA, TO YOUR KNOWLEDGE, HAD SHE EVER

19   CALLED THE POLICE WITH RESPECT TO 2 GARCES DRIVE BEFORE

20   THIS INCIDENT?

21        A.   SHE COMMUNICATED TO ME THAT SHE DID CONTACT THE

22   POLICE AND THAT SHE HAD A FRIEND IN LAW ENFORCEMENT THAT

23   SHE HAD BEEN REPORTING HER SUSPICIONS TO.

24        Q.   WHO WAS THAT FRIEND IN LAW ENFORCEMENT?

25        A.   I FORGET WHAT AGENCY SHE REFERRED TO, BUT IT

1   WASN'T THE POLICE DEPARTMENT. IT WAS ANOTHER LAW

2   ENFORCEMENT AGENCY SHE REFERRED TO.

3       Q. HER CONCERNS WERE?

4       A. SHE WAS CONCERNED THAT THERE COULD POSSIBLY BE

5   DRUG ACTIVITY, DRUG DEALING THAT WAS GOING ON OUT OF THE

6   APARTMENT.

7       Q. DO YOU HAVE ANY REASON TO BELIEVE THAT THERE IS

8   ANY OTHER DOCUMENTATION TO PARKMERCED WITH RESPECT TO

9   THOSE CONCERNS THAT SHE HAD OTHER THAN WHAT HAS BEEN

10   PRODUCED TODAY?

11       A. NO.

12       Q. IF WE WANT TO FIND OUT THROUGH THE SECURITY LOGS,

13   WE WOULD HAVE TO GO INTO THE STORAGE AREA?

14       A. CORRECT.

15       Q. IS IT TRUE ON JUNE 8TH A THREE-DAY NOTICE WAS

16   SERVED ON 2 GARCES DRIVE?

17       I'M SORRY. IT SAYS, "PARKMERCED 84," TOWARD THE

18   VERY END OF THE PACKET.

19       A. YES, THE NOTICE WAS SERVED.

20       Q. THAT IS THE ONLY THREE-DAY NOTICE THAT HAD EVER

21   BEEN SERVED ON 2 GARCES DRIVE, IS THAT CORRECT, OR HAD

22   THERE BEEN ANOTHER ONE?

23       A. TO MY KNOWLEDGE, YES, THAT IS IN THE FILE.

24       Q. IT'S THE ONLY ONE THAT IS IN THE FILE?

25       A. CORRECT, CORRECT.

1          Q.  NOW, EVENTUALLY, YOU GAVE A STATEMENT TO

2     INVESTIGATORS REGARDING THIS INCIDENT?

3          A.  YES, I DID.

4          Q.  IT WAS TAPE RECORDED?

5          A.  YES, IT WAS.

6          Q.  HOW MANY DAYS LATER DO YOU RECALL IT BEING?

7          A.  IT WAS PROBABLY WITHIN THE TWO WEEKS AFTER THE

8     INCIDENT.  I DON'T REMEMBER THE EXACT DATE.

9          Q.  IS IT FAIR TO SAY THAT YOUR RECOLLECTION AT THE

10    TIME THAT YOU GAVE THAT STATEMENT OF THE INCIDENT IS

11    BETTER THAN YOUR RECOLLECTION TODAY?

12         A.  I REMEMBER -- I WOULD SAY IT'S PROBABLY A LITTLE

13    BIT BETTER, YES.

14         Q.  AT THE TIME?

15         A.  AT THE TIME.

16         Q.  HAVE YOU LISTENED TO THAT STATEMENT?

17         A.  I HAVE NOT.

18         Q.  YOU HAVE NEVER HEARD IT AFTER YOU GAVE THE

19    STATEMENT?

20         A.  NO, I DIDN'T; NO, I HAVEN'T.

21         Q.  ARE YOU CERTAIN AS YOU SIT HERE TODAY THAT YOU

22    WENT TO GET THE FILE AND CAME BACK WITH THE FILE TO THE

23    SCENE OF 2 GARCES DRIVE BEFORE SHOTS WERE FIRED?

24         A.  YES.

25         Q.  OKAY.  IF YOU HAD SAID SOMETHING DIFFERENT ON THE

1   TAPE, DO YOU STILL STAND BY YOUR STATEMENT TODAY?

2       A.  YES.

3       Q.  DO YOU RECALL SPEAKING TO SERGEANT JEREMIAH

4   MORGAN AT THE SCENE OF THE INCIDENT ON THE NIGHT OF THE

5   INCIDENT?

6       A.  I DON'T REMEMBER WHAT HIS NAME WAS.  I SPOKE TO A

7   MALE OFFICER.  I DON'T REMEMBER THE NAME.

8       Q.  MR. MORGAN -- SERGEANT MORGAN ACTUALLY GAVE YOU

9   HIS BUSINESS CARD; CORRECT?

10      A.  THEN THAT WAS THE NAME OF THE OFFICER THAT I

11  SPOKE TO LATER IN THE EVENING, THE OLDER TALLER OFFICER,

12  YES.  I DIDN'T REMEMBER HIS NAME.

13      Q.  THAT IS THE OLDER TALLER CAUCASIAN OFFICER?

14      A.  YES, YES.

15                  (WHEREUPON, THERE WAS A DISCUSSION

16                  BETWEEN COUNSEL OFF THE RECORD.)

17  BY MR. NISENBAUM:

18      Q.  OKAY.  I DO HAVE A COPY OF THE TAPE STATEMENT,

19  AND I DO HAVE SOME CONCERNS.

20          MY UNDERSTANDING OF THE STATEMENT THAT YOU GAVE

21  TO THE OFFICERS IS THAT AFTER THE SHOTS WERE FIRED, YOU

22  SAW AN OFFICER COME OUT OF THE APARTMENT, AND THE OFFICER

23  SAID THERE WERE A LOT OF SHOTS FIRED AT HIM AND --

24      A.  CORRECT.

25      Q.  I WANT TO DISCUSS THAT.

1       A.  OKAY.

2       Q.  THIS HAPPENED AFTER YOU CAME BACK TO THE SCENE?

3       A.  YES, IT WAS.

4       Q.  YOU HAD THE FILE IN YOUR HANDS?

5       A.  YES.

6       Q.  YOU REMEMBER THAT SPECIFICALLY?

7       A.  I DO.

8       Q.  DID THIS OFFICER INDICATE WHAT HE HAD BEEN DOING

9   PRIOR TO THE SHOTS BEING FIRED --

10      A.  HE WASN'T SPEAKING TO ME.  I BELIEVE HE MAY HAVE

11  BEEN SPEAKING TO ANOTHER OFFICER.  I HAPPENED TO BE

12  STANDING NEARBY AND HEARD HIM WHEN HE MADE THE STATEMENT.

13      Q.  SO YOU DIDN'T HEAR HIM SAY HE HEARD BULLETS FLY

14  PAST HIS HEAD AS HE WAS KNOCKING ON THE CEILING OF THE

15  APARTMENT?

16      A.  REPEAT THAT.

17      Q.  YOU DID NOT HEAR HIM SAY THAT HE SAW BULLETS FLY

18  PAST HIS HEAD AS HE WAS KNOCKING ON THE CEILING OF THE

19  APARTMENT?

20      A.  I DID HEAR HIM MAKE A STATEMENT TO THAT EFFECT.

21  HE WASN'T SPEAKING TO ME, BUT I HEARD HIM MAKE THE

22  STATEMENT.

23      Q.  INCLUDING THE PART THAT HE WAS KNOCKING ON THE

24  CEILING?

25      A.  HE MADE A MOTION THAT THEY WERE HITTING THE

1  CEILING OF THE BEDROOM AND BULLETS -- HE MADE THE MOTION

2  OF BULLETS STARTED FLYING PAST ME.

3       Q.  DID YOU HAVE SOME UNDERSTANDING THAT HE WAS

4  REFERRING TO MORE THAN ONE BULLET?

5       A.  YES, HE WAS REFERRING TO MORE THAN ONE BULLET.

6       Q.  DID YOU HAVE SOME UNDERSTANDING OF WHERE HE WAS

7  LOCATED?  I THINK I UNDERSTAND THIS, BUT FOR THE RECORD,

8  DO YOU HAVE SOME UNDERSTANDING OF WHERE HE WAS LOCATED

9  WHEN HE WAS KNOCKING ON THE CEILING?

10          MR. KEITH:  OBJECTION; FOUNDATION.

11          THE WITNESS:  I DON'T KNOW WHICH BEDROOM.

12  BY MR. NISENBAUM:

13      Q.  YOU SAID THAT YOU COULD ACTUALLY SEE INTO ONE OF

14  THE BEDROOMS FROM WHERE YOU WERE?

15      A.  YES.

16      Q.  LATER ON, YOU FOUND OUT THAT THERE WAS A HOLE IN

17  THE CEILING?

18      A.  YES.

19      Q.  THAT WAS IN THE CEILING OF THE BEDROOM?

20      A.  ONE OF THE BEDROOMS, NOT THE BEDROOM WINDOW THAT

21  I WAS LOOKING INTO.

22      Q.  NOT THAT BEDROOM?

23      A.  NO.

24      Q.  THIS IS MY AREA OF CONCERN, JUST SO YOU KNOW:  ON

25  THE TAPE, THE WAY THAT I READ THE TAPE YOU SAY THAT WHAT

1    HAPPENED IS THE OFFICER COMES OUT AND HE SAYS HE SAW

2    BULLETS FLY PAST HIS HEAD AS HE WAS KNOCKING ON THE

3    CEILING OF THE APARTMENT AND THEN AFTER THAT YOU WERE

4    ASKED TO GO RETRIEVE THE FILES FOR THE APARTMENT AND WHEN

5    YOU RETURNED THE APARTMENT WAS TAPED OFF.

6              MR. KEITH:  OBJECTION; BADGERING.

7              MR. NISENBAUM:  I'M NOT BADGERING.  I JUST WANT

8    TO UNDERSTAND.  I DON'T HAVE THE TAPEDECK, AND I WANT TO

9    MAKE CERTAIN THAT --

10             MR. KEITH:  I'LL OBJECT AS THIS IS AN IMPROPER

11   WAY TO TRY AND ADDRESS IT, THE PRIOR STATEMENT.

12             THE WITNESS:  I'M JUST TRYING TO THINK BACK TO

13   THAT NIGHT.  I KNOW I WAS PRESENT WHEN THE SHOOTING

14   HAPPENED BECAUSE I REMEMBER GOING TO THE CAR, AND I KNOW

15   THAT I LEFT TO GO GET THE FILE.  IT WAS SOMETIME AGO.

16             THE ORDER MAY HAVE BEEN REVERSED, BUT I KNOW THAT

17   I HAD THE FILE AND I WAS PRESENT WHEN THE SHOOTING

18   HAPPENED.  I HAD ARRIVED, SPOKEN TO THE OFFICERS -- TO THE

19   COURTESY-PATROL OFFICER AND LEFT TO GO GET THE FILE.  THE

20   STATEMENT -- PROBABLY AT THE TIME THAT I MET WITH THE

21   INVESTIGATORS MAY BE MORE TRUE THAN WHAT I CAN REMEMBER

22   TODAY.

23   BY MR. NISENBAUM:

24        Q.  YOU DON'T MEAN TRUE BUT ACCURATE?

25        A.  YES, MORE ACCURATE, THE SEQUENCE OF EVENTS, BUT I

1    KNOW FOR CERTAIN THAT I WAS PRESENT AT THE TIME THAT THE
2    SHOOTING HAPPENED.

3         Q.  YOU DESCRIBED WHAT YOU WERE ABLE TO HEAR IN THE
4    APARTMENT?

5         A.  YES.

6         Q.  YOU DESCRIBED THAT YOU COULD HEAR AN
7    AUTHORITATIVE VOICE YOU ATTRIBUTED TO THE POLICE AND A
8    VOICE ATTRIBUTED NOT TO POLICE BUT WAS SAYING "JUST COME
9    ON DOWN" AND "COME ON DOWN," TO THAT EFFECT?

10        A.  CORRECT.

11        Q.  DID YOU EVER HEAR ANY OTHER VOICE?

12        A.  NO.

13        Q.  DID YOU EVER HEAR A VOICE THAT SAID SOMETHING
14   ALONG THE LINES OF QUOTE, "YOU WILL NEVER TAKE ME ALIVE,"
15   OR WORDS TO THAT EFFECT?

16        A.  NO.

17        Q.  THE VOICES THAT YOU COULD HEAR, WERE THEY
18   YELLING?

19        A.  THEY WERE SPEAKING VERY LOUDLY.

20        Q.  DO YOU HAVE ANY ABILITY TO -- STRIKE THAT.  THAT
21   IS A TERRIBLE QUESTION.

22            WERE YOU IN A POSITION WHERE IF A PERSON HAD BEEN
23   SPEAKING IN A RELATIVELY NORMAL TONE OF VOICE AND THEY
24   WERE UP IN THE ATTIC, WERE YOU IN A POSITION THAT YOU
25   BELIEVE YOU COULD HAVE HEARD THAT PERSON?

1        A.   I WOULD NOT HAVE BEEN ABLE TO HEAR.

2        Q.   COULD YOU TELL ME WHY THAT IS?

3        A.   I WAS OUTSIDE THE APARTMENT, AND THERE WAS A LOT

4   OF ACTIVITY GOING ON.  IF THERE WERE NORMAL CONVERSATIONS

5   GOING ON INSIDE OF THE APARTMENT, IN AN ATTIC SPACE, I

6   DON'T BELIEVE THAT I WOULD HAVE BEEN ABLE TO HEAR THAT

7   CONVERSATION GOING ON IF THEY WERE SPEAKING IN A NORMAL

8   TONE OF VOICE.

9        Q.   I WANT TO GET BACK TO THIS.  THE OFFICER WHO SAID

10  HE WAS POKING ON THE CEILING AND MADE A MOTION, DID HE SAY

11  ANYTHING ELSE ABOUT WHAT HE WAS DOING?

12       A.   NO.

13       Q.   YOU DIDN'T HEAR --

14       A.   NOT THAT I HEARD.

15       Q.   YOU DIDN'T HEAR HIM TELL ANYONE WHY HE WAS POKING

16  ON THE CEILING?

17       A.   NO.

18       Q.   YOU UNDERSTOOD HIM TO POKE ON THE CEILING WITH

19  THE NIGHT STICK; IS THAT CORRECT?

20       A.   WITH AN OBJECT.  I DON'T KNOW IF IT WAS A NIGHT

21  STICK.

22       Q.   AFTER THE SHOOTING OCCURRED, YOU SAW THE DECEASED

23  BODY COME OUT OF THE APARTMENT?

24       A.   YES.

25       Q.   ABOUT HOW MANY HOURS LATER WAS THAT?

1    STATE OF CALIFORNIA          )

2                               )    S.S.

3    COUNTY OF SONOMA         )

4

5        I, A CERTIFIED SHORTHAND REPORTER OF THE STATE OF

6    CALIFORNIA, HEREBY CERTIFY THAT THE WITNESS IN THE

7    FOREGOING DEPOSITION WAS BY ME DULY SWORN TO TESTIFY THE

8    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH IN THE

9    ENTITLED CAUSE.

10        THAT SAID DEPOSITION WAS TAKEN AT THE TIME AND

11    PLACE THEREIN STATED; THAT THE TESTIMONY OF THE SAID

12    WITNESS WAS REPORTED BY ME,

13

14                    **GINA PETERSEN,**

15    A CERTIFIED SHORTHAND REPORTER, THAT THE FOREGOING IS A

16    FULL, TRUE AND COMPLETE RECORD OF SAID TESTIMONY; AND THAT

17    THE WITNESS WAS GIVEN AN OPPORTUNITY TO READ AND CORRECT

18    SAID DEPOSITION AND TO SUBSCRIBE THE SAME.

19        SHOULD THE SIGNATURE OF THE WITNESS NOT BE

20    AFFIXED TO THE DEPOSITION, THE WITNESS SHALL NOT HAVE

21    AVAILED HIMSELF OF THE OPPORTUNITY TO SIGN OR THE

22    SIGNATURE HAS BEEN WAIVED.

23        I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

24    ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

25    DEPOSITION AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN

1   THE OUTCOME OF THE CAUSE NAMED IN SAID ACTION.

2        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND

3   AFFIXED MY SEAL OF OFFICE THIS 31st DAY OF March,

4   2007.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25