1  JOHN L. BURRIS, STATE BAR NO. 69888
   BENJAMIN NISENBAUM, STATE BAR NO. 222173
2  Law Offices of John L. Burris
   Airport Corporate Centre
3  7677 Oakport Road, Suite 1120
   Oakland, California  94621
4  Telephone:     510.839.5200
   Facsimile:      510.839.3882
5  Email: bnisenbaum@gmail.com

6

7  Attorneys for Plaintiffs

8

9

10               UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13  KATHLEEN ESPINOSA, et al;            CASE NO.  C06 04686 JSW

14          Plaintiffs,              **PLAINTIFFS' STATEMENT OF RECENT
                                     DECISIONS RE: SUBMITTED MATTERS**
15

16      vs.                         Trial Date: September 8, 2014
                                    Trial:  8:00 a.m.
17                                  Pretrial Conf.: August 4, 2014
                                    Time:  2:00 p.m.
18  CITY AND COUNTY OF SAN FRANCISCO, Courtroom 2, 4th Floor
    et al.,                          The Honorable Jeffrey S. White
19

20          Defendants.

21

22        Pursuant to Northern District of California Local Rule 7-3(d)(2), Plaintiffs hereby give

23  notice to the Court and Defendants of the following recent California Court of Appeal and 9th

24  Circuit decisions:

25        1. *Denise Green vs. City and County of San Francisco, et al,* 2014 S.O.S. 11-17892 (9th Cir.

26  May 12, 2014) (An officer is allowed to rely on information provided by other officers only when it

27  is objectively reasonable under the circumstances; and, an officer's failure to confirm erroneous

28  factual information, when objectively reasonably under the circumstances, may render a seizure to be

1

Espinosa v. City and County of San Francisco, Case No. C06 04686 JSW
Plaintiffs' Statement of Recent Decision re: Submitted Matters

without probable cause and unreasonable under the Fourth Amendment.)

A true and accurate copy of said decision is attached and incorporated herein by reference as Exhibit 1.

Respectfully submitted,

**THE LAW OFFICES OF JOHN L. BURRIS**

Dated: May 13, 2014                    /s/ Benjamin Nisenbaum
                                       Benjamin Nisenbaum
                                       Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN ESPINOSA, et al; | CASE NO.  C06 04686 JSW |
| Plaintiffs, | **PLAINTIFFS' STATEMENT OF RECENT DECISIONS RE: SUBMITTED MATTERS** |
| vs. | Trial Date: September 8, 2014<br>Trial:  8:00 a.m.<br>Pretrial Conf.: August 4, 2014<br>Time:  2:00 p.m. |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | Courtroom 2, 4th Floor<br>The Honorable Jeffrey S. White |
| Defendants. | |

# EXHIBIT 1

Espinosa v. City and County of San Francisco, Case No. C06 04686 JSW
Plaintiffs' Statement of Recent Decision re: Submitted Matters

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| DENISE GREEN,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; JA HAN KIM, Sergeant; ESPARZA, Officer; PEDERSEN, Officer,<br><br>*Defendants-Appellees*. | No. 11-17892<br><br>D.C. No. 3:10-cv-02649-RS<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted
February 12, 2014—San Francisco, California

Filed May 12, 2014

Before: Stephen Reinhardt and Sidney R. Thomas, Circuit
Judges, and William K. Sessions III, District Judge.[*]

Opinion by Judge Sessions

---

[*] The Honorable William K. Sessions III, District Judge for the U.S. District Court for the District of Vermont, sitting by designation.

## SUMMARY**

### Civil Rights

The panel reversed the district court's order granting summary judgment in favor of defendants, affirmed the district court's order denying partial summary for plaintiff, and remanded in an action brought pursuant to 42 U.S.C. § 1983 alleging wrongful detention, false arrest and excessive force.

Plaintiff's lawsuit arose out of a vehicular stop by San Francisco Police officers after the police department's Automatic License Plate Reader mistakenly identified plaintiff's Lexus as a stolen vehicle. Without visually confirming the license plate, a police officer made a "high-risk" stop during which plaintiff was held at gunpoint by multiple officers, handcuffed, forced to her knees, and detained for up to twenty minutes before the mistake was discovered and she was released.

The panel held that there were triable questions as to whether: (1) law enforcement had a reasonable suspicion to justify plaintiff's initial detention, (2) plaintiff's detention amounted to an arrest without probable cause, and (3) police officers used excessive force in effecting the detention. The panel further held that viewing the facts in plaintiff's favor, it could not make a determination as a matter of law that the officer who made the initial stop was entitled to qualified immunity. Because questions of fact remained regarding

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

defendants' conduct, the panel also reversed the district court's summary judgment as to the municipal liability and state law claims and affirmed the district court's denial of partial summary judgment as to plaintiff.

## COUNSEL

Michael Haddad (argued), Julia Sherwin, and Gina Altomare, Haddad & Sherwin, Oakland, California, for Plaintiff-Appellant.

Christine Van Aken (argued) and James F. Hannawalt, Deputy City Attorneys, Office of the City Attorney, San Francisco, California, for Defendants-Appellees.

## OPINION

SESSIONS, District Judge:

Plaintiff-Appellant Denise Green appeals from the district court's judgment granting summary judgment to Defendants-Appellees dismissing her § 1983 and state law claims for wrongful detention, false arrest, and excessive force. Green's suit arose out of a vehicular stop performed by Sergeant Ja Han Kim of the San Francisco Police Department ("SFPD") after the SFPD's Automatic License Plate Reader ("ALPR") mistakenly identified Green's Lexus as a stolen vehicle. Without visually confirming the license plate, Sergeant Kim made a "high-risk" stop during which Green was held at gunpoint by multiple officers, handcuffed, forced to her knees, and detained for up to twenty minutes. She was released only after officers eventually ran her plate and

4       GREEN V. CITY & CNTY. OF SAN FRANCISCO

discovered the ALPR mistake and that her vehicle was not stolen.

Green filed suit against the City and County of San Francisco, SFPD, and Sergeant Kim alleging Fourth Amendment violations for unreasonable search and seizure and unreasonable use of force, violation of Cal. Civ. Code § 52.1, intentional infliction of emotional distress, assault, and negligence. The Defendants moved for summary judgment, arguing that Sergeant Kim merely subjected Green to an investigatory detention and not an arrest, that he had reasonable suspicion to stop Green's vehicle, and that all force used was reasonable in the context of a lawful investigatory stop. Green also moved for partial summary judgment on her Fourth Amendment and § 52.1 claims. The District Court for the Northern District of California denied Green's motion and granted Defendants' motion. Because a rational jury could find that Defendants violated Green's Fourth Amendment rights and that Sergeant Kim is not entitled to qualified immunity at this stage, we reverse the district court's grant of summary judgment.[1]

## FACTS AND PROCEDURAL HISTORY

This case regards a vehicular stop made by the San Francisco Police Department following an erroneous read by its automated license plate reader technology. SFPD's ALPR uses mounted cameras on its police cruisers to capture the license plate numbers of passing vehicles and match the

---

[1] Green also appeals the district court's denial of her motion to alter or amend the judgment. As this panel hereby reverses the initial order, the appeal of the order denying the motion to alter or amend the judgment is rendered moot.

captured numbers against a database of wanted numbers. If the ALPR identifies a potential match, it alerts the officer and displays an image of the plate. It is undisputed that the ALPR occasionally makes false "hits" by misreading license plate numbers and mismatching passing license plate numbers with those listed as wanted in the database. Because of the known flaws in the system, SFPD officers are trained that an ALPR hit does not automatically justify a vehicle stop, and SFPD directs its officers to verify the validity of the identified hit before executing a stop. Patrol officers are instructed to take two steps to verify a hit before acting on an ALPR read. The first step is to visually confirm the license plate (to ensure that the vehicle actually bears the license plate number identified by the camera); the second step is to confirm with the system that the identified plate number has actually been reported as stolen or wanted.[2] Defendants' expert on ALPR technology confirmed in deposition that these two steps should be performed and explained how officers in a "camera car" (the cruiser operating the ALPR system) would do so, but did not outright identify any official policy that the responsibility lies solely with the camera car operator. In fact, at the time of the events of this case, the SFPD did not have a policy placing the responsibility of verifying the ALPR hit with the camera car operator or with the officer conducting the subsequent stop.

---

[2] The August 2010 International Association of Chiefs of Police National Law Enforcement Policy Center License Plate Readers Model Policy similarly states that after an ALPR alert, "Prior to initiation of the stop," officers must "a. [v]isually verify that the vehicle plate number matches the plate number run by the LPR system . . . [and] b. [v]erify the current status of the plate through dispatch or MDT query when circumstances allow."

6      GREEN V. CITY & CNTY. OF SAN FRANCISCO

On the night of March 30, 2009, Appellant Denise Green, a 47-year-old African-American woman with no criminal record, was driving her vehicle, a 1992 burgundy Lexus ES 300 with license plate number 5SOW350, on Mission Street in San Francisco. At approximately 11:15 PM, Green passed a police cruiser equipped with an ALPR operated by SFPD Officers Alberto Esparza and Robert Pedersen. When Green drove past Esparza and Pedersen's camera car, the ALPR misread her license plate number[3] and identified her plate as belonging to a stolen vehicle. It was late and dark outside, which rendered the ALPR photograph blurry and illegible. As a result, Officer Esparza could not read the ALPR photograph, nor could he get a direct visual of Green's license plate. Because Esparza and Pedersen had a suspect in custody at the time of the ALPR read, they radioed the hit to dispatch in case another officer in the vicinity would be able to act upon the alert. On the radio, Officer Esparza described the vehicle as a dark Lexus and read the entire plate number identified by the ALPR (5SOW750, not the license plate number on the Lexus). He also asked dispatch to confirm that plate number 5SOW750 was wanted. At no point did Officer Esparza state on the radio that he had or had not visually confirmed the plate himself. Dispatch ran plate number 5SOW750 and notified Officer Esparza that it was in fact wanted and that it belonged to a gray GMC truck.

Sergeant Kim, patrolling nearby, observed Green's vehicle pass him. Based on the radio traffic, Sergeant Kim knew that there had been a hit on a license plate number 5SOW750, that the plate number had been matched to a gray GMC truck, and that the vehicle the camera car officers had

---

[3] Green's license plate number is 5SOW350; the ALPR read it as 5SOW**7**50.

seen was a dark Lexus. Sergeant Kim saw that the first three numbers of Green's license plate matched the plate read over the radio, but he did not visually identify all seven numbers on Green's license plate. He also radioed Officer Esparza for a description of the vehicle, and Officer Esparza confirmed that the vehicle he saw was a dark burgundy Lexus. Sergeant Kim then decided to make a "high-risk" or "felony" stop. Officers perform "high-risk" stops when they perceive there to be a danger to the police effecting the stop. Such stops typically involve handcuffing the suspect at gunpoint and require the participation of multiple officers. Because Sergeant Kim believed that Green posed a risk, he waited for backup before pulling her over. While he waited, he followed her vehicle for a brief amount of time and, at one point, even stopped behind her at a red light. At no point while he was following or stopped behind Green's vehicle did Sergeant Kim visually confirm the entirety of Green's license plate number, even though nothing obscured his ability to do so. Furthermore, Sergeant Kim did not confirm Green's plate number with dispatch, but he did hear Officer Esparza inquire whether the vehicle with the plate number 5SOW750 was stolen. Sergeant Kim admits that if he had read the full plate, he would not have had the reasonable suspicion to effect the stop.

After backup arrived, Sergeant Kim directed Green to pull over, and she immediately complied. At this point, the officers all drew their weapons and pointed them at Green. The number of officers involved in the stop is disputed: Green estimates as many as six but it is undisputed that there were at least four. An unknown officer ordered Green to raise her hands and exit the vehicle and Green complied. As she exited the vehicle, Green observed a police officer pointing a shotgun at her. The officers gave her conflicting

orders, and eventually Sergeant Kim took charge in issuing commands. He holstered his gun while the remaining officers kept their weapons trained on Green, and he directed her to lower to her knees where he proceeded to handcuff her. At the time of the incident, Green was 5'6" and 250 pounds and experienced knee problems, so she faced some difficulty in lowering to the ground and in standing back up. Sergeant Kim had to help her back to her feet. Green says she saw four officers training their weapons on her while she was handcuffed; Sergeant Kim does not recall how many officers were pointing their guns at Green.

Officers then searched Green's vehicle and performed a pat-down search of her person. After the searches uncovered nothing, Sergeant Kim finally ran a check of Green's entire plate number. The license plate check confirmed that the plate belonged to a burgundy Lexus registered to Green that had never been reported as stolen. Green's handcuffs were promptly removed, but she was directed to remain until the officers had completed paperwork documenting the stop. The parties dispute the duration of the stop. Green states that she was handcuffed for at least ten minutes and that the entire stop lasted 18–20 minutes, while Defendants maintain that the stop was much shorter. It is undisputed that Green was wholly compliant and nonresistant for the entirety of the stop and that there was no indication that she was armed.

Green brought § 1983 claims against the City and County of San Francisco, SFPD, and Sergeant Kim alleging violations of her Fourth Amendment rights on the grounds that the incident constituted an unreasonable search and seizure and a de facto arrest without probable cause and involved an unreasonable use of force. Green's claims against the City and SFPD are premised on *Monell* liability,

which allows local governments to be sued under § 1983 for constitutional deprivations effected pursuant to a governmental custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). Green also brought several claims under California state law. These included claims under Cal. Civ. Code § 52.1[4] alleging a constitutional violation and tort law claims of intentional infliction of emotional distress, assault, and negligence. Green moved for partial summary judgment on her Fourth Amendment claim against Sergeant Kim and on her § 52.1 claim against all Defendants. Defendants moved for summary judgment on all claims on the basis that Sergeant Kim had reasonable suspicion to stop Green and that the force used was reasonable in the context of a lawful investigatory detention.

The district court granted summary judgment to Defendants and denied Green's motion for partial summary judgment. Despite the lack of a SFPD policy placing the responsibility of checking the ALPR read on the camera car operator, the district court determined that it was reasonable for Sergeant Kim to assume that Officer Esparza had visually confirmed Green's plate based on the fact that Officer Esparza did not expressly state otherwise. The district court concluded that Sergeant Kim's belief that the plates had been matched to the ALPR hit was a "good faith, reasonable mistake" and that "no reasonable jury could find that Kim

---

[4] California's Bane Act provides a private right of action under state law for damages and injunctive relief where a person "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1 (2005).

lacked reasonable suspicion to conduct an investigatory stop." *Green v. City & County of San Francisco*, No. C 10-02649 RS, 2011 WL 4434801, at \*5 (N.D. Cal. Sept. 23, 2011). On the remaining Fourth Amendment claims, the district court decided that the tactics used by the officers were objectively reasonable in the context of a lawful investigatory stop and rejected Green's unlawful arrest and excessive force claims. The court also determined that Sergeant Kim was entitled to qualified immunity based on its finding that Green had not established a constitutional violation. It dismissed Green's *Monell* and § 52.1 claims on the same grounds: they both require a showing of unlawful conduct and the district court found that Green had not made such a showing. Finally, the court dismissed Green's state law tort claims based on its finding that Defendants' conduct was reasonable pursuant to a lawful investigatory stop.

After the court's initial judgment, Green filed a motion to alter or amend the district court's order, which the district court denied. Green appeals both the initial order and the denial of the motion to alter or amend.

## DISCUSSION

### I. Standard of Review

We review *de novo* the district court's decision on cross motions for summary judgment. *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008). We apply the standards under Rule 56 to determine whether there are any genuine issues of material fact and whether the evidence, viewed in favor of the nonmoving party, supported judgment as a matter of law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## II. Fourth Amendment

On Green's Fourth Amendment claims, the district court granted summary judgment to Defendants on the grounds that Green could not establish a constitutional violation as a matter of law on her wrongful seizure, false arrest, or excessive force claims.  We reverse because, when viewing the facts in the light most favorable to Green, it is clear that a rational jury could find for Green on all three claims.

### A. Unlawful Seizure

Green's first Fourth Amendment claim is that Sergeant Kim lacked reasonable suspicion to make the investigatory stop, thereby making it an unlawful seizure in violation of the Fourth Amendment.  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (detention of automobile is seizure within meaning of Fourth Amendment).  It is well established by the record that an unconfirmed hit on the ALPR does not, alone, form the reasonable suspicion necessary to support an investigatory detention, and Defendants do not contest this.  Instead, the common practice of the SFPD at the time of Green's seizure required verifying the information supplied by the system by (1) visually confirming that the plate number matches that read by the ALPR system and (2) confirming that the plate number is actually wanted according to the database.  In this case, Officer Esparza performed the second step, but none of the officers involved made a visual confirmation, which of course was the error that kicked off this regrettable sequence of events.  The parties dispute whose responsibility it is to perform these two steps: Defendants state that it is the responsibility of the officer in the camera car, while Green argues that it is reasonable to expect the officer actually making the stop to perform these steps.  The parties cite no

SFPD policy that expressly places the responsibility with either officer. The question therefore becomes whether it was reasonable as a matter of law for Sergeant Kim to effect the stop without making an independent visual verification of the license plate.

Sergeant Kim may rely on information supplied by Officer Esparza in determining whether reasonable suspicion exists. *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc), *overruled on other grounds*, *United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (finding that "law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers"). Such reliance is only allowed when it is objectively reasonable. *Id.* at 1082. So, for example, if Officer Esparza had visually confirmed the plate erroneously, and Sergeant Kim had relied upon this erroneous information, such reliance would certainly be reasonable under *Motley*. However, this is not that case. Here, Officer Esparza did not visually confirm the plate *nor did he state that he had*. As Green states in her brief, "Kim *assumed* reasonable suspicion based on information *not* supplied by Esparza, without doing any investigation or making any appropriate inquiries." Defendants argue—and the district court agreed—that Sergeant Kim's reliance remained reasonable in this context because "Esparza never expressed any indication" that he had not made the visual confirmation. *Green*, 2011 WL 4434801, at \*5. The district court thus concluded that Sergeant Kim's belief that Officer Esparza had confirmed the plate was a good faith, reasonable mistake and that no rational jury could find that Sergeant Kim lacked reasonable suspicion as a result.

While the district court's conclusion is certainly a plausible one, it does not support a grant of summary

judgment for Defendants because it is based on an inference in their favor. Viewing the facts in the light most favorable to Green, as we must, the absence of any express indication from Officer Esparza that he had verified the plate necessarily precludes summary judgment for Defendants. At the time of this incident, there was no SFPD policy placing the ultimate or sole responsibility of verifying the accuracy of the ALPR reading on the camera car operator. Absent such a policy, it is disputable whether an officer conducting a stop could reasonably rely on a *lack* of qualifying information from the camera car operator as a justification for making the stop without making an independent verification. It thus remains a triable issue whether it was reasonable for Sergeant Kim to conclude that Officer Esparza had confirmed the plate in the absence of any affirmative indication that he had done so.

Even if Sergeant Kim's initial assumption was reasonable, the fact that Officer Esparza never verbally expressed that the plate had been visually confirmed also suggests that Sergeant Kim should have made an independent confirmation as "[a]ll officers . . . have an ongoing duty to make appropriate inquiries regarding the facts . . . if insufficient details are relayed." *Motley*, 432 F.3d at 1081. This need for additional investigation is further reinforced by the fact that the plate read by the ALPR belonged to a car with a different make, model, and color than Green's and that Sergeant Kim knew of this discrepancy. While Defendants place no weight on this detail (inferring instead that it automatically indicates additional wrongdoing—using stolen plates to avoid detection for other crimes), the mismatch between the ALPR read and Green's vehicle arguably justifies further investigation, particularly in the context of a system that frequently makes such mistakes. In fact, Sergeant Kim himself acknowledged in deposition that it is standard practice to double check an

ALPR hit where practicable.  Evidence in the record suggests that it would have been possible for Sergeant Kim to make further inquiries: Sergeant Kim had several opportunities to confirm the license plate number with dispatch and even spent time stopped behind Green at a red light, and nothing obscured Green's license plate throughout the incident.  A rational jury could conclude that it was unreasonable for Sergeant Kim to fail to double check the plate number in the absence of express confirmation from Officer Esparza.

As a result, it cannot be established as a matter of law whether or not reasonable suspicion existed to justify the investigatory detention, and Defendants' motion for summary judgment on this ground was improperly granted.   This conclusion is further supported by our precedent that the reasonableness of officer conduct should be decided by a jury where the inquiry turns on disputed issues of material fact. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

### B. *De facto arrest without probable cause*

Even if reasonable suspicion was satisfied, the parties additionally disagree on whether the stop amounted to a valid investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968), or rose to the level of an arrest, as Green contends. There is no bright-line rule to establish whether an investigatory stop has risen to the level of an arrest.  Instead, this difference is ascertained in light of the "'totality of the circumstances.'" *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (quoting *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990)).   This is a highly fact-specific inquiry that considers the intrusiveness of the methods used

in light of whether these methods were "reasonable *given the specific circumstances*." *Id.*

In this case, the methods used were highly intrusive. Green was held at multiple gunpoints, handcuffed, and directed to her knees. In *Washington*, we considered tactics that were markedly similar, and we found that "'handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop.'" *Id.* at 1188 (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)). We also noted that when police draw their guns, it "greatly increases the seriousness of the stop," and that physical restraints are an important factor in measuring the degree of intrusion. *Id.* We went on to conclude that "under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Id.* at 1187; *see also Del Vizo*, 918 F.2d at 825.

The question of whether this incident amounted to an unlawful arrest thus turns on whether it is sufficiently distinguishable from the "ordinary circumstances" to justify such tactics. In making such a determination, we have examined the reasonableness of the conduct in light of certain factors. Again, while there are no bright-line rules, "we have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur." *Washington*, 98 F.3d at

1189; *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176 (9th Cir. 2013) (quoting and applying *Washington* factors). These factors should all be considered in light of the specificity of the information law enforcement has to suggest both that the individuals are the proper suspects and that they are likely to resist arrest or police interrogation. *Washington*, 98 F.3d at 1189–90. The number of police officers present is also highly relevant. *Id.* at 1190. While these considerations are not exhaustive, they all inform the ultimate inquiry of whether the officers' conduct was a "*reasonable* response to legitimate safety concerns on the part of the investigating officers." *Id.* at 1186. As in the unlawful seizure context, because this inquiry is fact specific, it is often left to the determination of a jury.

When reviewing this case through the lens of *Washington*, in the light most favorable to Green, a rational jury could find that this incident exceeded the limits of an investigative detention under *Terry*, and therefore judgment cannot be granted to Defendants as a matter of law. The tactics used were extremely intrusive, yet none of the *Washington* factors justifying such tactics were present: (1) it is uncontested that Green was compliant with law enforcement at all times; (2) the police had no specific information that Green was armed; (3) the stop did not closely follow a violent crime; and (4) the police did not have information that a violent crime was about to occur. All of these factors count against a finding that the officers' conduct was a reasonable response to safety concerns. *See Del Vizo*, 918 F.2d at 825 (finding arrest where police drew and pointed guns, handcuffed suspect, and placed him in police car where defendant was completely cooperative at the scene).

Furthermore, the officers lacked specific information that Green was a proper suspect, and there was no indication that Green posed a threat to the officers necessitating the tactics employed. There were as many as six officers on the scene, in comparison to Green, who was alone and visibly unthreatening. During a portion of the time that the officers pointed their weapons at her, Green was handcuffed and secured; moreover, she weighed 250 pounds and was barely able to rise from her knees without assistance. A jury could certainly find that it was unreasonable for the officers to believe that their safety was at risk to the extent that such intrusive tactics were necessary. *Compare United States v. Thompson*, 906 F.2d 1292, 1297 (9th Cir. 1990) (finding presence of seven squad cars to be a factor in determining that intrusive actions taken by police against two suspects in car constituted an arrest); *Washington*, 98 F.3d at 1190 (finding arrest where two suspects outnumbered by four officers and police dog because "ratio of officers to suspects" weighs against reasonableness of intrusive action); *with United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983) (finding it reasonable for single officer to order two suspects out of car at gunpoint shortly after robbery); *United States v. Serna-Barreto*, 842 F.2d 965, 968 (7th Cir. 1988) (finding conduct "prudent" where single officer outnumbered by suspects).

Defendants argue that the existence of a stolen vehicle, in and of itself, is enough to satisfy the degree of force used; however, this is a conclusion over which reasonable jurors could disagree. In *Washington*, the unlawful arrest in question was based on a description of suspects for nineteen armed robberies. 98 F.3d at 1183. We found that the use of force was not justified given the totality of the circumstances in part because the suspects were cooperative and there was

no reason to believe they were dangerous, despite the fact that the plaintiffs were suspected of a violent crime that involved weapons. *Id.* at 1190. We reached a similar conclusion in *Del Vizo* where we found that there was no indication that the suspect was dangerous despite the fact that he was suspected of drug dealing, another inherently dangerous crime, where the suspect was compliant and cooperative at all times. *See* 918 F.2d at 825 (citing *United States v. McConney*, 728 F.2d 1195, 1206 (9th Cir.) (en banc), *cert. denied* 469 U.S. 824 (recognizing that the drug trade is often dangerous and involves weapons)). The fact that Green was stopped on suspicion of a stolen vehicle does not by itself demonstrate that she presented a danger to the officers. Furthermore, numerous factors—that law enforcement lacked any specific information that she was armed, that Green was compliant with instructions at all times, that there was no evidence of recent violence, and that the police significantly outnumbered Green so as to diminish the risk she posed—count against such a finding. When viewing the facts in the light most favorable to Green, a rational jury could find that the tactics were not reasonable given the totality of the circumstances and that Green was subject to an arrest.

If the stop amounted to an arrest, it would be unlawful absent probable cause. At the district court level, Defendants did not argue that there was probable cause to arrest Green (and Sergeant Kim himself stated in deposition that he did not believe there was probable cause); on appeal, Defendants argue that probable cause can be established. As it remains a triable question whether law enforcement even had *reasonable suspicion* to justify the detention, the existence of probable cause necessarily also remains a triable question. Green's unlawful arrest claim cannot be dismissed as a matter of law and must be decided by a jury.

### C. *Excessive Force*

Green's final Fourth Amendment claim asserts that the officers used excessive force in effecting the investigatory stop. Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1205–06 (9th Cir. 2000), *cert. granted, judgment vacated on other grounds*, 534 U.S. 801 (2001); *see also Torres*, 648 F.3d at 1125 (summary judgment "in excessive force cases should be granted sparingly"); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (finding that excessive force is "ordinarily a question of fact for the jury"); *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.").

In addressing a claim of excessive force, we balance the "nature and quality of the intrusion" against the "countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. There is no question that the degree of intrusion here was severe. Green states that she was ordered out of her vehicle by as many as six officers, many of whom pointed handguns and a shotgun directly at her. She was forced to her knees and handcuffed, which she had difficulty doing due to her knee problems, and officers continued to train weapons upon her while she was handcuffed on the

ground. She estimates that she was in handcuffs for as many as ten minutes and states in deposition that the experience has caused her lasting psychological impact.

The question therefore becomes whether this degree of intrusion was justified by the governmental interests at stake. To assess the gravity of the government interests, we have typically considered "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Chew*, 27 F.3d at 1440. Where these interests do not support a need for force, "*any* force used is constitutionally unreasonable." *Lolli v. County of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) (internal quotation marks omitted).

The district court stated without further inquiry that "[a]s these tactics were employed in conducting a lawful investigatory stop for suspicion of driving with stolen plates, no reasonable jury could find that Green was subjected to excessive force." *Green*, 2011 WL 4434801, at *6. This conclusion cannot support summary judgment for Defendants here for several reasons. First, triable questions remain as to whether the investigatory stop itself was lawful. Because it remains a question whether the stop was even justified by reasonable suspicion, the existence of a "lawful investigatory stop" cannot support the district court's finding that the force was not excessive as a matter of law. Second, even if reasonable suspicion *was* established, it alone is not enough to justify such intrusive tactics. This court has "consistently applied the principle that drawing weapons and using handcuffs or other restraints is unreasonable in many situations" involving investigatory or *Terry* stops. *Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002); *see*

*also Washington*, 98 F.3d at 1187 ("Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment.").  Instead, the reasonableness of the force used must be considered in light of all circumstances. When applying the factors laid out in *Chew*, the reasonableness of the force here cannot be determined as a matter of law.  While the crime at issue (stolen vehicle or plates) was arguably severe, there was no indication at the scene that Green posed an immediate threat to the safety of the officers or others.  As in the unlawful arrest context, Defendants seem to argue that the crime of vehicular theft is enough in itself to support a finding that Green posed an immediate threat; however, this is plainly an inference in Defendants' favor.  Construing the facts in the light most favorable to Green, a rational jury could find that the ALPR hit, without more, does not support a finding that Green posed a threat.

Furthermore, any inference of immediate threat was diminished once Green was handcuffed and her car was searched, therein eliminating the possibility of accomplices. According to Green, several officers continued to point weapons at her even after she was handcuffed and searched. Green was also considerably outnumbered, which counts against a finding that she posed a threat to the multiple officers at the scene.  Finally, neither party suggests that Green ever actively resisted law enforcement; in fact, the record makes clear that Green was compliant with the directions of law enforcement at all times.  We have found excessive force under similar circumstances.  *See, e.g.*, *Hopkins v. Bonvicino*, 573 F.3d 752, 776 (9th Cir. 2009) (finding excessive force where an officer pointed a weapon

at a cooperative, unarmed suspect and did not holster the weapon until after the suspect was handcuffed, and where the officers outnumbered the suspect); *Robinson*, 278 F.3d at 1014 (finding excessive force where misdemeanor suspect was "apparently unarmed and approaching the officers in a peaceful way[, t]here were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff").

Also relevant to the excessive force inquiry is "'what other tactics if any were available' to effect the[] arrest." *Headwaters Forest Def.*, 240 F.3d at 1204 (quoting *Chew*, 27 F.3d at 1443); *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (explaining that police must consider less intrusive alternatives). Here, there is evidence on the record suggesting that the officers had alternatives available; at the very least, they could have held their weapons at a "low ready" position rather than pointing them directly at Green. As the SFPD's "person most knowledgeable," Sergeant Michael Nevin, testified, SFPD officers are trained that depending on the level of threat they are facing, they should keep their weapons trained at the ground rather than at a person because "the weapon should only cover what you're willing to destroy."[5] Thus, when all of these facts are construed in Green's favor, as must be done at the summary judgment stage, a rational jury could find that the tactics amounted to excessive force.

Sergeant Kim contends that he should not be liable for excessive force here on the basis that officers are generally

---

[5] This deposition was provided in support of Green's motion to reconsider and therefore was not before the district court when it addressed the cross motions for summary judgment.

not liable under the Fourth Amendment for the conduct of other officers, s*ee Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004), and are liable only where they are a "integral participant" in the conduct that caused the constitutional violation. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). Sergeant Kim argues that he cannot be held liable for excessive force because he was not one of the officers who pointed his gun at Green while she was in handcuffs. While an accurate statement of the law, Sergeant Kim's position misconstrues the circumstances underlying Green's excessive force claim. Green's assertion of excessive force is not premised solely on the pointed weapons but also on the fact that she was held at gunpoint while she was otherwise restrained. The only reason Sergeant Kim was not pointing his weapon at Green while she was restrained is that he was the one restraining her. Even if Sergeant Kim was not one of the officers actually holding Green at gunpoint once she was restrained, he was plainly an active participant in this activity and a jury could find that he was an "integral participant" under *Blankenhorn*.

In light of our precedent, it cannot be determined as a matter of law that Green's Fourth Amendment rights were not violated here, and the district court's grant of summary judgment on all three grounds must be reversed. However, while the district court erred in granting summary judgment for Defendants, we nonetheless affirm the district court's denial of partial summary judgment as to Green. As detailed above, triable issues remain on all of Green's claims that preclude judgment as a matter of law in favor of either party. The district court's denial of Green's motion for partial summary judgment is affirmed, and these claims are to be determined by a jury.

### III.    Qualified Immunity

The district court also dismissed Green's suit on the grounds that Sergeant Kim was protected by qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stanton v. Sims*, 571 U.S. __, 134 S. Ct. 3, 4–5 (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al–Kidd*, 563 U.S. __, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). We have found that an officer will be denied qualified immunity in a § 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Torres*, 648 F.3d at 1123. In this case, the district court found that Sergeant Kim was protected by qualified immunity based on the finding that Sergeant Kim did not violate any constitutional right. However, as the preceding analysis makes clear, this remains an open question for the jury, and Sergeant Kim cannot be granted qualified immunity at summary judgment on this basis.

Instead, we proceed to the second step of the qualified immunity inquiry, that is, whether "the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be

unlawful." *Id.* This requires two separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). Both are questions of law to be determined by the court in the absence of genuine issues of material fact. *Id.*

Here, the first element is satisfied as a matter of law. It was established at the time of the incident that individuals may not be subjected to seizure or arrest without reasonable suspicion or probable cause, especially when the stop includes detention and interrogation at gunpoint, and that highly intrusive measures may not be used absent extraordinary circumstances. *Washington*, 98 F.3d at 1192–93. In *Washington*, we denied qualified immunity on a similar set of facts, finding:

> at the time of [the suspects'] detentions the law was clearly established that, when making a *Terry* stop, officers may not use highly intrusive measures such as the ones used here, unless the circumstances reasonably justify such extraordinary procedures in order to ensure the officers' safety. The law was also clearly established that if the *Terry*-stop suspects are cooperative and the officers do not have specific information that they are armed or specific information linking them to a recent or inchoate dangerous crime, the use of such aggressive and highly intrusive tactics is not warranted, at least when, as here, there

> are no other extraordinary circumstances
> involved.

*Id.* at 1192 (internal citation omitted).  Thus, applying *Washington* and construing the facts in the light most favorable to Green, the right against such intrusive measures was established at the time of Green's detention.

We must then determine whether an officer, given the specific facts at issue, "could have reasonably believed at the time that the force actually used was lawful under the circumstances." *Torres*, 648 F.3d at 1127.  This requires us to look at what Sergeant Kim knew at the time and whether it was sufficient to support a reasonable officer's belief that his actions were lawful. *See Washington*, 98 F.3d at 1193. While also generally a question of law to be determined by the court, there are disputed material facts here that prevent us from making such a finding at this juncture. *ActUp!/Portland*, 988 F.2d at 873 (explaining that determinations about the facts and circumstances within an officer's knowledge and about the conduct underlying an alleged violation must be made by a finder of fact).  For example, it is disputed whether Sergeant Kim had reason to believe that Officer Esparza had not visually confirmed the plate, and how much force was actually used in effecting the stop.  These are both material facts that preclude a determination as to qualified immunity at the summary judgment stage.

Moreover, even if material facts did not preclude this determination, Sergeant Kim would not be entitled to qualified immunity based on the facts as currently alleged. As we recently found in *Johnson*,

> [i]t is possible that a jury will conclude, after
> weighing all the facts, that the officers
> committed no constitutional wrongs. But our
> task at this stage in the litigation is not to
> attempt to weigh the facts and resolve the
> issues definitively in favor of one party or
> another. It is instead to construe the facts in
> the manner most favorable to the plaintiffs,
> who have a right to their day in court, and
> then ask if our solicitude of the judgment of
> law enforcement in this case requires us to
> shield the officers from further participation
> in this lawsuit.

724 F.3d at 1180 (refusing to grant qualified immunity at
summary judgment where question of whether officer acted
reasonably could not be determined based on facts before
court, and finding that this question must be resolved by a
jury).  When viewing the facts in the light most favorable to
Green, we cannot make a determination as a matter of law
that Sergeant Kim "could have reasonably believed at the
time that the force actually used was lawful under the
circumstances." *Torres*, 648 F.3d at 1127.  Instead, this
question must go before a jury.

## IV.    Municipal Liability

Green's claims against the City and SFPD are premised
on *Monell* liability, which allows local governments to be
sued under § 1983 for constitutional deprivations effected
pursuant to a governmental custom. *Monell*, 436 U.S. at
690–91.  Green thus seeks to hold the City accountable for
Sergeant Kim's actions, arguing that he acted pursuant to
municipal policy.   The district court granted summary

judgment to Defendants on Green's *Monell* claim on the ground that Green had failed to identify an underlying constitutional violation. Because as we hold supra, a genuine issue of fact remains as to the constitutional violations alleged by Green, the order for summary judgment on the *Monell* claim must be reversed. We therefore remand Green's *Monell* claim for further resolution consistent with this decision.

## V. State Law Claims

Green also brought state law claims under the Bane Act (which provides a state law cause of action similar to § 1983) and for IIED, assault, and negligence. The district court granted Defendants' motion for summary judgment on all of Green's state law claims. It dismissed the Bane Act claims on the basis that it "requires a showing that Green's detention was unlawful, which she has not made." *Green*, 2011 WL 4434801, at *6. As with the *Monell* claim, Green has raised triable issues of fact concerning the lawfulness of her detention; therefore, her Bane Act claims cannot be dismissed on this basis. The district court also dismissed the remaining state law claims on similar grounds: it found that IIED, assault, and negligence could not be established because Defendants' conduct was "pursuant to a lawful investigatory stop." *Id.* at *7. As it remains a question whether the conduct at issue was lawful, the district court's grant of summary judgment on the state law claims is reversed and remanded.

## CONCLUSION

On the record before us factual determinations remain that must be left to a jury. We therefore reverse the district

court's grant of summary judgment for Defendants, affirm the district court's denial of partial summary judgment to Green, and remand to the district court for further proceedings. Each party shall bear its own costs on appeal.

**AFFIRMED in part; REVERSED and REMANDED in part.**